

Sandi Dawn Nieves, Pro Se
_____
NAME

CDCR Number: W87025
_____
PRISON IDENTIFICATION/BOOKING NO.

Central California Women's Facility
_____
ADDRESS OR PLACE OF CONFINEMENT

P.O. Box 1508 Chowchilla, CA 93610
_____
Note:    It is your responsibility to notify the Clerk of Court in writing of any
         change of address. If represented by an attorney, provide his or her
         name, address, telephone and facsimile numbers, and e-mail address.

**FILED**
**CLERK, U.S. DISTRICT COURT**

JAN 22 2024

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Fee Due

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Sandi Dawn Nieves, in pro per
_____
FULL NAME (*Include name under which you were convicted*)

                                            Petitioner,

                v.

Anissa De La Cruz, Warden (A)
_____
NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

                                            Respondent.

CASE NUMBER:

CV24  642 - SB (AJR)
To be supplied by the Clerk of the United States District Court

☐ _____  AMENDED

### PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY
### 28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION  Los Angeles County, CA
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(*List by case number*)
CV ① PA030589-01
CV ② S092410            ④ B321737
    ③ S070902            ⑤ S277296

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.    To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.    In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3.    Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.    Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.    You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6.    You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7.    When you have completed the form, send the original and two copies to the following address:

> Clerk of the United States District Court for the Central District of California
> United States Courthouse
> ATTN: Intake/Docket Section
> 255 East Temple Street, Suite TS-134
> Los Angeles, California 90012

PLEASE COMPLETE THE FOLLOWING (*check appropriate number*):

This petition concerns:
1.  ☑ a conviction and/or sentence.
2.  ☐ prison discipline.
3.  ☐ a parole problem.
4.  ☐ other.

PETITION

1.  Venue

    a.  Place of detention Central California Women's Facility, Chowchilla, CA 93610

    b.  Place of conviction and sentence Los Angeles County, CA, Superior Court

2.  Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).

    a.  Nature of offenses involved (*include all counts*): Four counts of first degree murder, 1 count of attempted murder, 1 count of arson. Special circumstances of committing multiple murders, and that each murder was committed while lying in wait and while engaged in the crime of arson.

    b.  Penal or other code section or sections: Cal. Pen. Code, §§ 187, 664, 451(b), 190.2(a)(3), (15), (17).

    c.  Case number: PA030589-01

    d.  Date of conviction: July 27, 2000

    e.  Date of sentence: August 9, 2000

    f.  Length of sentence on each count: As to the first degree murder: Death (reduced to LWOP on appeal). As to the attempted murder: seven years to life, concurrent. As to the arson count: five years (stayed).

    g.  Plea (*check one*):

        ☑ Not guilty

        ☐ Guilty

        ☐ Nolo contendere

    h.  Kind of trial (*check one*):

        ☑ Jury

        ☐ Judge only

3.  Did you appeal to the California Court of Appeal from the judgment of conviction?    ☐ Yes  ☑ No

    If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):

    a.  Case number: *due to the death penalty, appeal automatically proceeded to the California Supreme Court.

    b.  Grounds raised (*list each*):

        (1) _____

        (2) _____

(3) _____

(4) _____

(5) _____

(6) _____

c.  Date of decision: _____

d.  Result _____

_____


4.  If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?  ☑ Yes    ☐ No

If so, give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a.  Case number: S092410 (automatic appeal due to death sentence) _____

b.  Grounds raised *(list each)*:

(1)  See Addendum 1. _____

(2) _____

(3) _____

(4) _____

(5) _____

(6) _____

c.  Date of decision: May 3, 2021 _____

d.  Result  "We reverse the death sentence and affirm the judgment in all other respects."

_____


5.  If you did not appeal:

a.  State your reasons _____

_____

_____

_____

_____

b.  Did you seek permission to file a late appeal?    ☐ Yes    ☐ No


6.  Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☑ Yes    ☐ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: See Addendum 2 for previous state habeas petitions and claims

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a)   See Addendum 2 for previous state habeas petitions and claims

    (b)   _____

    (c)   _____

    (d)   _____

    (e)   _____

    (f)   _____

(5) Date of decision: See Addendum 2 for previous state habeas petitions and claims

(6) Result   See Addendum 2 for previous state habeas petitions and claims

_____

(7) Was an evidentiary hearing held?   ☐ Yes   ☑ No

b.  (1) Name of court: See Addendum 2 for previous state habeas petitions and claims

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a)   See Addendum 2 for previous state habeas petitions and claims

        (b)   _____

        (c)   _____

        (d)   _____

        (e)   _____

        (f)   _____

    (5) Date of decision: See Addendum 2 for previous state habeas petitions and claims

    (6) Result   See Addendum 2 for previous state habeas petitions and claims

_____

    (7) Was an evidentiary hearing held?   ☐ Yes   ☑ No

c.  (1) Name of court: See Addendum 2 for previous state habeas petitions and claims

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a)   See Addendum 2 for previous state habeas petitions and claims

        (b)   _____

        (c)   _____

        (d)   _____

        (e)   _____

        (f)   _____

(5) Date of decision: See Addendum 2 for previous state habeas petitions and claims

(6) Result    See Addendum 2 for previous state habeas petitions and claims

(7) Was an evidentiary hearing held?        ☐ Yes  ☑ No

7.  Did you file a petition for certiorari in the United States Supreme Court?        ☐ Yes      ☑ No

   If yes, answer the following:

   (1) Docket or case number (if you know): _____

   (2) Result: _____

   (3) Date of result (if you know): _____

   (4) Citation to the case (if you know): _____

8.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the <u>facts</u> supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

   **CAUTION:**    *Exhaustion Requirement:* In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present <u>all</u> of your grounds to the California Supreme Court.

   a.  Ground one: See Memorandum of Points and Authorities for claims for relief

   (1) Supporting FACTS: _____

   (2) Did you raise this claim on direct appeal to the California Court of Appeal?        ☒ Yes    ☐ No
   (3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes    ☐ No
   (4) Did you raise this claim in a habeas petition to the California Supreme Court?       ☒ Yes    ☐ No

   b.  Ground two: See Memorandum of Points and Authorities for claims for relief

   (1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

c.  Ground three: See Memorandum of Points and Authorities for claims for relief

_____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

d.  Ground four: See Memorandum of Points and Authorities for claims for relief

_____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

e.  Ground five: See Memorandum of Points and Authorities for claims for relief

_____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☑Yes    ☐No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☑Yes    ☐No

9.  If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: <u>All claims were presented to the</u> <u>California Supreme Court either on direct appeal, in habeas proceedings, or in a petition for review.</u>

_____

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐Yes    ☑No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.    (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result

_____

(7) Was an evidentiary hearing held?    ☐Yes ☐No

b.    (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?        ☐ Yes ☐ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?        ☐ Yes ☑ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?        ☐ Yes ☑ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on  01/17/2024            Sandi Dawn Nieves
_____            _____
*Date*                             *Signature of Petitioner*

## Addendum 1

**Direct appeal - California Supreme Court, Case No. S092410**

Grounds for relief raised on direct appeal:

- **Ground 1:** The trial judge's misconduct, bias, and prejudice against defendant and her counsel resulted in a fundamentally unfair trial, denial of the right to a meaningful defense, denial of the right to confrontation, denial to the effective assistance of counsel, and resulted in an unreliable sentencing verdict.
- **Ground 2:** The trial court prejudicially failed to conduct or permit adequate voir dire.
- **Ground 3:** The trial court prejudicially refused access to evidence relevant to impeach the testimony of the eyewitness to the fire.
- **Ground 4:** The trial court prejudicially ordered defendant to submit to psychological and neurological examinations by the prosecution.
- **Ground 5:** The trial court prejudicially restricted the scope of defense expert testimony.
- **Ground 6:** The trial court prejudicially excluded evidence of the pet scan at both the guilt and penalty phases which would have provided medical corroboration for opinions of defense experts and a basis for sympathy.
- **Ground 7:** The trial court prejudicially refused to disqualify a prosecution expert who had been poached from the defense.
- **Ground 8:** The trial court improperly glamorized a prosecution expert witness giving him additional credibility on the critical issue of intent.
- **Ground 9:** The prosecution committed misconduct and the trial court prejudicially permitted the prosecution to question a defense expert witness about the veracity of another defense witness.
- **Ground 10:** The prosecution cross-examination of defense expert Gordon Plotkin constituted prejudicial misconduct.
- **Ground 11:** The trial court prejudicially instructed the jury to consider as a basis for guilt discovery violations attributed to the defendant.
- **Ground 12:** The trial court refused to instruct the jury on lesser included offenses.
- **Ground 13:** The findings on the lying-in-wait special circumstance allegations must be reversed.
- **Ground 14:** The findings on the arson-murder special circumstance allegations must be reversed.

- **Ground 15:** The trial court prejudicially permitted victim impact evidence that was unnecessary, excessive, irrelevant, cumulative, and inflammatory.
- **Ground 16:** The trial court prejudicially excluded relevant lay opinion on defendant's state of mind.
- **Ground 17:** The trial court's exclusion of defense expert Dr. Kyle Boone during the penalty phase violated defendant's right to present mitigating evidence.
- **Ground 18:** The trial court excluded additional relevant mitigating evidence during the penalty phase while permitting the prosecution to commit misconduct in its cross-examination.
- **Ground 19:** The trial court prejudicially interfered with, and undermined, the testimony of the only mental health expert to testify for the defendant at the penalty phase.
- **Ground 20:** The prosecution committed misconduct during the penalty phase closing argument requiring reversal of the death sentence.
- **Ground 21:** The trial court's comments and interruption of the defense closing argument precluded the jury from giving full and meaningful consideration to all mitigating evidence warranting a sentence less than death.
- **Ground 22:** The trial court prejudicially invited the jury to consider as a basis for the death sentence discovery violations attributed to the defendant.
- **Ground 23:** The death penalty is disproportionate to Sandi Nieves's individual culpability.
- **Ground 24:** The trial court's cumulative errors require reversal of the convictions and penalty.
- **Ground 25:** California's death penalty statute, as interpreted by this court and applied at appellant's trial, violates the United States Constitution and international law.
- **Ground 26:** The trial court violated the defendant's rights at the restitution hearings.

**Result:** "We reverse the death sentence and affirm the judgment in all other respects."

## Addendum 2

### Previous state court habeas petitions, claims, and result

**State habeas petition - California Supreme Court, Case No. S207902**
(filed January 9, 2013; Order denying and issuing an Order to Show Cause entered on
June 16, 2021)

- **Claim 1:** Defense Counsel Provided Ineffective Assistance Due to His Failure
  Properly to Investigate and Evaluate the Background, Qualifications, and
  Credibility of Defense Expert Witness Dr. Philip G. Ney.
  - **Result:** Summarily denied on the merits.
- **Claim 2:** Defense Counsel Provided Ineffective Assistance in Preparing a Guilt
  Phase Defense That Detrimentally and Unreasonably Relied on Pet Scan
  Evidence Despite Notice of its Potential Inadmissibility.
  - **Result:** Summarily denied on the merits.
- **Claim 3:** Defense Counsel Provided Ineffective Assistance at the Guilt Phase
  of the Trial Due to His Failure Properly to Anticipate Which Experts He
  Would Call to Testify and by His Failure to Know the Contents of Attorney-
  Client Communications and Expert Work-Product Before Disclosing it to the
  Prosecution.
  - **Result:** Summarily denied on the merits.
- **Claim 4:** Defense Counsel Provided Ineffective Assistance by Failing to
  Object During the Guilt Phase When the Prosecutor Committed Misconduct
  by Eliciting an Expert Witness's Opinion on the Veracity of a Defense Witness.
  - **Result:** Summarily denied on the merits.
- **Claim 5:** Defense Counsel Provided Ineffective Assistance by Failing to
  Object During the Guilt Phase When the Prosecutor Told the Jury That Sandi
  Nieves Had Committed the Crimes of Perjury and Fraud.
  - **Result:** Summarily denied on the merits.
- **Claim 6:** Defense Counsel Provided Ineffective Assistance of Counsel by
  Unreasonably Failing Properly to Investigate and Prepare for the Penalty Phase.
  - **Result:** Denied as moot because of the direct appeal decision vacating
    Nieves's death sentence.
- **Claim 7:** The Trial Judge Denied Petitioner a Fair Trial Because He Was
  Actually Biased Due to Compensation for Conduct Alleged to Be Criminal in
  Connection with a Child.
  - **Result:** Summarily denied on the merits.

- **Claim 8:** Post-Trial Evidence Further Demonstrates That the Trial Judge's Misconduct, Bias, and Prejudice Against Petitioner, Her Counsel, and Defense Witnesses Denied Petitioner a Fair Trial, the Right to a Meaningful Defense, Confrontation, Effective Assistance of Counsel and a Reliable Guilt and Penalty Verdict.
  - **Result:** Summarily denied on the merits.
- **Claim 9:** Petitioner Did Not Receive a Fair Trial Due to the Cumulative Prejudicial Effect of the Trial Judge's Misconduct, Bias, and Prejudice and Due to the Ineffective Assistance of Counsel.
  - **Result:** Summarily denied on the merits.
- **Claim 10:** At Least One Juror Followed News Media Coverage During the Trial Which Denied Petitioner Fair and Reliable Verdicts Based on the Evidence Adduced at Trial.
  - **Result:** Order to Show Cause issued.
- **Claim 11:** At Least One Juror Consulted with Her Spiritual Advisor During the Trial Denying Petitioner Fair and Reliable Verdicts Based on the Evidence Adduced at Trial.
  - **Result:** Summarily denied on the merits
- **Claim 12:** At Least One Juror Consulted with a Friend During the Trial Denying Petitioner Fair and Reliable Verdicts Based on the Evidence Adduced at Trial.
  - **Result:** Summarily denied on the merits.
- **Claim 13:** Cumulative Prejudice Due to Juror Misconduct.
  - **Result:** Summarily denied on the merits.
- **Claim 14:** The Prosecution Failed to Disclose Potential Impeachment and Exculpatory Evidence That Undermined the Credibility of a Key Prosecution Expert Witness Dr. James Ribe in Violation of *Brady v. Maryland*.
  - **Result:** Summarily denied on the merits.
- **Claim 15:** Defense Counsel Provided Ineffective Assistance in Failing to Discover Potential Impeachment and Exculpatory Evidence That Undermined the Credibility of Prosecution Expert Witness Dr. James Ribe.
  - **Result:** Summarily denied on the merits
- **Claim 16:** Defense Counsel Provided Ineffective Assistance by Failing to Object When the Prosecutor Committed Misconduct by Eliciting an Expert Witness's Opinion on the Veracity of a Defense Witness.
  - **Result:** Denied as moot because of the direct appeal decision vacating Nieves's death sentence.

- **Claim 17:** Defense Counsel Provided Ineffective Assistance by Failing to Object Properly When the Prosecutor Stated to the Jury During the Guilt Phase That Nieves Had Committed the Crimes of Perjury and Fraud.
  - **Result:** Denied as moot because of the direct appeal decision vacating Nieves's death sentence.
- **Claim 18:** Defense Counsel Provided Ineffective Assistance of Counsel by Failing to Object During the Penalty Phase When the Prosecutor Told the Jury Sandi Nieves Had Committed the Crime of Perjury.
  - **Result:** Denied as moot because of the direct appeal decision vacating Nieves's death sentence.
- **Claim 19:** The Destruction of Evidence Through No Fault of the Petitioner Occurred Due to the Delay in Appointing Appellate and Habeas Counsel for Petitioner, Denying Her Due Process and Equal Protection of the Law.
  - **Result:** Summarily denied on the merits.
- **Claim 20:** Petitioner's Convictions and Death Sentence Must Be Vacated Due to the Inadequate Funds Provided to Conduct a Reasonably Necessary Investigation to Prepare and Develop Post Conviction and Post Sentencing Claims.
  - **Result:** Summarily denied on the merits.
- **Claim 21:** Petitioner's Convictions and Death Sentence must Be Vacated Because the Lack of Subpoena Power Provided by the California Appellate Process Prevented Her from Fully Investigating and Developing Post Conviction and Post Sentencing Claims.
  - **Result:** Summarily denied on the merits
- **Claim 22:** The California Sentencing Scheme Violates the Equal Protection Clause of the Federal Constitution By Denying Procedural Safeguards to Capital Defendants That Are Afforded to Non-Capital Defendants.
  - **Result:** Summarily denied on the merits.
- **Claim 23:** Failure to Apply the Presumption of Life in Penalty Determination Denied Petitioner Due Process of Law.
  - **Result:** Denied as moot because of the direct appeal decision vacating Nieves's death sentence.
- **Claim 24:** The California Statutory Scheme under Which Petitioner Was Sentenced to Death Is Unconstitutional Because it Fails Adequately to Narrow the Class of Persons Eligible for the Death Penalty.
  - **Result:** Denied as moot because of the direct appeal decision vacating Nieves's death sentence.

- **Claim 25:** Petitioner's Right to Effective Assistance of Counsel, Due Process and Equal Protection Have Been Violated by the Disparity in Resources Between Her Counsel and Counsel Employed by Agencies Representing Capital Defendants in Post-Conviction Proceedings and by the Differences in Procedures on Habeas Corpus for Capital and Non-Capital Defendants.
  - **Result:** Summarily denied on the merits.
- **Claim 26:** The Penalty of Death Is Arbitrary and Capricious Because Imposition Is Dependent on the County in Which the Defendant Is Charged.
  - **Result:** Denied as moot because of the direct appeal decision vacating Nieves's death sentence.
- **Claim 27:** The Delay in Appointing Appellate and Habeas Counsel for Petitioner, Petitioner's Prolonged Confinement under Sentence of Death, and the Execution of Petitioner Following Such Delay and Confinement Constitutes Cruel and Unusual Punishment.
  - **Result:** Denied as moot because of the direct appeal decision vacating Nieves's death sentence.
- **Claim 28:** Petitioner's Convictions and Death Sentence Must Be Vacated Because of the Cumulative Effect of All the Errors and Constitutional Violations Shown in this Petition and on the Automatic Appeal.
  - **Result:** No apparent ruling.

**Proceedings on remand regarding Claim 10 -**
**Los Angeles Superior Court, Case No. PA030589-01**
(order denying writ of habeas corpus entered on April 11, 2022 and April 13, 2022)

> **Result:** Habeas relief denied.

**State habeas petition - California Court of Appeal, Case No. B321737**
(Petition for writ of habeas corpus filed July 21, 2022;
order denying entered on November 4, 2022)

> **Claims:**

- The Juror's Exposure to Media Coverage of the Trial Resulted in Prejudicial Misconduct
- The Juror's Failure to Inform the Court that He Had Been Exposed to Media Coverage Was Prejudicial

- Petitioner Was Denied the Fair Trial Required by the United States Constitution

**Result:**   "The court has read and considered the petition for a writ of habeas corpus filed on July 21, 2022. The petition is denied."

## Petition For Review - California Supreme Court, Case No. S277296
(filed November 14, 2022; order denying review entered on February 1, 2023)

Claims/arguments:

- The Juror's Review of Media Accounts During Trial is Misconduct as a Matter of Law
- The Juror Intentionally Reviewed News Media Coverage Throughout the Trial
- Respondent's Failure to Submit Additional Evidence Rebutting the Presumption of Prejudice Required the Superior Court to Grant Relief
- Cases Cited in the Superior Court by the Respondent Do Not Foreclose Relief
- The Strength of the Evidence at Trial is Irrelevant Because the Defendant Was Entitled to 12 Unbiased Jurors
- The Juror's Failure to Inform the Court that He Had Been Exposed to Media Coverage Was Prejudicial
- Petitioner Was Denied the Fair Trial Required by the United States Constitution

**Result:** "Petition for review denied"

Sandi Dawn Nieves, *Pro Se*

Central California Women's Facility

CDCR Number: W87025

P.O. Box 1508

Chowchilla, CA 93610

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| Sandi Dawn Nieves,<br><br>       Petitioner<br><br><br>      v.<br><br><br>Anissa De La Cruz, Warden<br><br>      Respondent. | No. 12-CR-792-GW<br><br>**Memorandum of Points and Authorities In Support of Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254.** |

Petitioner Sandi Dawn Nieves submits this Memorandum of Points and Authorities in Support of her Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. Nieves was initially sentenced to death, but the California Supreme Court vacated that death verdict on direct appeal. She now is sentenced to life without the possibility of parole. She was represented in her state appeal and state habeas proceedings by a court-appointed lawyer but now is proceeding *pro se* in this Court. With minimal assistance from the Federal Public Defender,

who largely only helped her compile her claims into a single document, Nieves petitions this Court for habeas relief. She anticipates filing a motion for appointment of counsel and leave to file an amended petition should the Court appoint her counsel.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

PROCEDURAL HISTORY ................................................................ 3

SUMMARY OF TRIAL ..................................................................... 9

GENERAL ALLEGATIONS TO EACH CLAIM ............................... 33

CLAIMS FROM NIEVES'S DIRECT APPEAL ................................ 36

GROUND 1: THE TRIAL JUDGE'S MISCONDUCT, BIAS, AND
PREJUDICE AGAINST DEFENDANT AND HER COUNSEL
RESULTED IN A FUNDAMENTALLY UNFAIR TRIAL, DENIAL OF
THE RIGHT TO A MEANINGFUL DEFENSE, DENIAL OF THE
RIGHT TO CONFRONTATION, DENIAL TO THE EFFECTIVE
ASSISTANCE OF COUNSEL, AND RESULTED IN AN UNRELIABLE
SENTENCING VERDICT ................................................................ 36

GROUND 2: THE TRIAL COURT PREJUDICIALLY FAILED TO
CONDUCT OR PERMIT ADEQUATE VOIR DIRE ................................ 179

GROUND 3: THE TRIAL COURT PREJUDICIALLY REFUSED  ACCESS
TO EVIDENCE RELEVANT TO IMPEACH THE TESTIMONY OF THE
EYEWITNESS TO THE FIRE ............................................................ 242

GROUND 4: THE TRIAL COURT PREJUDICIALLY ORDERED
DEFENDANT TO SUBMIT TO PSYCHOLOGICAL AND
NEUROLOGICAL EXAMINATIONS
BY THE PROSECUTION ................................................................ 264

GROUND 5: THE TRIAL COURT PREJUDICIALLY RESTRICTED THE
SCOPE OF DEFENSE EXPERT TESTIMONY ................................ 290

GROUND 6: THE TRIAL COURT PREJUDICIALLY EXCLUDED
EVIDENCE OF THE PET SCAN AT BOTH THE GUILT AND
PENALTY PHASES WHICH WOULD HAVE PROVIDED MEDICAL
CORROBORATION FOR OPINIONS OF DEFENSE EXPERTS AND A
BASIS FOR SYMPATHY ................................................................ 316

GROUND 7: THE TRIAL COURT PREJUDICIALLY REFUSED TO
DISQUALIFY A PROSECUTION EXPERT WHO HAD BEEN
POACHED FROM THE DEFENSE ................................................ 344

# TABLE OF CONTENTS

GROUND 8: THE TRIAL COURT IMPROPERLY GLAMORIZED A
PROSECUTION EXPERT WITNESS GIVING HIM ADDITIONAL
CREDIBILITY ON THE CRITICAL ISSUE OF INTENT ......................... 389

GROUND 9: THE PROSECUTION COMMITTED MISCONDUCT AND
THE TRIAL COURT PREJUDICIALLY PERMITTED THE
PROSECUTION TO QUESTION A DEFENSE EXPERT WITNESS
ABOUT THE VERACITY OF ANOTHER DEFENSE WITNESS ........ 399

GROUND 10: THE PROSECUTION CROSS-EXAMINATION OF
DEFENSE EXPERT GORDON PLOTKIN CONSTITUTED
PREJUDICIAL MISCONDUCT ........................................................... 409

GROUND 11: THE TRIAL COURT PREJUDICIALLY INSTRUCTED
THE JURY TO CONSIDER AS A BASIS FOR GUILT DISCOVERY
VIOLATIONS ATTRIBUTED TO THE DEFENDANT ............................ 418

GROUND 12: THE TRIAL COURT REFUSED TO INSTRUCT THE
JURY ON LESSER INCLUDED OFFENSES ................................................ 486

GROUND 13: THE FINDINGS ON THE LYING-IN-WAIT SPECIAL
CIRCUMSTANCE ALLEGATIONS MUST BE REVERSED ...................... 515

GROUND 14: THE FINDINGS ON THE ARSON-MURDER SPECIAL
CIRCUMSTANCE ALLEGATIONS MUST BE REVERSED ...................... 529

GROUND 15: THE TRIAL COURT'S CUMULATIVE ERRORS REQUIRE
REVERSAL OF THE CONVICTIONS ............................................... 563

GROUND 16: THE TRIAL COURT VIOLATED THE DEFENDANT'S
RIGHTS AT THE RESTITUTION HEARINGS ............................................. 565

CLAIMS FROM NIEVES'S STATE HABEAS PROCEEDINGS ................. 577

GROUND 17: DEFENSE COUNSEL PROVIDED INEFFECTIVE
ASSISTANCE DUE TO HIS FAILURE PROPERLY TO INVESTIGATE
AND EVALUATE THE BACKGROUND, QUALIFICATIONS, AND
CREDIBILITY OF DEFENSE EXPERT WITNESS DR. PHILIP G. NEY 577

GROUND 18: DEFENSE COUNSEL PROVIDED INEFFECTIVE
ASSISTANCE IN PREPARING A GUILT PHASE DEFENSE THAT
DETRIMENTALLY AND UNREASONABLY RELIED ON PET SCAN
EVIDENCE DESPITE NOTICE OF ITS POTENTIAL
INADMISSIBILITY .......................................................................... 600

# TABLE OF CONTENTS

GROUND 19: DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE OF THE TRIAL DUE TO HIS FAILURE PROPERLY TO ANTICIPATE WHICH EXPERTS HE WOULD CALL TO TESTIFY AND BY HIS FAILURE TO KNOW THE CONTENTS OF ATTORNEY-CLIENT COMMUNICATIONS AND EXPERT WORK-PRODUCT BEFORE DISCLOSING IT TO THE PROSECUTION ........... 631

GROUND 20: DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT DURING THE GUILT PHASE WHEN THE PROSECUTOR COMMITTED MISCONDUCT BY ELICITING AN EXPERT WITNESS'S OPINION ON THE VERACITY OF A DEFENSE WITNESS ................................................................. 653

GROUND 21: DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT DURING THE GUILT PHASE WHEN THE PROSECUTOR TOLD THE JURY THAT SANDI NIEVES HAD COMMITTED THE CRIMES OF PERJURY AND FRAUD .............. 662

GROUND 22: THE TRIAL JUDGE DENIED PETITIONER A FAIR TRIAL BECAUSE HE WAS ACTUALLY BIASED DUE TO COMPENSATION FOR CONDUCT ALLEGED TO BE CRIMINAL IN CONNECTION WITH A CHILD ........................................................... 669

GROUND 23: POST-TRIAL EVIDENCE FURTHER DEMONSTRATES THAT THE TRIAL JUDGE'S MISCONDUCT, BIAS, AND PREJUDICE AGAINST PETITIONER, HER COUNSEL, AND DEFENSE WITNESSES DENIED PETITIONER A FAIR TRIAL, THE RIGHT TO A MEANINGFUL DEFENSE, CONFRONTATION, EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE GUILT AND PENALTY VERDICT ........................................................................................ 688

GROUND 24: PETITIONER DID NOT RECEIVE A FAIR TRIAL DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE TRIAL JUDGE'S MISCONDUCT, BIAS, AND PREJUDICE AND DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL ................................. 691

GROUND 25: AT LEAST ONE JUROR FOLLOWED NEWS MEDIA COVERAGE DURING THE TRIAL WHICH DENIED PETITIONER FAIR AND RELIABLE VERDICTS BASED ON THE EVIDENCE ADDUCED AT TRIAL ............................................................................ 696

iii

## TABLE OF CONTENTS

GROUND 26: AT LEAST ONE JUROR CONSULTED WITH HER
SPIRITUAL ADVISOR DURING THE TRIAL DENYING PETITIONER
FAIR AND RELIABLE VERDICTS BASED ON THE EVIDENCE
ADDUCED AT TRIAL..................................................................715

GROUND 27: AT LEAST ONE JUROR CONSULTED WITH A FRIEND
DURING THE TRIAL DENYING PETITIONER FAIR AND RELIABLE
VERDICTS BASED ON THE EVIDENCE ADDUCED AT TRIAL..........718

GROUND 28: CUMULATIVE PREJUDICE DUE TO JUROR
MISCONDUCT............................................................................721

GROUND 29: THE PROSECUTION FAILED TO DISCLOSE
POTENTIAL IMPEACHMENT AND EXCULPATORY EVIDENCE
THAT UNDERMINED THE CREDIBILITY OF A KEY PROSECUTION
EXPERT WITNESS DR. JAMES RIBE IN VIOLATION OF BRADY V.
MARYLAND ..............................................................................723

GROUND 30: DEFENSE COUNSEL PROVIDED INEFFECTIVE
ASSISTANCE IN FAILING TO DISCOVER POTENTIAL
IMPEACHMENT AND EXCULPATORY EVIDENCE THAT
UNDERMINED THE CREDIBILITY OF PROSECUTION EXPERT
WITNESS DR. JAMES RIBE...........................................................743

GROUND 31: PETITIONER'S CONVICTIONS AND SENTENCE MUST
BE VACATED DUE TO THE INADEQUATE FUNDS PROVIDED TO
CONDUCT A REASONABLY NECESSARY INVESTIGATION TO
PREPARE AND DEVELOP POST CONVICTION AND POST
SENTENCING CLAIMS..................................................................748

# TABLE OF CONTENTS

GROUND 32: PETITIONER'S CONVICTIONS AND SENTENCE MUST BE VACATED BECAUSE THE LACK OF SUBPOENA POWER PROVIDED BY THE CALIFORNIA APPELLATE PROCESS PREVENTED HER FROM FULLY INVESTIGATING AND DEVELOPING POST CONVICTION AND POST SENTENCING CLAIMS ................................................................................................. 753

GROUND 33: THE CALIFORNIA SENTENCING SCHEME VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FEDERAL CONSTITUTION BY DENYING PROCEDURAL SAFEGUARDS TO CAPITAL DEFENDANTS THAT ARE AFFORDED TO NON-CAPITAL DEFENDANTS ................................................................................................. 756

GROUND 34: PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND EQUAL PROTECTION HAVE BEEN VIOLATED BY THE DISPARITY IN RESOURCES BETWEEN HER COUNSEL AND COUNSEL EMPLOYED BY AGENCIES REPRESENTING CAPITAL DEFENDANTS IN POST -CONVICTION PROCEEDINGS AND BY THE DIFFERENCES IN PROCEDURES ON HABEAS CORPUS FOR CAPITAL AND NON-CAPITAL DEFENDANTS ................................................................. 760

GROUND 35: PETITIONER'S CONVICTIONS AND SENTENCE MUST BE VACATED BECAUSE OF THE CUMULATIVE EFFECT OF ALL THE ERRORS AND CONSTITUTIONAL VIOLATIONS SHOWN IN THIS PETITION AND ON THE AUTOMATIC APPEAL ..................................... 763

CONCLUSION & PRAYER FOR RELIEF ......................................................... 768

ELECTION REGARDING CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE (NO) ........... 769

DECLARATION IN SUPPORT OF REQUEST TO PROCEED IN FORMA PAUPERIS ............................................ 770

REQUEST FOR APPOINTMENT OF COUNSEL ........ 776

v

## INTRODUCTION

Sandi Nieves's capital trial was a mockery of justice, especially for a capital case. The extreme actions of a biased trial judge and an inept and ineffective defense counsel turned Sandi Nieves's trial into a charade that resulted in conviction and a sentence of death.

Judge L. Jeffrey Wiatt did nothing to hide from the jury his profound bias against Sandi Nieves and his intense animosity towards her defense team. He went to great lengths to disparage Nieves, her counsel, and even her lay and expert witnesses in the presence of the jury. He insulted them, threatened them, and turned the jury against them.

In her direct appeal, Nieves sought relief based on Judge Wiatt's bias, misconduct, and prejudice against her that permeated the trial. The California Supreme Court reversed the death sentence based on the cumulative effect of Judge Wiatt's misconduct.

In her state habeas petition, Nieves sought relief based on new information, unknown at the time of trial, that Judge Wiatt treated Nieves with a compensatory bias meant to cover up his own mistreatment and criminal conduct in connection with a child. Revelations that Judge Wiatt was alleged to have committed a criminal act involving a child shed light on his behavior during Nieves's capital trial.

Nieves's defense counsel did no better for her. His overall ineffectiveness colored all aspects of her trial, including, the guilt phase, and most devastatingly, the penalty phase. Representing Nieves without co-counsel, he performed a cursory investigation. He had no effective strategy for the penalty phase of the

1

trial and failed to present an effective case for mitigation of the penalty, despite petitioner's dysfunctional, chaotic, and traumatic background. He turned damaging evidence over to the prosecution. He detrimentally and unreasonably relied on evidence despite notice of its inadmissibility. He made incoherent and bizarre opening and closing statements, antagonized the trial judge and the jurors, and failed to meet the most basic objective standards for representation of a capital defendant prevalent at the time of trial.

Information brought out after the trial revealed that two jurors had consulted with non-jurors during deliberations, one a jury consultant and the other a spiritual advisor, and that at least one juror read media accounts of the case throughout the trial. As for this latter claim of juror misconduct (alleged herein as Ground 10), the California Supreme Court issued an order to show cause and sent the case back to the Superior Court for further proceedings. Ultimately, however, Nieves lost on that claim in state court.

In addition to other claims set forth in this petition, the prosecution failed to produce material evidence to the defense in violation of *Brady v. Maryland* (1963) 373 U.S. 83.

Nieves is presently without counsel. Although she has received minor assistance from the Federal Public Defender to assemble this petition in order to meet AEDPA's statutory deadline, she will request the appointment of counsel and leave to file an amended petition.[1]

---

[1] Under difficult time constraints, the Federal Public Defender endeavored to streamline this case by removing all penalty-phase claims from Nieves' state-court briefs and pleadings, as they were mooted by the California Supreme Court's reversal of Nieves's death sentence. However, neither Nieves nor the Federal Public Defender are able to attest that they have removed all of those claims. Also, given that the Federal Public Defender does not currently

## PROCEDURAL HISTORY

Petitioner was sentenced to death by the Los Angeles County Superior Court following her conviction of four counts of murder with special circumstances, attempted murder and arson.

### A. Trial

Petitioner Sandi Dawn Nieves was charged in the Los Angeles County Municipal Court, Case No. PA 030589. The complaint was filed on July 6, 1998. It charged that she had committed four counts of first degree murder in violation of Penal Code § 187, with special circumstances (multiple murder, lying in wait and felony murder) in connection with the deaths of Nikolet Amber Nieves, Kristl Dawn Folden, Jaqlene Marie Folden and Rashel Hollie Nieves on or about July 1, 1998 (counts I-V). The complaint further charged that petitioner had committed one count of attempted murder of David Fernando Nieves in violation of Penal Code § 664/187(a) on or about July 1, 1998 (count V). It further charged that petitioner had committed one count of arson causing great bodily injury on or about July 1, 1998, in violation of Penal Code § 451(a) (count VI). 9 RCT 1999-2005.[2]

---

represent Nieves, and given the aforementioned time constraints, the Federal Public Defender did not make any major substantive changes to Nieves's state-court briefs and claims. Rather, the Federal Public Defender assembled the briefs and pleadings in a manner to ensure the claims were timely filed under 28 U.S.C. § 2244(d)(1). As noted above, Nieves will request counsel and leave to file an amended petition.

[2] Throughout this petition, references to the clerk's record in the automatic appeal are referred to by volume number "RCT" and page. References to the reporter's transcript of the trial are referred to by volume followed by a page number. Other reporter's transcripts are referenced by a date followed by the page number.

After she was held over for trial following a preliminary examination, an information was filed on June 16, 1999. It charged petitioner with four counts of first degree murder in violation of Penal Code § 187 in connection with the deaths of Nikolet Amber Nieves, Kristl Dawn Folden, Jaqlene Marie Folden and Rashel Hollie Nieves (counts I-IV) and alleged special circumstances of multiple murder (Penal Code § 190.2(a)(3)), murder committed while engaged in the commission of the crime of arson (Penal Code § 190.2(a)(17)), and murder committed while lying in wait (Penal Code § 190.2(a)(15)). The information further alleged one count of attempted murder in violation of Penal Code § 664/187(a) related to David Fernando Nieves (count V), and one count of arson causing great bodily injury in violation of Penal Code 451(a) (count VI). 9 RCT 2014-2018.

On June 16, 1999, petitioner was arraigned in Los Angeles County Superior Court before the Hon. L. Jeffrey Wiatt. She entered a plea of not guilty as to each count and denied the special circumstances alleged in the information. 1 RT 3, 9 RCT 2019 (6/16/99 Minute Order).

On September 7, 1999, the People filed a notice pursuant to Penal Code § 190.3. It stated that the People intended to introduce victim impact evidence and the facts of the crime as evidence of aggravation. 10 RCT 2109.

On May 30, 2000, during the trial, an amended information was filed. It alleged four counts of first degree murder in violation of Penal Code § 187 in connection with the deaths of Nikolet Amber Nieves, Kristl Dawn Folden, Jaqlene Marie Folden and Rashel Hollie Nieves (counts I-IV), with special

4

circumstances of multiple murder (Penal Code § 190.2(a)(3)), murder committed while engaged in the commission of the crime of arson (Penal Code § 190.2(a)(17)), and murder committed by means of lying in wait (Penal Code § 190.2(a)(15)). It further alleged one count of attempted murder in violation of Penal Code § 664/187(a) related to David Fernando Nieves (count V), and one count of arson of an inhabited structure or property in violation of Penal Code § 451(b) (count VI). 18 RCT 4487-4492; 28 RT 3608:7-3609:22. Petitioner entered a plea of not guilty to the amended count VI on May 30, 2000. 28 RT 3609.

The amended information was again amended on July 18, 2000. In counts I-IV, the lying in wait special circumstances allegation was modified to allege murder committed "while lying in wait" rather than "by means of lying in wait." 18 RCT 4488, 4489 and 4490. As further amended, the superseding amended information set out the charges considered at the guilt phase of Sandi Dawn Nieves's trial.

Trial on the six counts alleged in the information started on April 24, 2000. 12 RCT 2928, 11 RT 633.

After closing arguments and instructions from the court, the jury started guilt phase deliberations on July 26, 2000. 20 RCT 5131. On July 27, 2000, the jury indicated it had reached a verdict. 20 RCT 5159. The jury found petitioner guilty as to all counts. The jury found all of the alleged special circumstances to be true. 20 RCT 5160-5162, 58 RT 9026-9032.

The penalty phase started on August 1, 2000. 21 RCT 5269; 60 RT 9266. The People offered victim impact evidence and the facts of the crime as

5

aggravating circumstances, pursuant to Penal Code § 190.3(a). Petitioner offered the testimony of some friends and of her aunt, a Los Angeles jail chaplain, and a bishop of her church, in mitigation along with the testimony of a psychologist who had prepared a court ordered child custody report in connection with her divorce.

After closing arguments and instructions from the court, the jury started penalty phase deliberations on August 8, 2000. 21 RCT 5383. On August 9, 2000, the jury returned its verdict. 21 RCT 5422. It recommended death. Id., 65 RT 10217.

Petitioner moved for a new trial. 22 RCT 5535. On October 6, 2000, the court denied the motion. 22 RCT 5630, 66 RT 10348, 10365-10366.

Pursuant to Penal Code § 190.4(e), the superior court considered petitioner's automatic application to modify the death verdict. 22 RCT 5630. The court denied the application to modify. Id., 66 RT 10366.

The court then sentenced Sandi Dawn Nieves to death. 22 RCT 5616-5619, 66 RT 10391-10392. The court further sentenced her to seven years to life on count V (attempted murder) to run concurrent with the sentence imposed in counts I-V. 22 RCT 5638, 66 RT 10392-10393. The court further sentenced petitioner to five years to run concurrent with the sentences imposed for counts I-V, but stayed the sentence on count VI pursuant to Penal Code § 654. 22 RCT 5638, 66 RT 10393-10394.

On October 10, 2000, the court imposed a restitution fine pursuant to Penal Code § 1204(b) in the amount of $10,000.00. 22 RCT 5641, 66 RT 10408.

6

On December 1, 2000, the court ordered petitioner to pay restitution to the State pursuant to Penal Code § 1204(f) in the amount of $1,890.00 for David Nieves, $450.00 for Jaqueline Nieves, $900.00 for Fernando Nieves, $2,914.58 for Kristl Folden, $2,922.58 for Nikolet Folden, $2,922.58 for Rashel Folden, $3,580.25 for Jaqlene Folden, plus additional amounts to be determined. Supp RCT 1 at 2, 67 RT 10422-10423.

### B. Automatic appeal

Nieves appealed her convictions and death sentence. *See People v. Nieves*, California Supreme Court Case No. S092410. She filed her appellant's opening brief on December 22, 2008. The State filed its Respondent's Brief on February 28, 2011. She filed her reply brief on July 13, 2012. After the parties submitted supplemental briefs, the Court held oral argument. Ultimately, the Court reversed the death sentence and affirmed the judgment in all other respects. *See People v. Nieves*, 11 Cal. 5th 404 (2021).

She did not petition the United States Supreme Court for a writ of certiorari.

### C. State habeas proceedings

While her automatic appeal was pending, Nieves petitioned the California Supreme Court for habeas relief. *See Nieves (Sandi Dawn) on H.C.*, California Supreme Court Case No. S207902. She filed her petition on January 9, 2013. The State filed its informal response on August 7, 2013, and Nieves filed her informal reply on February 28, 2014.

On June 16, 2021, the California Supreme Court ordered the Secretary of the Department of Corrections and Rehabilitation to show cause in the Superior Court of California, County of Los Angeles, "why the relief prayed for should not be granted on the grounds that, as alleged in Claim 10, a juror committed prejudicial misconduct by: (1) viewing media coverage about petitioner's trial; and (2) not disclosing to the trial court any viewing of media coverage about petitioner's trial." (Order, June 16, 2021.) The Court denied several of Nieves's claims "on the merits" and other claims were "denied as moot" in light of the Court's opinion in Nieves's automatic appeal. The California Supreme Court did not impose any procedural bars on any of the claims.

Back in Los Angeles County Superior Court, after further proceedings, the Superior Court denied habeas relief on Claim 10 on or around April 13, 2022. *See People v. Nieves,* PA030589.

Following this denial, Nieves filed a petition for writ of habeas corpus in the California Court of Appeal on July 21, 2022. *See In re Sandi Dawn Nieves on Habeas Corpus.*, California Court of Appeal Case No. B321737. The court denied the petition on November 4, 2022, ruling, in its entirety, that "[t]he court has read and considered the petition for a writ of habeas corpus filed on July 21, 2022. The petition is denied." *Id.*

Finally, on November 14, 2022, Nieves filed a petition for review of the denial of her habeas petition to the California Supreme Court. *See Nieves (Sandi Dawn) on H.C.*, California Supreme Court Case No. S277296. The court, after

requesting an answer from Respondent, denied review without explanation on February 1, 2023. *Id.* The court imposed no procedural bars.

## **SUMMARY OF TRIAL**

Petitioner refers to and incorporates the trial record in appeal No. S092410, and summarizes the pertinent facts as follows.

### A. Guilt phase

During the evening of June 30 or early morning of July 1, 1998 a fire occurred at the home of Sandi Dawn Nieves[3] and her five children in Santa Clarita. Four children, girls aged five to twelve, died due to smoke inhalation. The fifth child, David Nieves, age fourteen, survived. Sandi was convicted and sentenced to death for setting the fire and the resulting deaths. Sandi Nieves married Fernando Nieves when she was 19 years old. He was the father of three of the children, David, Nikolet, and Rashel. After a divorce from Fernando, Sandi married her stepfather, David E. Folden. Folden was the father of Kristl and Jaqlene. He also adopted the three older children. After they divorced his child support payments for all five children became Sandi's only source of income.

---

[3] Throughout this petition we frequently refer to petitioner as "Sandi" or "Sandi Nieves." We do not intend to be informal or to diminish the seriousness of the claims. We have done so because petitioner changed her surname many times during the course of her life. The one constant was her first name, which we use to avoid confusion. Further, there are several persons, including petitioner's son and ex-husband named Nieves. Using the surname alone would also be confusing.

9

After a divorce from David Folden, Sandi befriended Scott Volk, a man who was eight or nine years younger than her. She became pregnant by him. This would have been her sixth child. When he learned of the pregnancy, he broke up with her.

Following the loss of Scott Volk, Sandi had an abortion. The abortion occurred several days before the fire. During this period she was served with legal papers by David E. Folden who sought to annul his adoption of the three older children and terminate them. A court hearing was set for July 2, 1998.

At trial the prosecution argued that Sandi intended revenge against the men in her life by killing her children. It also argued that Sandi, intent on committing suicide, also set the fire for the sake of the children, believing they would be better off in heaven with her than living with either of their fathers. The defense contended that Sandi's life collapsed around her and that she had been in a dissociative state when the fire occurred. The defense contended that Sandi did not act with the mens rea required for conviction.

### The Prosecution Case

On July 1, 1998, at 1:09 p.m., Catherine Casterino, a law enforcement technician, took a 911 call from a person who identified herself as "Sandi" – 27445 Cherry Creek Drive. 16 RT 1475-77; Trial Exhibits [hereafter "Tr. Exhs."] 1-A and 1-B. The caller said there had been a fire "last night." When asked how the fire started, the caller said, "I have no clue." Tr. Exh. 1-B, at 2:2-3. The caller said she had children who were in the kitchen on the floor, but that she did not know their condition. *Id.* at 3:1-5. Castorino testified that the caller seemed

10

"confused." 16 RT 1486:11-14. After giving paramedics her address in Santa
Clarita and her phone number, the caller said that "everything is black." *Id.* at
4:15; 5:4. The caller explained that she had five kids, that she was thirty-four
years old, and that she could not stand without swaying. *Id.* at 6:6-22.

Castorino told paramedics that she was "not sure what she's got there, sounds
like she might be a 5150." *Id.* at 5:23-24.

Bruce Alpern, a firefighter paramedic testified that he arrived at the home
at 1:20 p.m. He saw a van backed into the driveway touching up against the
garage door of the home facing outward. 16 RT1497:21-1501:5. Sandi Nieves
answered the door. She was covered in soot. He also saw David and then asked
both of them to step out and sit on the grass. Id. at 1501:23-1504:6. In the
kitchen area, Alpern found four girls lying in middle of the kitchen floor. They
were lying on sleeping bags and blankets and had foam around their mouths. He
pronounced them dead. 16 RT 1506:4-1509:7; Tr. Exhs. 3 A-F, 4 A-D.

In one of the bedrooms, Alpern found a gas can with a pour spout
attached. In the stove was a burned dish towel and what looked like a tablecloth.
He smelled gasoline in the hallway. 15 RT 1510:19-1514:12. Alpern talked to
Sandi Nieves outside the house. She asked about her "kids," but showed no
emotion when Alpern told her they were dead. 16 RT 1516:24- 1520:24,
1538:26-27, 1590:14-19, 1601:22-28-1609:1.

Paramedic John Harm corroborated Alpern's observations. He also
testified the stove was still warm and the gasoline can had about an inch and a
half of liquid in it. 16 RT 1632:25-27, 1643:18-20, 1643:20-1646:26. Maryse Ford,

11

a neighbor, testified she smelled smoke at about 3:30 a.m. when she got out of bed to go to the bathroom. 17 RT 1664:1-1665:22. Another neighbor, Benjamin Debene, testified that he never saw Sandi Nieves's children outside, that her shades were always drawn, and that the van was usually parked head first in the driveway. *Id.* at 1674:18-1678:10. He also said he smelled smoke at 7:00 a.m. *Id.* at 1677:10-15. A third neighbor, Gregg Lewison, said Nieves's curtains were usually drawn, that her children did not play with other kids on street, that her van was usually parked head on, and that he, too, smelled smoke. *Id.* at 1699:5-1703:24, 1718:3-21.

James Ribe, M.D., a senior deputy medical examiner, performed an autopsy on Jaqlene Folden. He found she died from inhalation of products of combustion, that is, smoke inhalation. 17 RT1720:11-1724:5. He described a typical death from inhalation as a combination of suffocation, internal lung injury, carbon monoxide intoxication, and irritative effects of being in a fire. He said death usually takes between 30 minutes and several hours. *Id.* at 1724:22-1726:28.

Pulmonary edema fluid is expelled from the lungs after death. Id. at 1731:1-28. He also performed the autopsy of Kristl Folden and assigned the same cause of death. *Id.* at 1733:1-1735:4. He testified that the major cause of death was carbon monoxide, but they both could have died without carbon monoxide. *Id.* at 1741:17- 1742:1. His best estimate of the time of death was "sometime between the time they were last known to be alive and the time when

the bodies were found." *Id.* at 1760:12-14. See id. at1772:8-19 (between four and twenty four hours).

Dr. Ribe supervised Dr. Stephanie Erlich who performed the autopsy on Nikolet Folden and Rashel Folden. 18 RT 1830:10-15. He testified that they, too, died from inhalation of products of combustion. *Id.* at 1830:16-21. Logically, he said, all four girls were comatose before they died. *Id.* at 1847:10-17. There was no evidence of singeing or burning. *Id.* at 1854:11-17.

John Ament, a sergeant with the Sheriff's arson and explosives detail, said he entered the home with a warrant around 6:00 p.m. on July 1. 18 RT 1876:10, 1882:5-25. He saw the bodies in the kitchen. In the hallway he observed a burn area 9½ to 10 feet long. It was irregularly shaped, indicating a flammable liquid had been poured. On the ground he saw a smoke alarm melted. The door to a bedroom was impinged and partially destroyed by fire. Fire had gotten into studs through drywall. Paint had blistered on the bathroom door. *Id.* at 1885:10-18, 1892:18-1894:19. He also observed the smoke alarm did not have a battery. And he saw another unconnected pour area just inside the entryway of the northwest bedroom. It was about one by one and half to two feet, irregularly shaped. The Southwest bedroom had a trailer, that is, a "trail of liquid" that was poured on the carpet that ran from the hallway to the inside of the bedroom. It ran all the way to another pour area of about one by three feet, irregularly shaped. 18 RT 1896:2-1897:15. He stated that the cause of the heavy sooting was gasoline, synthetic carpet, and incomplete combustion. 18 RT 1903:17-1905:3. In his opinion, the fires were "deliberately and intentionally set." *Id.* at 1905:5-6. He

estimated that one to one and a half gallons of gasoline had been used. *Id.* at 1905:20-21. The fire had burned out because it was poorly ventilated. Oxygen was depleted and the fire self-extinguished. *Id.* at 1907:3-7. He stated that the cause and origin of the fire was gasoline in the hallway, northwest bedroom, and southwest bedroom. Gasoline had been poured, ignited by an open flame. He also said there had been a fourth attempt utilizing the oven. All, in his opinion, were deliberate and intentional. *Id.* at 1917:2-21. He ruled out accidental causes. Id. at 1917:22-28. Ament testified that "My opinion is that the person lit this fire with the intent to burn the house down." *Id.* at 1918:1-20.

Ament said the fire probably lasted 15 to 20 minutes. *Id.* at 1935:12-25. Scott Volk testified Sandi Nieves was not fond of ex-husband David Folden, but, because she did not work, she lived off child support payments that Folden sent to her. 19 RT 2092:12-24. See also 24 RT 2997:24-2998:9 (testimony of Fernando Nieves). Scott Volk also supported Sandi while he lived in her house. 23 RT 2767:9-18.

Volk said he met Sandi Nieves over the Internet. He was about eight or nine years younger than her. 19 RT 2111:2-2112:22. At the time they met he was living in Santa Clarita; she was living in Perris, California. They dated on and off until Sandi Nieves moved to Santa Clarita. Then he moved in with her about three months before the fire. *Id.* at 2088:23-2091:28. He broke up with her about a month and a half to two weeks before the fire. *Id.* at 2098:5-12; 2158:18-25. When he said he was leaving Sandi tried to talk him into staying. She told him she was pregnant. *Id.* at 2098:26-2099:10.

14

When they were together in Santa Clarita, Volk learned Sandi was
pregnant with his child. 19 RT 2149:24-2149:28. Volk recalled that he may have
told the police he broke up with her because she was too old and had too many
kids. *Id.* at 2150:8-17. Volk recalled Sandi had told him of a suicide plan: "send
the kids away, write the letter, and let everybody know, and then she was going
to kill herself." 22 RT 2741:28-2742:16, 2744:22-2747:12.

Alethea Volk, Scott's mother, testified she spoke to Sandi Nieves the
morning before the fire and Sandi sounded depressed and upset. 20 RT 2358:8-
2358:21. She received a letter from Sandi Nieves on July 1, postmarked June 29,
1998. It was dated June 28. *Id.* at 2359:4-7, 2360:25-26; Tr. Exh. 27. She tried to
call Sandi on July 1 because the letter indicated she was depressed. *Id.* at 2364:3-
8. Later she received a second letter dated, June 30. *Id.* at 2366:26-2368:2; Exh.
28.

On cross-examination she testified she believed, after she came to know
Sandi Nieves, that Sandi had little self worth or self esteem. *Id.* at 2377:18-22.
She gave Sandi a book on self respect because she believed Sandi needed it. 22
RT 2661:24-2662:25.

Alethea testified Sandi was concerned she would not have enough money
to support another child. 22 RT 2670:9-12. Additionally Sandi said abortion
would go against Mormon teachings and she would feel guilty and have to live
with it for the rest of her life. Sandi discussed getting fat and the burden of an
additional pregnancy. 22 RT 2671:15-2672:1.

According to Alethea, Sandi cried quite a bit in the last few weeks. *Id.* at 2676:28-2677:5. Alethea recounted a hurtful answering machine message Scott Volk had left Sandi, telling Sandi he would ask her to be the "best man at his wedding" to another woman. *Id.* At 2678:23-2679:10. She also described a second letter from Sandi, received after July 4 in which Sandi said she was having a "very hard time knowing I killed my baby." *Id.* at 2689:20-2691:24.

David Nieves testified he was the son of Sandi and Fernando Nieves. 21 RT 2389:21-2390:8. He was fourteen at the time of the fire. *Id.* at 2389:21-2390:8, 2430:9-11. At the time of the fire, he lived with his mother and his four sisters: Nikolet, age 12, Rashel age 11, Kristl age 7, Jaqlene age 5. *Id.* at 2391:2-25, 2430:15-18. David said that on the night of the fire his mother had organized a "slumber party" for the children in the kitchen. She had never done that before. His mother said he "had to." The children ate popcorn and watched two movies. 21 RT 2392:3-2393:15. After the movies they went to sleep. *Id.* at 2394:6-13. At some point after he fell asleep he woke up, and he, his sisters, and mother were coughing. Id. at 2396:21- 2397:8. He asked his mother if they could go outside, but she said that "it" could be coming from outside. *Id.* at 2397:9-16. Nikolet asked to go to the bathroom to throw up, but her mother said to throw up where she was. Sandi Nieves told the children to put their faces in the pillows and covers and stay close to the ground. David then passed out. *Id.* At 2398:19-2399:28, 2558:11-2560:10, 22 RT 2622:17-2623:1. David woke up a second time. He went to the bathroom to urinate and then threw up. *Id.* at 2400:1-23. He noticed that the floor was burned and the wall and door on his sisters' bedroom was burned. A window was cracked and the blinds had fallen down and were

16

leaning on the dresser. *Id.* at 2401:2-26. He noticed that his bedroom and floor were burned. *Id.* at 2402:3-4. David then went to the refrigerator, got some juice, and laid down again. *Id.* at 2402:24-2403:8. David saw his sisters. They were laying still and foam was coming out of their mouths. He thought they had just been drooling. *Id.* at 2406:8-2407:2, 2563, 2565:16-2566:23.

David woke up a third time when it was light out. He saw his sisters with foam. He thought his sisters were sleeping. Next he went to the refrigerator and got a popsicle and juice. His mother was on the telephone. He then sat on the couch with his mother. She was drinking from a pitcher of juice. *Id.* at 2408:28-2410:23. When the paramedics arrived, he saw his mother crying. *Id.* at 2493:5-18, 22 RT 2604:23-26.

David further testified that his mother, his sisters, and he attended church activities. The Mormon Church played a big part in their lives. 24 RT 3064:14-3065:14 (testimony of David E. Folden). They sat in the first row. His mother drove the children around to church functions, soccer events, piano lessons, and to little league. She did it alone. 21 RT 2432:13-2434:3, 2444:27-2445:1. David took piano lessons several nights per week. *Id.* at 2445:6-9, 2449:11-15. Each child had a separate piano schedule. *Id.* at 2483:23-2485:11. His mother also took him to beaches, playgrounds, and parks. His fathers did not participate. *Id.* At 2438:20-2439:3. She home taught the children. 2478:14-28. He trusted her because she was good to him. 22 RT 2645:16-2646:19.

David said his mother's only source of income was child support from David Folden. *Id.* at 2482:10-16.

17

David saw some changes in his mother in the week before the fire. She did not spend much time with them; she got a new tattoo. She allowed him and his sisters to dye their hair. 21 RT 2541:26-2542:16, 22 RT 2621:16-21. His mother went out more during the week. 21 RT 2543:27-2544:2. His mother cooked less in the last few weeks. 22 RT 2619:19-27.

At the time he testified, David believed his mother set the fire. 22 RT 2626:13-17. He admitted he had had help from the police in piecing things together. *Id.* at 2646:21-27.

Fernando Nieves, David's father, testified that he married Sandi in 1983. They separated in 1984 or 1985 and were divorced in 1987. Together they had three children, David, Nikolet, and Rashel. 23 RT 2784:21-2787:15. Fernando admitted he treated Sandi badly. *Id.* at 2849:23-2851:2. He stopped paying child support in 1991. *Id.* at 2859:25-2860:1

Fernando first met David E. Folden when he attended the wedding between Folden and Sandi's mother, Dolores. 23 RT 2784:21-2785:28. Fernando knew Sandi later married Folden. In fact, he allowed Folden to adopt his three children at Sandi's suggestion. *Id.* at 2788:1-9, 2791:20-2792:27. After the marriage, Fernando had little contact with the children until Sandi's marriage to Folden broke up. At that point, in 1996, he had more contact. *Id.* at 2802:11-2805:11. In a letter dated May 22, 1997, Sandi mailed him a will and also requested he seek custody of the children if "something happens to me." Fernando thought this was "weird." *Id.* at 2813:26-2817:17; Exhs. 32, 33.

18

On June 24, 1998 Fernando received a call from Sandi telling him she was having an abortion. 23 RT 2822:20-2823:9. She sounded very down and depressed during the call. *Id.* at 2999:26 - 3002:21. She asked him to watch the children. Fernando picked up the children and returned them to Sandi on June 28. *Id.* at 2823:17-25. When he returned the children Sandi showed him legal papers filed by David Folden to "reverse" the adoption. Sandi was "furious." 23 RT 2823:26-2824:25, 3002:10-19, 3004:21-28, 3005:13-20. She was furious because Folden was trying to get out of paying child support. 24 RT 3006:3-4.

David Folden testified he first met Sandi through her mother. Sandi was 14 at the time. 24 RT 3046:2. Folden treated Sandi as a step daughter. She called him dad. 24 RT 3048:15-3049:1. Folden moved in with Sandi before he was divorced from Sandi's mother. 24 RT 3054:4-18, 3055:15-21. In 1989, he married Sandi. *Id.* at 3057:8-17. They had two children together, Kristl and Jaqlene, in addition to the three children he adopted. *Id.* at 3025:7-3026:19. They were divorced in August, 1997. *Id.* at 3027:18-3028:2. In May 1998 he went to a lawyer to set aside the adoption because Fernando Nieves had parental rights to see his biological children. Folden did not feel it was justified that he was required to support them if he could not see them. *Id.* at 3035:1-14, 3094:25-3095:2. He had been paying $2400 a month child support, which was garnished from his wages. 25 RT 3175:9-3176:15.

### The Defense Case

Dr. Gary Ordog, a toxicologist from Henry Mayo Hospital, testified that he examined Sandi Nieves on July 1. He found evidence of phentermine, a diet

19

drug. He checked for tricyclic antidepressants, but did not check for serotonin depressants, such as Zoloft. 29 RT 3793:7-3794:20. Phentermine can stay in the blood for as long as three to seven days. He did not check for quantity. 29 RT 3794:26-3795:1, 3795:28-3796:10.

Del Winter, a recently retired fire investigator for the City of Los Angeles Fire Department, testified that a small amount of gasoline was used to set the fire. He found oddities such as the fact the fire was set in locations that were not likely to cause any great amount of damage. The gasoline can was put back in its location. To him the fire did not make a lot of sense. Three fires were started on fire resistant carpet. Also flat surfaces cannot start a fire successfully because they do not burn very well. 29 RT 3809:12-3810:7. He had never heard of people leaving over half the gasoline when they use it to start a fire. If a greater amount of gasoline had been used, the gallon would have vaporized and had tremendous explosive combustion. *Id.* at 3812:6-20. He also found it strange that a lighter would have been put in the kitchen, if it had been used. *Id.* at 3816:11-23. However, he did say that in his opinion the fire had been intentionally set, meaning it was not accidental. *Id.* at 3818:23-28, 3830:10-17. Winter did not believe that the items scorched in the fire were intended to start the fire. *Id.* at 3855:21-3856:1.

Winter testified that carbon monoxide would affect judgment, similar to alcohol or a drug. It would cause disorientation or the making of poor choices. It would cause lethargy and would eventually lead to coma and death. 29 RT

3825:25-3826:24, 3857:23-3858:1. Because carbon monoxide rises, the air would
be better at the bottom of a room. *Id.* at 3828:15-3829:4.

Debbie Wood, Sandi's friend, testified that she lived in Perris. She knew Sandi
since 1991. She was also a mother and part of the same Mormon church. 30 RT
3963:15-3964:23. Sandi was very active in the Church; she was always in the
front row. *Id.* at 3965:24-3966:25. Wood described Sandi as a very caring, proud,
active mother. *Id.* at 3967:15-3968:2, 3972:10-3973:3. She said Sandi's moods
would flip flop from day to day. *Id.* at 3980:19-21.

She explained that a woman could be excommunicated from the Church
for having an abortion. 30 RT 3975:11-20. Sandi told her on June 25 that she
had had an abortion. *Id.* at 3980:22-3981:10. She saw Sandi after the abortion.
She was "very sad, very depressed." She regretted having the abortion. *Id.* at
3981:18-3982:10. The following day Wood drove Sandi back to her home in
Santa Clarita. She spent part of the weekend with her. *Id.* at 4016:19-27. At that
time Sandi received annulment papers from David Folden. *Id.* at 3982:12-3983:7,
4015:11-20. Sandi was concerned the children would feel they were rejected by
another father. *Id.* at 3983:8-25. She was also concerned that if she did not get
child support she would not be able to survive, feeding the kids, paying the rent,
being out of a job, the abortion, having bad relationships. Sandi "had a lot to
worry about that was at stake." *Id.* at 3984:4-12. Wood said Sandi had told her of
her "fear of dying and possibly leaving her kids here with the two fathers she
had." 30 RT 4019:24- 4020:2.

21

On June 30 Sandi called Wood all day. She left voicemail and pager messages, briefing her on what she and Scott Volk were feuding about, including Scott's comment about Sandi being best man at his wedding. They spoke briefly. 30 RT 3988:9-3989:16. Late that evening about 10:30 - 11:00 p.m. they spoke for at least an hour. Sandi "was really upset." She was drinking. She was upset about her financial status, her breakup with Scott, the abortion. "It was against her religion, and it was on her conscience that she did something that she did not believe in." She was unemployed. She said she was afraid to tell Alethea Volk about the abortion. *Id.* at 3989:25-3991:20. She mentioned that her children were sleeping on the floor and then said that she would call Wood the next day. *Id.* at 3992:14-3993:18.

Rhonda Hill, another friend of Sandi's, also testified believed abortion was morally wrong; she was confused and very depressed about the whole situation. 30RT at 4046:23-26, 4066:1-18. On June 25, Sandi had made a decision. *Id.* at 4056:1-19, 4074:3-28, 4076:3-15. She left the children with Rhonda before the abortion procedure. Id. at 4047:20-4048:15. After the abortion Sandi was in poor mental condition, depressed, and regretting what took place. She was crying. *Id.* at 4049:14-22, 4057:27-4058:22. On Sunday, June 28, Hill talked to Sandi about the annulment papers. Sandi was concerned and hurt that the children would be disappointed in Folden's decision to end support of them. *Id.* at 4050:9-24.

Albert Lucia, Sandi's stepfather, recalled how Sandi had talked of her concern for her children in the year before the fire. 30 RT 4089:17-4091:9. He last talked to Sandi by telephone on June 30, 1998. She was very concerned

about the children, the annulment of the three oldest, where she would be, and trying to get a job. *Id.* at 4091:19-4092:13. She was very concerned about money. *Id.* at 4096:15-4097:18.

Penny Lucia, Albert's wife, spoke to Sandi on the 30th after Albert. Sandi was upset because did not know how she would be able to tell the kids once again they had "a dad that didn't care for them." She was also concerned about how she would care for and support the children. 30 RT 4105:4-28, 4106:8-11.

Sandi Nieves testified on her own behalf. 35 RT 4782:19. She testified she was ten weeks pregnant on June 24. 35 RT 4785:24-4786:4. Although Scott Volk did not want the baby, she did. "It was against everything inside of me to get an abortion." *Id.* at 4786:5-15. Scott's mother, Alethea Volk, was encouraging her to have the baby. *Id.* at 4786:16-21. Sandi described how she felt after the abortion: she felt like she killed her own baby and would have to live with it the rest of her life. 35 4789:13-25. On June 25 she went to have the abortion. She called Fernando Nieves on the phone for comfort. *Id.* at 4827:9-4828:13. Rhonda Hill took the children. *Id.* at 4790:25-4791:26. Debbie Wood took her home to Santa Clarita after the abortion. *Id.* at 4791:19-26. Sandi got a tattoo on her chest the same night. *Id.* at 4793:4-6; 4832:9-4832:10. Someone also left the annulment papers at her house. She faxed them to Fernando Nieves. To her, the annulment papers felt like an abandonment by another man in her life.

*Id.* at 4793:7-24.

She recalled seeing her children asleep, but next remembered waking up in black smoke. She told the children to lay on their stomachs and breathe through

the blankets. She yelled at the kids to lay on their stomachs. 35RT at 4811:5-4812:21. She had no recollection of starting a fire. *Id.* at 4817:12-14.

On cross-examination, Sandi admitted that she had had thoughts of suicide her whole life. *Id.* at 4900:9-18.

Albert Lucia was recalled as a witness. He attempted to lay a foundation for Sandi's psychological defense by testifying about Sandi's childhood. He said Sandi would hold her breath for about 30 seconds and pass out. This occurred most frequently when Sandi's mother was physical with her. He observed this until Sandi was young. 37 RT 5058:1-5059:11, 5088:4-5089, 5091:13-17, 5095:19-5096:4. He also described an incident when Sandi was two years old. She had a seizure and was then hospitalized for ten days. *Id.* at 5059:12-5061:2, 5079:1-5081:28. Lucia described physical abuse by Sandi's mother occurring on a daily basis. "Her favorite was in the back of the head." *Id.* at 5065:18-25. Sandi's mother also subjected her to verbal abuse. She told her she was ugly and looked like Howdy Doody. *Id.* at 5067:3-19. Sandi's fainting spells as a child occurred more often during verbal or physical abuse from her mother. *Id.* at 5095:19-5096:4.

Lorie Humphrey, Ph.D., a licensed clinical psychologist performed neuropsychological testing to determine whether there were brain abnormalities and their causes. 37RT at 5127:12-26, 5138:4-5140:10, 5140:14-5141:8, 5234:3-5235:24. She testified that Sandi's history was consistent with a seizure disorder, such as epilepsy. *Id.* at 5147:14-23. She offered the opinion that Sandi's history was consistent with a brain malfunction, which would impede her coping skills.

24

*Id.* at 5148:1-11, 5149:2-16. She stated that the test results showed that "something might be going on" and that Sandi had the most difficulty with executive functioning. *Id.* at 5167:24-5170:19, 4175:22-5178:5. She noted particularly that Sandi's test scores dropped regarding problem solving abilities and the ability to do two things at the same time. *Id.* at 5187:4-5188:19. This characteristic would make her vulnerable if stressed out and needing to solve problems. *Id.* at 5188:20-5190:16, 5191:6-10, 5198:4-27.

Dr. Phillip Ney, from Victoria, Canada, a psychiatrist and member of the Royal Society of Physicians had conducted research into the postpartum effect of hormones on women who have abortions, including the effects of abortion on mothers, children, and families. After forty years of clinical practice, he claimed to have had experience in pharmacology, serotonin syndrome, epileptic seizures, and dissociative symptoms. 40 RT 5739:3-5743:14.

The court did allow Ney to testify he was 80% certain Sandi was depressed on the night of the fire. 40 RT 5767:10-5769:23. He also attempted to lay the foundation to show Sandi Nieves was in a dissociative state the night of the fire. (This is a fugue state caused by a seizure triggered by depression, serotonin syndrome, and the loss of placenta. *Id.* at 5773:21-5779:13.) He testified that an organically induced dissociative state can last an hour or two. *Id.* at 5786:25-5787:4, 6282:16-6283:3. A psychologically induced dissociative state can last for several months. *Id.* at 5787:5-11. It is usually associated with overwhelming stress. *Id.* at 5787:25-5788:6. With an organically induced

25

dissociative state, a person cannot recover memory because there is no memory being formed. 43 RT 6282:16-6283:3.

Ney stated that in his opinion Sandi Nieves's symptoms fit a dissociative state, the diagnosis of a major depression, postpartum depression, and serotonin syndrome. *Id.* at 6370:2-16.

The prosecution challenged Ney's qualifications. 42 RT 6096:16-6099:5. The prosecutors also attempted to show that Ney was evasive in answering. *Id.* at 6100:18-6110:21, 6117:12-28. And, the prosecutors used Ney's cross-examination to show that there was no preexisting documentation of mental disorder, a seizure disorder, or a previous dissociative state. 42 RT 6136:4-6142:3, 6147:10-25, 6172:5-11. Although he testified that in his opinion Sandi Nieves was not malingering during his examination of her (*id.* at 6155:22-6174:20), the prosecutors challenged the foundation for many of his conclusions (*id.* at 6174:10-6181:17, 6192:24-6198:28).

### *Prosecution Rebuttal*

In addition to other experts, Dr. Alex Caldwell testified for the prosecution that Sandi's MMPI profile was consistent with someone in a victim life role– a tendency to feel unfairly hurt, martyred. "It comes about often when the person has been beaten or hurt or severely punished as a child." 44RT at 6600:10-22. See *id.* at 6615:26-6616:7.

Dr. Caldwell interpreted the letters Sandi Nieves wrote to Scott and Alethea Volk, Tr. Exhs. 20-B, 28, 36, as "all suicidal goodbye notes to my mind." *Id.* at 6612:22-6615:10.

26

Dr. Robert Sadoff, a clinical psychiatrist from Pennsylvania (47 RT 7058:22-7062:1), said there was almost no medical probability of acting in a dissociative state. *Id.* at 7087:7-12. Dr. Edward Amos, a physician said serotonin syndrome cannot cause homicidal behavior. 48RT at 7327:18-20, 7337:25-27. He also testified that there was no connection between abortion and homicidal behavior or dissociative states. *Id.* at 7339:4-7. Dr. Amos said that he had reviewed Sandi Nieves's trial testimony and that he did not believe her memory deficits are neurologically based. *Id.* at 7303:6-15.

Dr. Scott Phillips, a medical toxicologist, testified that serotonin syndrome does not cause homicidal or suicidal behavior. 49 RT 7462:25-7463:2. He confirmed that Sandi Nieves had a prescription for Zoloft (49 RT 7469:23-28, 7498:1-8; Exh. 92), but he disagreed that Zoloft and Phentermine could cause serotonin syndrome (*id.* at 7470:18-7471:5). He found no evidence that Sandi Nieves had had serotonin syndrome. *Id.* at 7464:5-13, 7476:4-13, 7567:20-7568:15. He further testified he found evidence Sandi Nieves had mild carbon monoxide poisoning in the aftermath of the fire, along with soot and plastic byproducts. *Id.* at 7478:17-7482:24, 7571:17-7572:12.

### *Defense Surrebuttal*

Dr. Gordon Plotkin, a psychiatrist with board certifications in psychiatry and neurology, testified for the defense on surrebuttal. 48 RT 7376:20-7379:13. He testified an individual with two or more serotonin drugs in his or her system can suffer from serotonin syndrome which can include delirium. 48 RT 7413:18-

28. He testified Phentermine and Zoloft mixed together can cause serotonin syndrome and increase the risk of seizures. *Id.* at 7414:1-12, 7419:4-8.

Dr. Plotkin testified that a dissociative state is generally a psychological condition caused by stress (52 RT 7828:22-26), and that stress will increase the risk of seizure (*id.* at 7998:2-7998:8), including the stress factors facing Sandi Nieves in the days before the fire (53 RT 8163:24-8164:12). Although the data in this case suggested that something neurological was going on (52 RT 7975:17-18), Plotkin did not believe Nieves had been in a dissociative state but rather in a state of delirium (53 RT 8100:6-8102:15).

### *Further Rebuttal*

As their final witness, the prosecution recalled Dr. Amos (54 RT 8274:13), to give the opinion that the record was clear Sandi Nieves had not had seizures (*id.* at 8279:19-8280:3). He agreed that there was no evidence of dissociation or delirium. *Id.* at 8296:18-8297:8.

### B. Penalty phase

### *Prosecution Evidence*

The prosecution penalty phase evidence consisted of the circumstances of the crime and victim impact evidence. The prosecution did not contend Sandi Nieves had ever been convicted of a crime or that there were any unadjudicated criminal acts in her background. The prosecution did not contend that Sandi Nieves would be a danger in the future.

### *Defense Evidence*

Shirley Driskell, Sandi Nieves's childhood friend, testified that they had
gone to school together and lived for some time in the same apartment complex.
She generally described what she had observed in the relationship between Sandi
and Sandi's mother: verbal and physical abuse, criticism, a strict dress code, and
bruises and bumps. 61 RT 9473:11- 9477:6. She had attended the wedding
between Dolores and David Folden. *Id.* at 9477:7-16. She testified, based on a
year she lived with Dolores, Sandi's mother, that something was "terribly wrong"
with Dolores. *Id.* at 9477:17-9478:25. Driskell testified she kept in touch with
Sandi, that Sandi was a very good mother, who was caring and concerned about
her children. *Id.* at 9478:26-9480:25. She testified she believed Sandi to be a good
human being. *Id.* at 9493:26-28.

Tammy Pearce testified she had known Sandi Nieves through the
Mormon church and saw her regularly until 1993. *Id.* at 9515:9-11. Sandi had
been an excellent Cub Scout troop committee chairperson and regularly attended
church. She was a good example of a good mother. *Id.* at 9505:11-9507:14,
9508:14-24, 9509:15-17, 9510:20-9511:7.

Henry Thompson, Shirley Driskell's father, described Sandi as a loving,
devoted parent. *Id.* at 9547:14-9553:2. Lynn Jones, a bishop in the Perris Ward of
the Church of Jesus Christ of Latter Day Saints, testified Sandi had been very
active in the Church. *Id.* at 9580:20-9582:28. She worked well with the Cub Scout
program. *Id.* at 9584:2-9584:12. He testified that the only time the Church would
recognize abortion at that time was in case of rape, incest, or if mother's life was

in severe danger. It was against Church rules to have an abortion under other circumstances. *Id.* at 9586:22-9587:19.

Carl Hall said that he had observed a warm loving relationship between Sandi and her children. *Id.* at 9657:21-9659:24. Lenora Frey, Sandi's aunt, described Sandi's mother, Delores, as having married six times. Delores was not a warm or nurturing woman. Her children "got smacked" regularly. 62 RT 9680:27-9682:28. She testified Sandi did not have a mean bone in her body. *Id.* at 9687:8-19. Sandi tried "really hard" not to be like Dolores. *Id.* at 9707:3-4. Cindy Hall also described Sandi as a loving and kind to her children. *Id.* at 9725:1-9726:14. Albert Lucia, one of Sandi's mother's husbands, testified that Sandi did not get the attention he would expect from a mother. Sandi was mistreated, made fun of, and accused of trying to get attention when she passed out as a child. *Id.* at 9750:13-22.

Dr. Robert Suiter, a clinical psychologist, had conducted a court ordered evaluation in 1997 concerning child custody between David Folden and Sandi Nieves (62 RT 9760:5-9762:2) to make recommendations to the court about custody and visitation of the five children. It started as a visitation evaluation.

Then David Folden wanted custody of the two younger children. *Id.* at 9762:3-9763:5. Dr. Suiter found Sandi open and frank in many contexts regarding her difficult childhood, problems in her marriage, prior depression, and psychotropic medications. *Id.* at 9764:11- 9765:14. Sandi felt positive about her children and desired to remain as primary caretaker. *Id.* at 9768:1-6. Although Sandi was a dependent, needy person, he had no information that she was

30

abusive and no information that she was not a loving and caring mother. *Id.* at 9772:7-9774:1.

Shannon North, a friend who had known Sandi since they were six years old, also testified that Sandi was a loving and caring mother. 63 RT 9854:28-9856:21. She was followed by Tricia Mulder, who knew Sandi when they lived in Perris, California. Mulder testified Sandi had helped her through her marriage and that she was a loving, caring mother, who set an example for her. *Id.* at 9866:28-9874:19.

Lelia Mrotzek, who had been the protestant chaplain at the twin towers jail in Los Angeles County where Sandi Nieves had been held since her arrest, testified Sandi had participated in Bible study and expressed remorse in the jail. She said Sandi was not a person who found "jailhouse religion" as a convenience. 63 RT 9885:6-9889:19.

### *Prosecution Rebuttal*

In rebuttal, the prosecution called Elaine Hoggan, the principal at Palms Elementary School in Perris. She said that Sandi's daughters had been students at the school. She would not describe Sandi as kind, loving, and caring. She found her to be very controlling. 63 RT 9933:5-9934:6. There were 950 children in the school; she had seen Sandi once. She based her testimony on what other teachers had said. *Id.* at 9937:17-9939:10.

Marilyn Boyd, a teacher at the school, said Sandi was abrasive with the staff and manipulative. She had not seen physical affection from Sandi. *Id.* at 9941:13-9948:2.

31

Phillip Rogers, a neighbor from Perris, testified Sandi was over protective of her children. She limited their freedom to participate in the world. In later years he came to believe Sandi had lied and exaggerated. He testified that he believed that Sandi tried to turn the children against David Folden. 63 RT 9976:11-9984:7, 9988:3-10.

Patricia Rogers had been Sandi's friend from Perris. She said she would not describe Sandi as a warm, kind, caring mother; she was controlling and overbearing and spoke badly of David Folden. 63 RT 10010:10-10012:24-10027:26. She said to the jury that "As far as protecting them, she murdered them." *Id.* at 10030:2-10031:16. She did agree, however, that her previous opinion that Sandi had been an excellent mother only changed after Sandi was convicted. *Id.* at 10037:12-10054:12. She formulated her new opinion from the news reports of the deaths. *Id.* at 10055:3-6.

### *Penalty Verdict*

Following closing arguments (64 RT 10096-10171), instructions (65 RT 10196-10205), and deliberation, the jury returned the death verdict (21 RCT 5422; 65 RT 10216:11-10218:28).

32

## GENERAL ALLEGATIONS TO EACH CLAIM

Nieves raises below the guilt-phase claims from her appellate and state habeas proceedings. In support of her federal petition for writ of habeas corpus, she generally alleges the following as to each of the claims below:

Legal authorities in support of each claim are identified within that claim. Each and every claim is based on the Federal Constitution.

Nieves does not waive any applicable rights or privileges by the filing of this Petition and the exhibits, and, in particular, does not waive either the attorney-client privilege or the work-product privilege. Nieves requests that any waiver of a privilege occur only after a hearing with sufficient notice and the right to be heard on whether a waiver has occurred and the scope of any such waiver. Nieves also requests "use immunity" for each and every disclosure he has made and may make in support of this Petition.

To the extent the California Supreme Court denied a claim on the merits, the state-court decision was contrary to or involved an unreasonable application of clearly established federal law and/or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

If de novo review applies, either because the state court did not adjudicate the merits of the claim or because Nieves can satisfy 28 U.S.C. § 2254(d), Nieves can also establish her entitlement to review on de novo review.

If the prejudice standard found in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), is applicable to a specific claim below, Nieves can show that she satisfies that test as to that claim. *See Brown v. Davenport*, 596 U.S. 118, 134 (2022). Any references in her claims below to the State's inability to satisfy *Chapman v.*

33

*California*, 386 U.S. 18 (1967), should be read to allege and show her ability to satisfy *Brecht*.

If Respondent contends that any claim should not be considered on the merits because the final state court decision found the claim to be procedurally barred under state law, Nieves contends that the bar does not preclude federal merits review because it is not an adequate and independent state ground. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003). If this Court finds any claim to be procedurally defaulted, federal review of the merits of the claim is nevertheless required because Nieves can establish: (1) cause and prejudice for the default; and (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *id.* at 753-54 ("[an] error that constitutes ineffective assistance of counsel is cause"); *Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *House v. Bell*, 547 U.S. 518, 522 (2006) ("In certain exceptional cases involving a compelling claim of actual innocence . . . the state procedural default rule is not a bar to a federal habeas corpus petition.").

To the extent that the error or deficiency alleged was due to defense trial counsel's or state appellate/habeas counsel's failure to investigate and/or litigate in a reasonably competent manner on Nieves's behalf, Nieves was deprived of the effective assistance of counsel. To the extent that trial counsel's or state appellate/habeas counsel's actions and omissions were the product of purported strategic and/or tactical decisions, such decisions were based upon state interference, prosecutorial misconduct, inadequate and unreasonable

34

investigation and discovery, and/or inadequate consultation with independent experts, and therefore were not reasonable, rational, or informed.

To the extent that the facts set forth below could not reasonably have been uncovered by trial counsel, those facts constitute newly discovered evidence which casts fundamental doubt on the accuracy and reliability of the proceedings and undermines the prosecution's case against Nieves such that her rights to due process and a fair trial have been violated, and collateral relief is appropriate.

If the State disputes any of the facts alleged below, Nieves requests that this Court issue an order directing that an evidentiary hearing be held so that the factual disputes may be resolved. After Nieves has been afforded discovery and the full disclosure of material evidence by the prosecution, the use of this Court's subpoena power, and the funds and opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition. *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), and 28 U.S.C. § 2254(e)(2) does not limit Nieves's ability to develop the factual basis of her claims in federal court. Nieves diligently sought in the state court proceedings to produce affirmative evidence demonstrating her entitlement to relief. The state court denied Nieves's state petition, without granting her discovery power or an evidentiary hearing. Because Nieves made a reasonable effort to develop the factual basis of her claims in the state court proceedings, she may now develop her claims in federal court. *See Williams (Michael) v. Taylor*, 529 U.S. 420, 444 (2000).

## CLAIMS FROM NIEVES'S DIRECT APPEAL

**GROUND 1: THE TRIAL JUDGE'S MISCONDUCT, BIAS, AND PREJUDICE AGAINST DEFENDANT AND HER COUNSEL RESULTED IN A FUNDAMENTALLY UNFAIR TRIAL, DENIAL OF THE RIGHT TO A MEANINGFUL DEFENSE, DENIAL OF THE RIGHT TO CONFRONTATION, DENIAL TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AND RESULTED IN AN UNRELIABLE SENTENCING VERDICT**

The trial of Sandi Nieves was stained with unmistakable and persistent bias by the trial judge.

The fundamental unfairness of the trial judge that permeated the trial proceedings included:

- Disparaging defense counsel before the jury;

- Threatening a defense expert with perjury and threatening to remove another from the county's indigent defense panel;

- Threatening a lay defense witness with contempt for failing to give appropriate answers during cross-examination;

- Calling defense counsel and defense experts "liars";

- Disparaging the defendant before the jury;

- Engaging in Internet investigation of defense experts during trial and sharing the results with the prosecution;

- Curtailing defense opportunities to confront prosecution witnesses;

- Failing to apply the law evenhandedly regarding defense experts and defense evidence;

36

- Sanctioning defense counsel for making speaking objections, but ignoring comments from the two prosecutors;
- Ex parte contact with the prosecution and arbitrary and excessive payment of prosecution experts out of court funds;
- Refusing simple accommodations to several defense witnesses and refusing to make accommodations for defense counsel;
- Aligning itself with the prosecution.

Many of the pervasive instances of misconduct took place in front of the jury. Others took place outside the jury's presence. But the judge's bullying plainly affected defense counsel, defense strategy, and witness testimony. "It is obvious that under any system of jury trial the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest work or intimation is received with deference, and may prove controlling." Starr v. United States (1884) 153 U.S. 614, 626, quoted in Carter v. Kentucky (1981) 450 U.S. 288, n. 20. Through the eyes of the jury here there could be no question of the judge's disdain for the defendant and the judge's view that the defense was not to be distrusted.

We recognize that this portion of the argument, which applies to both the guilt and penalty phases, is lengthy. The sheer volume and variety of improprieties by the trial judge cannot be conveyed without a lengthy, detailed description so that the context is clear.

37

Some improprieties affected the trial on multiple levels. For example the judge's ruling or comment may have been demeaning and disparaging but also an abuse of discretion by disallowing admissible evidence.

Many of the improprieties are relevant not only as cumulative instances of bias and unfairness, but also as separate stand alone errors requiring reversal because they were demonstrably prejudicial. Some of the descriptions will be recounted again in other substantive portions of this brief because they are relevant to free standing substantive issues raised by defendant as separate bases for reversal.

Because the judge's improprieties were not restricted to any one witness or any single issue, they occur throughout the proceedings. We have therefore omitted from this section some context and instances of misconduct that are more thoroughly described in the other substantive portions of the argument. To the extent that they are addressed in more detail later, we incorporate them here by reference.[11]

Sandi Nieves was entitled to a 'fair trial in a fair tribunal," In Re Murchison (1955) 349 U.S. 133, 136, "before a judge with no actual bias against the defendant or interest in the outcome of [her] particular case." Bracy v. Gramley (1997) 520 U.S. 899, 904-05. See Johnson v. Mississippi (1971) 403 U.S. 212, 216; Haupt v. Dillard (9th Cir. 1994) 17 F.3d 285, 288 ("The right to a fair trial is "a

basic requirement of due process" and includes the right to an

unbiased judge."); Lyell v. Renico (6th Cir. 2006) 470 F.3d 1177,

1186-1189; Cooper v. Superior Court (1961) 55 Cal. 2d 291, 301

("The judge's function as presiding officer is preeminently to act

impartially."); People v. Mahoney, (1927) 201 Cal. 618, 626 ("Every

defendant under such a charge is entitled to a fair trial on the facts,

and not a trial on the temper or whimsies of the judge who sits in

his case. Whatever the degree of guilt of appellant here, those who

know the circumstances surrounding his conviction are likely to

feel that the verdict resulted from the conduct of the judge and not

from the evidence.").

---

[11] Unlike most appellate transcripts, the reporter's transcript in this case is

particularly difficult to follow due to the constant and unceasing intervention

of the judge and the ensuing bickering among defense counsel, the court,

and the two prosecutors.

California law requires a fair trial before a fair judge in every court proceeding, but particularly when the irrevocable death of a human being is at stake. People v. Sturm (2006) 37 Cal. 4th 1218, citing People v. Zamora (1944) 66 Cal.App.2d 166, 210 ("Trial judges 'should be exceedingly discreet in what they say and do in the presence of the jury lest they seem to lean toward or lend their influence to one side or the other.'"). "The trial of a case should not only be fair in fact, but it should also appear to be fair. And where the contrary appears, it shocks the judicial instinct to allow the judgment to stand." Pacific etc. Conference of United Methodist Church v. Superior Court (1978) 82 Cal.App.3d 72, 87-88, citing Pratt v. Pratt (1903) 141 Cal. 247, 252; Wood v. City Civil Service Commission (1975) 45 Cal.App.3d 105, 110. See People v. Perkins (2003) 109 Cal.App.4th 1562; People v. Hefner (1981) 127 Cal.App.3d 88. Canon 3B(4) of the California Code of Judicial Ethics requires that

> "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers and of all court staff and personnel under the judge's direction and control."

Similarly, Canon 3B(5) requires that

> A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, engage in speech, gestures, or other

40

conduct that would reasonably be perceived as (1) bias
or prejudice, including but not limited to bias or
prejudice based upon race, sex, religion, national origin,
disability, age, sexual orientation, socioeconomic status
or other similar factors, or (2) sexual harassment.

As the California Supreme Court stated in <u>People v. Rigney</u>
(1961) 55 Cal.2d 236, 241, the trial judge, "must not become an
advocate for either party or under the guise of examining witnesses
comment on the evidence or cast aspersions or ridicule on a
witness."

Both Penal Code, section 1122, and Code of Civil
Procedure, section 611, provide that the judge must
admonish the jury not to form or express any opinions
on any subject connected with the trial until the case is
finally submitted to them. A judge must not defeat the
purpose of these provisions by comment on the
evidence during the trial but must also keep an open
mind until he has had an opportunity to hear all the
evidence. Moreover, comment should be expressly
labeled as the judge's opinion, and the jury advised that
it may be disregarded; questions are not so labeled, and
when they convey the judge's opinion of the credibility
of a witness, there is grave danger not only that they
may induce the jury to form an opinion before the case

41

> is finally submitted to them, but that the jury will substitute the judge's opinion for their own. The judge, therefore, may not ask questions to convey to the jury his opinion of the credibility of a witness. (<u>People v. Huff</u>, 134 Cal.App.2d 182, 188 [285 P.2d 17].) Nor should he intervene so extensively in behalf of the prosecutor as to align himself with the prosecutor in the minds of the jury. (<u>People v. Robinson</u>, 179 Cal.App.2d 624, 633-637 [4 Cal.Rptr. 50].)

<u>Id.</u> <u>See also</u>, <u>McCartney v. Commission On Judicial Qualifications</u> (1974) 12 Cal.3d 512, 533 ("A trial judge may not, however, in the course of examining witnesses become an advocate for either party or cast aspersions or ridicule upon a witness."). <u>Kloepfer v. Commission On Judicial Performance</u> (1989) 49 Cal.3d 826, 845 quoting <u>People v. Carlucci</u> (1979) 23 Cal.3d 249, 258 ("It is fundamental that the trial court . . . must refrain from advocacy and remain circumspect in its comments on the evidence, treating litigants and witnesses with appropriate respect and without demonstration of partiality or bias."). "There is never an instance which justifies a trial judge or counsel in being discourteous one to the other, to witnesses, parties litigant or jurors." <u>Etzel v. Rosenbloom</u> (1948) 83 Cal.App.2d 758, 762.

The judge that presided in this case, Superior Court Judge L. Jeffrey Wiatt, was, among other things, impatient, undignified, and

discourteous to the defendant, defense counsel, and defense witnesses. He showed a rare bias and prejudice that is not often encountered in California courtrooms. He acted as a third prosecutor. And he undermined Sandi Nieves's defense at both the guilt and penalty phases of the trial by hamstringing the defense and signaling to the jury that he believed her defense and her defense counsel were neither credible nor persuasive. Because the judge's misconduct permeated the trial and was unfairly prejudicial, the convictions and the death penalty must be reversed.

A.    Standard of Review

The denial of a fair trial by a fair judge is a structural error which requires per se reversal, "Because the impartiality of the adjudicator goes to the very integrity of the legal system, the Chapman harmless-error analysis cannot apply." Gray v. Mississippi ( 1987) 481 U.S. 648, 668. "Some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." Chapman v. California (1967) 386 U.S. 18, 23. "The right to an impartial adjudicator, be it judge or jury, is such a right." Id., at 23, n. 8. See Tumey v. Ohio (1927) 273 U.S. 510; People v. Mahoney (1927) 201 Cal. 618. Under California law, when "the appearance of judicial bias and unfairness colors the entire record,"

reversal is required.  Hernandez v. Paicius (2003) 109 Cal.App.4th
452, 461.

But even if the trial judge's improper comments and behavior
did not constitute immeasurable structural error, the misconduct
must be evaluated for prejudicial error, with the State having the
burden of persuasion under Chapman.  See People v. Sturm (2006)
37 Cal.4th 1218, 1244.  Under Chapman the question is whether the
court is "able to declare a belief that [any error] was harmless
beyond a reasonable doubt." 386 U.S. at 24.

B.    Objections in the Trial Court

In this case, as we will demonstrate, defense counsel, Howard
Waco, repeatedly objected to Judge Wiatt's conduct.  He made
numerous motions for mistrial and he sought mid-trial to disqualify
Judge Wiatt from presiding.  But even if these efforts had not been
made, Sturm clearly holds that it is not necessary that a defendant
object every single time a trial judge engages in misconduct.  "[A]
defendant's failure to object does not preclude review 'when an
objection and an admonition could not cure the prejudice caused by
such misconduct, or when objecting would be futile.'" 37 Cal.4th at
1237.  Here, the misconduct was so pervasive and so intensive that
even those objections that were made were ultimately futile.

44

C.    **The Trial Judge's Comments and Behavior**

From the defendant's opening statement at the guilt phase
to the defense closing argument at the penalty phase, Judge Wiatt
clearly expressed a deep hostility to defense counsel and the
defendant.

In this respect Judge Wiatt's conduct is similar to that of the
judge in Offutt v. United States (1954) 348 U.S. 11.  After the Court
of Appeals reversed the defendant's conviction due to the judge's
conduct,[12] the Supreme Court also reversed findings of contempt

---

[12]  Peckham v. United States (D.C. Cir. 1953) 210 F.2d 693, 702
("excessive injection of the trial judge into the examination of
witnesses, his numerous comments to defense counsel, indicating
at times hostility, though under provocation, demonstrated a bias
and lack of impartiality which may well have influenced the jury: .
. . this court is barred from sustaining the judgment as the product
of a fair and impartial trial.  This necessitates reversal.")

against defense counsel. Justice Frankfurter's words are especially fitting. Over fifty years later they apply just as well to the trial of Sandi Nieves:

> The record discloses not a rare flareup, not a show of evanescent irritation – a modicum of quick temper that must be allowed even judges. The record is persuasive that instead of representing the impersonal authority of law, the trial judge permitted himself to become personally embroiled with the petitioner. There was an intermittently continuous wrangle on an unedifying level between the two. For one reason or another the judge failed to impose his moral authority upon the proceedings. His behavior precluded that atmosphere of austerity which should especially dominate a criminal trial and which is indispensable for an appropriate sense of responsibility on the part of court, counsel and jury."

Id. at 17.

The judge's behavior here tipped the scales against Sandi Nieves marking her as guilty, while condemning her to death.

### 1. Disparagement of Defense Counsel

"A 'trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to

46

discredit the defense or create the impression that it is allying itself with the prosecution.' . . . 'Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trial'. . . . 'When "the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary." People v. Sturm (2006) 37 Cal.4th 1218, 1233, citations omitted.

a.    **Guilt Phase – Disparagement Before the Jury**

Beginning with defense counsel's opening statement at the guilt phase of the trial, Judge Wiatt started disparaging counsel in front of the jury. Toward the end of the opening statement this colloquy occurred. It set the tone of Judge Wiatt's behavior toward counsel throughout the trial.

Mr. Waco:  What happened? Why did it happen? Sandi still doesn't have all the answers. The D.A. would have you see Sandi as a murderer, which she is not, and the evidence will show it. Pictures don't show the complete story of anything. My job is to show both sides of the story so you get a complete picture. I will do that, and not let you down and not let Sandi down.

47

Mr. Barshop:   I will object.  That is argumentative again.

The Court:  That entire last statement is stricken.  It's argumentative, and you are to disregard it.

Mr. Waco:  The evidence will show that some of us have demons to overcome, just like Sandi.
Mr. Barshop:    Objection.  That's argumentative. The Court:  Sustained,
sustained.  That is stricken. Mr. Waco:  Sandi
--

The Court:   You're going to present evidence about demons being in the court and not in the court?

Mr. Waco:   I meant it figuratively.

The Court:   You're going to present evidence of a demon? Mr. Waco:    I meant it figuratively, your honor.

15 RT 1446:8-1447:4.[13]

---

[13]  There were two prosecuting attorneys throughout the trial, Deputy District Attorney Kenneth Barshop and Deputy District Attorney Beth Silverman.  Each was permitted to make objections and address the court. They frequently objected in tandem.

48

The disparagement continued.  Bruce Alpern, a fire fighter paramedic was called by the prosecution to describe what he observed when he responded to the scene of the fire.  On cross-examination he testified he was surprised when Sandi Nieves answered the door and then went back into the house, which was filled with soot and smoke. 16 RT 1532:22- 1535:21.  When defense counsel asked whether he was amazed "that anybody of sound mind would stay in such environment," the court sustained the prosecutor's objection and sarcastically said, "he's not qualified to testify as to whether somebody has a sound mind or not." 16 RT 1534:20-28.  Next, when counsel asked the court the number of a particular exhibit, Judge Wiatt responded: "Look at the tag on the front; it might give you a clue." Id. at 1562:16-19.

As defense counsel was showing Alpern photographs and asking the court's permission to mark them, this colloquy occurred:

Q  At any rate, the -- if I can have these marked a-1, 2, 3 and 4, your honor?

The Court:   They have been.

Mr. Waco:  I did, but I just wanted to make sure it was okay with the court.  With the court's permission, it's difficult to hold it here, but I'll do the best I can with regards to the view of this particular location and the spill, and hopefully the jury can see it.

49

The Court:  All right.  Mr. Waco, everything you just said is stricken, and the jury will disregard it.  If you want to show something, you can pass it out, but don't say anything while you're doing it.

Mr. Waco:  Okay.

The Court:  Because then you're testifying.  If you want to testify, you can do that.

16 RT 1566:20-1567:8.

Later during further cross-examination of Alpern, defense counsel asked about a statement Alpern had made at the preliminary hearing regarding a conversation with Sandi Nieves immediately after the fire. Alpern said: "Again, this is going on two years, and apparently that is better to go by than a year later." Defense counsel attempted a brief transition by saying, "All right.  I appreciate the fact that –." Without giving defense counsel a chance to finish, Judge Wiatt sarcastically interjected: " All right. What your appreciation level is, is not  pertinent or helpful." 16 RT 1594:17-28.

When defense counsel attempted to read from the preliminary hearing transcript, the court interrupted, saying the reading was incomplete, implying counsel was misleading the jury. Judge Wiatt then said, "so I will [read it] to make sure it's accurate." 16 RT 1964:21-1965:20.  When defense counsel cross-examined one

50

of the neighbors, Gregg Lewison, the trial court began sustaining questions as argumentative. When defense counsel asked the court whether the tenor of the questions was the problem, the court ridiculed him:

> Mr. Waco: Is it the manner in which I'm asking the question? I'm trying to abide by the court's rule.

> The Court: It's a ridiculous question, Mr. Waco. If he's 43 miles away in Inglewood, there's no way he can see what is going on in his neighborhood. Maybe in comic books or the movies or something, but not in the real world.

16 RT 1712:5 - 1713:4.

During the cross-examination of the fire department investigator, John Ament, defense counsel attempted to impeach the witness with his preliminary hearing testimony. After one of the prosecutors made a speaking objection without admonishment from the court, the judge interjected to help the prosecution by implying that the defense counsel's question was inaccurate and misleading:

> Q [By Mr. Waco] do you recall your testimony now with regards to saying that if it's a foot or two away

from the wall and the door frame it would not have

ignited either one?

A    I don't recall that I said that, but I read it, so I must

have. But there's a factor that plays in that, and that is

the quantity of gasoline in that area.

Mr. Barshop:   It's also not the complete answer.

Mr. Waco:   I would like to be able to ask my own

questions, if I can.

The Court:   You may do that, but they should -- if

you're reading back an answer, it should be the entire

answer.

Mr. Waco:   I'm asking about a specific portion of  testimony.

The Court:   You don't want to do it, so I will to

make sure it's accurate.

18  RT  1964:10-27.

During the cross-examination of David Nieves, Sandi Nieves'

son, defense counsel asked whether Sandi  had kept calendars.

Counsel attempted to refresh David's recollection about the

calendars.  Judge Wiatt gratuitously denigrated defense counsel

before the jury:

[Mr. Waco:]Q  If I showed you the calendar, would that

help refresh your memory?

52

A  Maybe.

Q  Again, I have a calendar to show him which the district attorney provided me.

The Court:  Show it to the prosecutors, same as any exhibit. If you want to show something, show it to them first.

Mr. Waco:  I understand. I believe the district attorney has it. The Court:  Mr. Waco, don't talk, except to ask a question.

Get on to something else then, Mr. Waco. If you don't have what you need, then get on to some other area of your questioning.

Mr. Waco:  I have a copy of the calendar. I wonder if I could use that. The district attorney has the original, your honor.

The Court:  You don't listen, do you?

21  RT  2451:15-2452:8.

As defense counsel was cross-examining Alethea Volk, the trial judge again chastised him in front of the jury.

Q By Mr. Waco:  Were there any instructions on the use of the phone, to the best of your knowledge, by anybody in the family?

53

Ms. Silverman:   Objection. Calls for

speculation. The Court:  Sustained.

Mr. Waco:   I am just asking to the best of her knowledge.

The Court:   How could she possibly know that, unless

she heard it from somebody else? If you want to try to

lay a foundation that she was living with your client at

all times and every time she was on the phone -- don't

ask questions that call for speculation please.

21 RT  2674:4-16

The trial judge was quick to claim defense counsel had

misstated simple facts, even when the court made the misstatement.

This is an example from the cross-examination of Fernando Nieves:

Q  By Mr. Waco:   Now, the District Attorney – let's

see. Two weeks after this is when she sent you a  copy

of a will, right?  I think it's people's 33, your honor.

A  Yes.

Q  Dated May the 22nd,

'97? The Court:  Is that

correct? The Witness:  It's

May 24th.

Mr. Waco:   I thought the will was dated the 22nd.

The Court:  Well, you're wrong, Mr. Waco.  Why don't

54

you just ask questions rather than expressing your
beliefs.

By Mr. Waco:   On top of the will, isn't it dated
May the 22nd?

Mr. Barshop:   I objecst.  The document speaks for itself.

The Court:   Sustained.  I thought you said the 27th.

But the document speaks for itself, Mr. Waco.[14]

24  RT  2959:20-2960:9.

Midway through the prosecution case, the trial judge started
accusing defense counsel of violating court orders in front of the
jury.  For example, when defense counsel was cross-examining
forensic document examiner
Wesley Grose and asked a foundational question, both prosecutors
objected in tandem and the trial judge chastised defense counsel:

[Mr. Waco:]   Now, with regards to your -- is it the
habit and custom to be asked for your honest
opinion?

Mr. Barshop:  Objection.

Ms. Silverman:

Objection.

Q  By Mr. Waco -- by the

sheriffs? The Court:  What's the

55

objection? Mr. Barshop:   It's

irrelevant.

The Court:   What grounds?

Ms. Silverman:  It's

irrelevant. The Court:

Sustained.

By Mr. Waco:   Is it the habit and custom to speak

honestly and open to the sheriffs that come in  here?


The Court:  Why are --

Mr. Barshop:

Objection.

The Court:   Whose habit and custom?  This

witness'? Mr. Waco:   Is it the habit and custom

as far as --

The Court:   I am going to sustain the objection.  It's

vague and may be irrelevant.

Q By Mr. Waco:    Has it been your experience in

dealing with the sheriff's department that their habit and

custom is to ask you for your honest opinion about

things?

Mr. Barshop:    Objection.  It's irrelevant.

---

14  See People's Exhibit 33, page 1 of 3 (first line) (May 22, 1997).

The Court: Sustained. And it's in violation of the court's order at the 402 hearing. So get onto something else, Mr. Waco.[15]

26  RT  3377:23-3378:22.

When the defense paralegal was assisting counsel and played a tape of a conversation of detective Robert Taylor, the trial judge chastised the paralegal for stopping the tape at the point pertinent to the cross- examination:

(Whereupon a portion of the  tape was played.)

Mr. Waco:    I wonder if I can have the court's permission to play that one more time?

The Court:    No, you may not.  You played it once and there's a transcript.

Mr. Barshop:  I am going to object. We have a transcript of additional portions on the tape.

The Court:    Pardon?

---

[15]   Similarly, when defense counsel examined Dan Skipper, a burglar alarm installer about Sandi Nieves' home, defense counsel asked: "and in going into the house, did you see pictures of the kids on the wall?" The trial judge sustained a relevance objection. Defense counsel tried to explain:

I believe it goes to the lack of intent, your honor. State of mind.

The Court:    All right. You just violated the court's order that there are to be no speaking objections. The objection remains sustained.

28  RT  3716:24-3717:10.

The Witness:  He didn't play the whole tape. The Court:  Why did you stop it then?

Ms. Katz [defense paralegal]:  I thought the pertinent part was over.

Mr. Waco:    Play whatever is there.  It's fine.

The Court:  Mr. Waco, you provided a transcript, and if you don't play the whole thing, we'll strike it.  Who stopped it?

Ms. Katz:  I did.

The Court:  Why did you stop it?

Ms. Katz:   I'm sorry.  I thought the pertinent part was over.

The Court:  It's not for you to decide what's pertinent and not pertinent, Miss Katz.  Just start where it left off.

26  RT  3482:5-28.

When defense counsel attempted to show through cross-examination that detective Taylor had attempted to withhold

58

evidence from the defense, the trial judge imposed an ultra high
level of specificity and then chastised defense counsel when counsel
did not meet it.

> By Mr. Waco:  Did you and/or your partner, in your
> presence, tell them at the lab "if you have" – basically,
> "if you have any evidence that might help the defense,
> we want it off the record"?
>
> Mr. Barshop:  Objection. That's speculative and
> argumentative.
>
> The Court:    Sustained.
>
> Q By Mr. Waco:  Did you and/or your partner, in your
> presence --
>
> The Court:  When you say "his partner," you're asking
> for the partner's state of mind.  Don't ask it, because it
> would be calling for speculation.
>
> Q By Mr. Waco:  Did you and/or your partner, in your
> presence, make any statements that "if you are not sure,
> or if you're inconclusive, we'd like that off the record"?
>
> Mr. Barshop:   Objection. Speculative and argumentative.
>
> The Court:    Sustained.  You're paraphrasing, Mr.
> Waco. That's the  problem.  You're not referring to a
> direct statement or direct quote.

26 RT 3474:8-3475:1.

The judge told the jury mid-trial that the defense was to
blame for a delay in the proceedings, implying that inconvenience
was the fault of the defense.

> All jurors are back. Ladies and gentlemen, under the
> law in California, the laws of discovery require that the
> prosecution and the defense are required to disclose to
> each other before trial the evidence each intends to
> present at trial. The reason for doing that is to
> promote the ascertainment of truth, save court time,
> and avoid surprise which may arise during the course of
> trial.
>
> Disclosures of evidence are required to be made at least
> 30 days in advance of trial. Any new evidence
> discovered within 30 days of trial must be disclosed
> immediately. This morning, and in one case this
> afternoon, Mr. Waco provided the prosecution for the
> first time statements of witnesses that should have been
> disclosed 30 days before trial. Because it is late
> disclosure the court is going to give the people
> sufficient time to prepare as to one witness, and the
> court will consider what will happen as to the other
> two or more witnesses.

28 RT 3709:22-3710:26. (The court hardly missed a chance to

60

disparage defense counsel.  Judge Wiatt later told the jurors on June 21: "The reason we are breaking now is because of the defense failure to have their witnesses available in a timely manner."  37 RT 5104:4-6).

The court chastised defense counsel for saying, "okay." 26 RT 3437:5-8 ("Don't say 'okay' anymore.").  Next, as defense counsel continued cross-examining detective Robert Taylor, the court chastised counsel for saying, "Ah."

> Q  And what about Mr. Nieves,
>
> Fernando?  The Court:  What about
>
> him, what?
>
> By Mr. Waco:
>
> Who interviewed him?
>
> A  Both myself and detective Perales.
>
> Q  And both of you were present at the supposed
>
> crime scene and giving directions to each of the people
>
> you mentioned, right -- crime lab people and fire
>
> people, sheriff people, photo people, and coroner
>
> personnel?
>
> A  Yes.  We were giving directions to different individuals.
>
> Q  And you also participated in the various
>
> observations that Mr. Ament made from the fire
>
> department, both at the -- on July 1st and afterward
>
> when you went back there again; right?

A  I made observations, yes.

Q  Ah.  But you both interviewed and talked to Mr.
Ament when you went to the location at the various
times; isn't that also correct?

A  I don't recall interviewing detective Ament.  He
was working along with us on this case.

Q  Ah.  You gave him questions and gave him
directions; right?

A  We exchanged information.

Q  Okay.  With regards to other people, with regards
to, for example, Mr. Scott, Scott Volk, he was
interviewed by both yourself and Miss Perales; right?

A  No, sir.

Q  Who was he interviewed
by? A    Me.

Q  You alone?

A  Yes.

Q  Ah.  With regards to –

The Court:   Stop saying "ah" every time you get an answer.

26  RT  3417:2-3418:10.[16]

[16]  Later during a section 402 hearing outside the jury's presence,
the court lectured defense counsel" "I don't want to hear 'Thank
you, your honor' if I rule on something." 42 RT 6165:15-16.

62

When defense counsel was examining Dr. Phillip Ney on direct, he attempted to use an illustration and have it marked as an exhibit. The trial judge gratuitously demeaned counsel before the jury:

> [Mr. Waco:]   I wonder if we can have not only a -- to mark the overhang, but also to mark a "hard copy" of the same designation as the overhang, with the court's permission.  Is that okay?

> The Court:   I don't know why you're asking me this, Mr. Waco.  A witness can use demonstrative evidence.  It doesn't necessarily have to be marked as an exhibit.  So for right now, you can continue on with your questioning.

37 RT 5183:3-15.

As defense counsel was cross-examining Dr. Robert Brook, a prosecution expert, the witness gave a non-responsive answer. Counsel tried to get him to answer the question asked. Judge Wiatt then told the jury that counsel violated a court order and that the trial judge was imposing monetary sanctions against defense counsel.

> Q  If Dr. Humphrey had made -- say put down the maximum score of, let's say, even a lower score than 15.  Let's say six out of 12, it would have made Mrs. Nieves look like she got half of them right?

> A  It would be inaccurate information.

63

Q  But it would make it look like she got half of them

right; is that correct, sir?

A  You're talking about impression management, and

that's not what psychological testing is about.

Psychological testing is about accuracy.

Mr. Waco:   I'm asking the witness to answer the  question.

The Court:  Mr. Waco, you violated the court's rule

about no speaking objections.  I am imposing monetary

sanctions against you.

I am going to ask the jury to go back in the jury room.

40 RT  5614:27-5615:15[17] [18]

_____

[17]  During the cross-examination of Dr. Alex Caldwell, the court
admonished defense counsel to allow him to finish an answer.
The prosecutor immediately said, "Let the witness finish the
answer."  There was no admonishment to the prosecutor about
editorializing or speaking objections.  45 RT 6784:4-10.

[18]  After the jury was sent out, Judge Wiatt chastised counsel,
imposed sanctions, denied him a hearing, and denied him the
opportunity to have counsel.  When defense counsel attempted to
explain the objective of his cross-examination of Dr. Brook, that is,
to rehabilitate Dr. Lorie Humphrey's testimony, Judge Wiatt cut
off further cross-examination on the subject altogether:

(. . . continued)

64

During cross-examination of the prosecution fire expert, John Dehaan, Judge Wiatt not only helped out the prosecution by interposing and sustaining his own objection to a question, he denigrated defense counsel before the jury as well.

> Q By Mr. Waco:  In planning a fire, do you -- would you take into consideration the fact that someone did or didn't try to ignite flammable material all around the house, including boxes filled with paper?
>
> Ms. Silverman:   Objection.  Asked and answered.
>
> The Court:   Assumes facts not in evidence.

------------------------

[18][The Court:]   Dr. Humphrey made a mistake. Argument can be that had she done it right, it would have made the defendant look better than worse.

Mr. Waco:   Can't I cross-examine on that point?

The Court:   That's argument at this point. Bring back the jury. No further questions in this area. Under 352 the probative value is outweighed by the undue consumption of time. Bring the jury back.

Mr. Waco:   Your honor, I would also object to the fact that the court chastised me in front of the jury and cited me in front of the jury. (continued...)

40 RT 5618:27-5619:11.

Sustained. There's no evidence of any flammable material around the house other than the remaining gasoline in the gas can.

Mr. Waco:    Well, I used the word "flammable materials"?

The Court:    *Well, that's the word you used and you're stuck with it.*

44 RT 6556:24-6557:9 (italics added).[19]

During the cross-examination of Dr. Caldwell, defense counsel asked about various letters Sandi Nieves had sent to David Folden.

Defense counsel clumsily formulated a followup question by asking:

"What letter are you referring to to Mr. Folden that shows Mrs. Nieves felt guilty, or felt love, and had a problem with regards to Mr. Folden? What letter?  I'm not aware of any."

45 RT 6680:17-20.  After the prosecution objected and the trial judge sent the jury out of the courtroom, the judge chastised defense counsel for stating personal beliefs before the jury.  When the jurors returned, the judge told them that counsel had been chastised:

---

[19] Plainly, defense counsel was referring to flammable material in the home, such as papers and such.  He was not referring to an accelerant, such as gasoline. 44 RT 6557:10-20.

> The jury is instructed to disregard Mr. Waco's last
> question, particularly the last part of it, which was an
> expression of his personal belief. He's not supposed to
> do it. I admonished him not to do it again.

Id. at 6683:1-6.[20]

Even in an instance when the trial judge sustained a prosecution
relevance objection to a question defense counsel put to Dr.
Caldwell, the judge suggested that defense counsel had
misrepresented facts.

> Q By Mr. Waco:  Do you have any conclusions with
> regards to your 1999 report about the diagnosis of
> depressive and paranoid psychosis are [sic] typical with
> the pattern of results that you received?

———————————————

[20]  During the prosecution closing argument during the penalty
phase, prosecutor Beth Silverman said "I will be satisfied and
justice will be done if you show her again the same mercy that
she showed to her own children." The defense objected, but the
Judge Wiatt overruled the objection, allowing this personal
statement by the prosecutor. 64 RT 10122:20-25. See 64 RT
10130:1-10131:4 (renewed objection overruled). See Part XXIII
infra.

67

> Ms. Silverman:   Objection.   Irrelevant.
>
> The Court:   Sustained.  He did not make a diagnosis,
>
> Mr. Waco.
>
> Q  By Mr. Waco: Did you make a diagnostic
>
> impression, sir? Ms. Silverman:   Objection.  Improper
>
> question.
>
> The Court:   Overruled.
>
> The Witness:   One of the four sections in the report is
>
> labeled "diagnostic impression."

45 RT 6782:1-13.  When defense counsel continued cross-examining
Dr. Caldwell, the witness at first said that counsel was confusing two
reports. Through  cross-examination,  Dr.  Caldwell  admitted  that
1997 report was actually repeated in the 1999 report.  At that point
counsel asked, "I didn't mislead you, though?"  45 RT 6783:20.  The
trial judge lost little time in chastising counsel before the jury:

> The Court:   Mr. Waco, I've warned you repeatedly,
>
> don't editorialize.  Don't make gratuitous comments.

Id. at 25-26.

At the end of the cross-examination of Fernando Nieves, Judge Wiatt
abruptly cut off the examination and excused the jury.  The judge
admonished defense counsel regarding his examination. [21]
When the judge finished, he offered defense counsel an opportunity
to make an offer of proof when he was done with his other

questions as to what was said at the hospital. Defense counsel responded: "I would like to take the opportunity, with the court's permission, to talk about that at this time." The judge then said, "Not at this time. Let's buzz the jury back in." 46 RT 6935:16-6936:26.

---

[21] In open court, defense counsel had asked Fernando Nieves: "For example, do you recall her [Sandi] going to the doctor during one of her pregnancy times and feeling dizzy in the office, for example, I believe, and lie down for a half hour or more?" The prosecution objected on the ground that the question called for speculation and assumed facts not in evidence. After the jury was sent out, the judge sustained the objection with the comment: "don't ask any more questions that call for speculation as to what your client may have told this witness.

 Mr. Waco:   I am asking --

The Court:   And furthermore, when you said the words 'I believe,' it is misconduct on the part of an attorney to state his or her personal belief about the evidence, or to suggest that there is evidence."

So don't use the word 'I believe' anymore."

46 RT 6935:16-6936:12. But see note 20 supra.

When the jury returned defense counsel announced that he had no further questions, subject to the offer of proof. The judge then disparaged defense counsel again.

> The Court: Then why didn't you say that when the
> jury was out, Mr. Waco?
>
> Mr. Waco: I tried to, your honor. The Court: No,
> you didn't.
>
> All right. If would you please go back in the jury room.
> Remember my admonition.

46 RT 6937:9-15. Outside the jury's presence counsel protested that Judge Wiatt gratuitously made him "look bad in front of the jury." Judge Wiatt responded by saying, "you're making yourself look bad, Mr. Waco. You don't need my assistance in that regard." Id. at 6937:21-25.

While cross-examining Dr. Amos, defense counsel mistakenly referred to the psychological state Dr. Ney had described as a "disassociative" state, instead of "dissociative state." 48 RT 7350:3-11. The witness interjected, "I think that's what he  probably means." Id. at 12-13. The court then chided defense counsel again. "It would be helpful if you used the right term." Id. at 16-17.

The record shows the district attorney then laughed. Id. at 7351:5-7352:15.[22]

During Dr. Plotkin's direct examination, Judge Wiatt again accused defense counsel in the presence of the jury of violating a lawful court order. This time it was predicated on counsel's citation of a page of prior transcript to show that a question he had put to Dr. Plotkin was based on facts that were in evidence. 48 RT 7409:20-7410:21 ("Mr. Waco, I have already advised you that you can't say that, and you're disobeying a lawful court order."). See also, 52 RT 7827:18-19 ("And this is a violation of the court's order before the jury came in.").

During the cross-examination of Dr. Scott Phillips, defense counsel asked about antagonists versus agonists as antidotes for drug treatment. He then asked, "with regards to the antagonist, as opposed to agonist, those are rather tongue-twisting type words aren't they?" Both prosecutors objected in tandem. After

---

[22] Later, outside the jury's presence, defense counsel used the term "dissociated state." Judge Wiatt interjected, "Why can't you say it the way it's supposed to be said? Dissociative. Is that so difficult?" 50 RT 7610:2-7622:28.

Defense counsel tried to explain that he was trying to show that Dr. Ney could have confused the terms during his testimony. This explanation only resulted in more disparagement.

> sustaining the objection, the trial judge gratuitously added, "I guess it depends on whose tongue is wagging at the time. Let's get on to something meaningful, Mr. Waco." 45 RT 7521:23-7522:5.
>
> Q It's a type of term that could be easily misunderstood, isn't it?
>
> Ms. Silverman:  Objection. Calls for speculation, if we're talking about a physician.
>
> The Court:  Why don't you state it in the context of a psychiatrist and a psychologist, if that's what you are -- if you're talking about Dr. Ney.
>
> Mr. Waco:   I'm talking about whether it be Dr. Ney misspeaking himself, or the court reporter, or somebody else listening who is not a doctor. I'm asking him: is that a type of terminology that can be easily misunderstood?
>
> The Court:  Your speaking objection is stricken, and the jury will disregard it.

Don't shake your head, Mr. Waco, when I rule against you.

Id. at 7522:7-20.

Later during cross-examination of Dr. Scott Phillips, Judge Wiatt told the jury that defense counsel was lying even though the Judge's comments were contradicted by the facts. Counsel attempted to show that he did not have much opportunity to obtain discovery from Dr. Phillips due to Phillips' late appointment as a prosecution expert in the case. The judge quickly sustained an objection to a yes or no question and then condemned counsel for stating a falsehood.

> Q [by Mr. Waco:]    And with regards to the only opportunity we had to talk was two minutes before the jury arrived about 10:00 o'clock; is that correct?
>
> Mr. Barshop:    I am going to object. That's a misstatement of the facts.
>
> The Court: It is. It's false and misleading. It is a misstatement. The jury will disregard it. The jury will

disregard it.  He was here yesterday and he was here at
8:15 this morning, Mr. Waco.

49 RT 7486:27-7487:8.[23]

After the judge insinuated that defense counsel was lying, the witness actually
answered a rephrased question, stating, "We did talk this morning just for a
few minutes.  I don't know exactly if it was two minutes or three minutes or
four minutes, but we spoke briefly."  Id. at 7487:14-17.  See 52 RT
7827:7828:10.

Near the end of the redirect examination of Dr. Plotkin,
Judge Wiatt again became impatient:

"How much more do you have, Mr. Waco?

Mr. Waco:  A bit.  I'm not going to be able to finish
this morning.

The Court:   Well, maybe if you get to some questions
that are proper, you might finish sooner rather than
later."

53 RT 8163:2-7.

_____

[23]   See 49 RT 7449:16-7452:10 for the background of the attempt
to interview Dr. Phillips.  Judge Wiatt allowed very little time for
the interview and then blamed defense counsel for failing to
anticipate when Dr. Phillips would be in the prosecutor's office or
arrive in the courtroom.

74

b.    **Penalty Phase – Disparagement Before the Jury**

When defense counsel started his opening statement during the penalty phase, after uttering only 39 words, the district attorney objected and the trial judge lost little time in denigrating counsel, despite counsel's attempt to humanize the situation:

> By Mr. Waco:   Ladies and gentlemen, it seems like we've gone through a lifetime, at least for me, over these past three months.  And, of course, two years since I have had this case. Your decision obviously is disappointing to me as –
>
> Ms. Silverman:   Objection.  Improper argument.
>
> The Court:  Sustained. Let's just confine ourselves to what you expect the evidence will show.
>
> Mr. Waco:  It's very difficult to appear here again after my statements and arguments have been rejected.
>
> Ms. Silverman:  Objection. Inappropriate argument. The Court:  Sustained.
>
> Mr. Waco:  I presume and assume that your decision was made soberly.
>
> Ms. Silverman:   Objection.  Inappropriate argument.
>
> The Court:  Sustained. If you can't tell us what you expect the evidence will show, sit down and don't say anything more.

60  RT  9270:21-9271:17.

Several minutes later, the trial judge threatened to terminate the opening statement, as if it was a waste of time, because defense counsel said he could appreciate why David Folden, who was paying the bills, was jealous after Fernando Nieves decided to begin seeing his children again.

[Mr. Waco:]   And this frustrated, I can appreciate that, Mr. Folden.  He was paying the bills.

Mr. Barshop:  I am going to object.  That's improper opening statement.

The Court:  Sustained.  That part is stricken. Mr. Waco, I am not going to warn you again.  Confine yourself to what you expect the evidence will show, not what you personally believe.

Mr. Waco:  He was paying the bills, Mr. Folden, and was not enamored –

Mr. Barshop:  I am going to object.  This is improper opening statement.

Mr. Waco:   I believe the evidence will show this.

The Court:   Sustained.  How much more do you have?

Mr. Waco:  I don't know.  I didn't time it out, your honor.  I would respectfully ask for the court's.  I am trying to put in what I believe –

76

> The Court:  Just don't explain to me what you are
> trying to do.  I am telling you what you cannot do.  If
> you  continue to do it, I will terminate your opening
> statement.  Continue.

60 RT 9281:15-9282:11.  After what amounts to ten pages of trial
transcript in this death case, the judge was already threatening to
terminate opening statement.  In addition to breaking up counsel's
presentation, this undoubtedly caused the jury to view anything
counsel said disfavorably.

When Fernando Nieves was cross-examined during the
penalty phase, defense counsel attempted to ask him about the
signatures on several cards written by the children to Sandi Nieves.
63 RT 9928:23-9930:10 (comparing exhibits VV-9 and VV-10).
When defense counsel prefaced a question by saying the signatures
looked the same to him, the trial judge once again cited him in
front of the jury.

> The Court:  Mr. Waco, I'm citing you for misconduct
> for making that comment, and I'll cite you later for
> contempt.  It occurred in the direct presence of the
> court.  I have warned you repeatedly about stating your
> opinion in front of this jury. You did it.  Don't do it
> again.

77

Mr. Waco:    I apologize, your honor.

The Court:    The jury will disregard his comments.

Id. at 9939:13-21.

During the direct examination of Shirley Driskell, Sandi Nieves's childhood friend, defense counsel tried to show her some greeting cards Sandi had received from her children. One of the prosecutors objected on relevance grounds. Then he said the prosecution had not seen them. When defense counsel pointed out that they were among the exhibits, the trial judge said, "Sustained. Sustained. Sustained." 61 RT 9494:1-12.[24] Defense counsel asked for an Evidence Code section 402 hearing, but the judge instead cut off further questioning. He then asked the prosecution if it wanted to begin cross-examination immediately. Mr. Barshop, one of the prosecutors, responded: "I'd love to start cross-examining her now." There was no admonishment from the court for this gratuitous personal statement. 61 RT 9495:6-7. Instead the court allowed the cross-examination to begin at once. Id. 9495:8-12.

---

[24] Compare the trial judge's treatment of the defense when counsel objected to victim impact evidence it had not seen in advance, such as the posters placed in the courtroom and the 13 minute memorial videotape played for the jurors. In those instances, the court found no unfairness from the surprise; nor did the court see any reason to exclude the evidence. See Part XVII infra.

See also Part XXII _infra_ (court chastises counsel during closing argument for arguing that there are multiple Penal Code § 190.3 factor (k) factors).

c.    **Disparagement Outside the Presence of the Jury**

From beginning to end, outside the presence of the jury, Judge Wiatt acted even worse. It is not surprising that twice the judge called the case as People v. Waco, instead of People v. Nieves. 40 RT 5789:6-9 ("We'll go back on the record in People versus Waco – People v. Nieves."); 59 RT 9296:12-26 ("People v Waco"). [25] Early in the case, Judge Wiatt said to defense counsel, "I think you are not being helpful to your cause, if you have a cause." 22 RT 2581:16-18. At the end of the case during a hearing on the restitution fine, after counsel argued that the death penalty was severe enough, the judge said, "It may seem strange to your office, Mr. Waco, but maybe following the law might seem strange to your office, because that's the only way you can explain it." 65 RT 10407:5-8.

_____

[25] At least one juror explicitly conflated the defendant with defense counsel. After the case ended, the juror wrote: "I feel disappointed that the defendant feels we didn't do our job to _his_ liking. I thought thats(sic) what he supports. = The Justice System=" 21 RCT 5528 (emphasis added).

79

Judge Wiatt accused defense counsel of "acting the fool." 23 RT 2915:20-2916:1. Then he accused counsel of trying to inject error and acting like a "clown." 24 RT 3010:1-14 ("I agree with Mr. Barshop's analysis. You're trying to inject error into this case. You're acting like a clown half of the time with some of your questions."); 61 RT 9469:2-3 ("The Court: Mr. Waco, stop acting like a clown, and start acting like a lawyer when we resume."). He called defense counsel a liar. 23 RT 2862:8-10 ("I don't believe they're asked in good faith. I think you're lying to me. You don't know the difference, that's what I think."). When counsel moved for a mistrial based on the court's animosity and failure of impartiality (18 RCT 4638-4639), the motion was denied. 27 RT 3550:23-27; 3569:1-3578:10. At one point the judge chastised counsel over this exchange during the cross-examination of Dr. Robert Brook.

> [Mr. Waco] Q  Sir, isn't the consequence of her giving a  lower maximum --
>
> The Court:    Return to the podium.
>
> Mr. Waco:  I'd like to use the -- my chart there to show something, to mark it.
>
> The Court:    What chart?
>
> Mr. Waco:  I believe there's a set of papers here, and I'd like to make a demonstration to the jury by writing on it.

80

> The Court:   No.  You can have the witness write.
>
> Mr. Waco:   Then I'll have the witness write on it.
>
> Can you put it down, sir.
>
> The Court:   I am going to ask the jury to go back into the jury room.

40 RT 5612:22-5613:7.  Based on this exchange, the Court chastised counsel for communicating his "disagreement with the court." Id. at 5613:20-5614:4.

At one point, Judge Wiatt threatened to report Mr. Waco to the State Bar and to write a letter to the Public Defender.  43 RT 6377:4-17.

d.   **Sanctions and Contempt**

During the course of the trial the judge cited defense counsel for contempt or imposed monetary sanctions.  Some of those citations occurred in the presence of the jury.  Judge Wiatt first imposed sanctions of $500 against defense counsel for failing timely to turn over discovery.  31 RT 4163:8-10.  At the hearing on the discovery sanction Deputy Public Defender Terri Towery said she was unable to locate a lawful order that Mr. Waco was accused of violating.  Judge Wiatt said the order was "the

Penal Code." 31 RT 4159:15-17.[26] See 18 RCT 4596-97 (order for sanctions); 19 RCT 4847-4880 (order for sanctions). After the hearing, Judge Wiatt accused Ms. Towery of being a liar: "That was a lie. Miss Towery lied to Miss Towery lied to the court saying there was no such order." 34 RT 4668:11-17. [27] The court also accused Mr. Waco of being untruthful for just standing by when Ms. Towery made her statement in his defense.  Id.[28]

On June 21, 2000, during the defense direct examination of witness Albert Lucia, counsel asked about Sandi's upbringing by her mother: With regards to the mother's actions toward the child, was that a daily, weekly, or pretty constant basis?"  The following then occurred.

————————————————

[26] Counsel filed a petition in the Court of Appeal challenging the sanctions.  The Court of Appeal issued a stay and a notice, pursuant to Palma v. U.S. Industrial Fasteners, Inc. (1984) 36 Cal.3d 171, indicating that it was contemplating issuing a peremptory writ to set aside the sanction. Waco v. Superior Court, B142821.

[27]  An amended discovery order is in the record at 11 RCT 2560-61.

[28]  Compare Judge Wiatt's general view of the prosecution.  "I am going to just accept Miss Silverman's representation. I don't think she's going to misrepresent anything to the court." 49 RT 7510:10-13.

> Ms. Silverman:   Objection.
>
> Vague.  Mr. Barshop:  Vague.
>
> Mr. Waco:   I object to the dual team.
>
> The Court:  Sustained.  I am going to ask the jury to go
> back into the jury room, and don't form or express any
> opinion about the case or talk to anyone about the
> case.

37 RT 5062:6-15.  After the jury was excused, the judge told defense counsel, "you have violated the court's order about no speaking objections." Id. at 5062:22-23.  The judge asked defense counsel to explain his conduct and then imposed monetary sanctions pursuant to Code of Civil Procedure § 177.5 in the amount of $750 for "making a speaking objection in the presence of the jury."  The judge proceeded to deny counsel a hearing and then ordered the jury back into court and resumed the trial.  Id. at 5062:21-5064:16. [29] See 18 RCT 4647-48 (order 29 for sanctions).

------

[29] Defense counsel petitioned the Court of Appeal for a writ of mandate.  Waco v. Superior Court, B142288.  The Court issued a stay of Judge Wiatt's order a Palma notice.

After Judge Wiatt withdrew the sanction Sandi Nieves had been sentenced to death.  65 RT 10227:28-10229:8.  See id. at 10228:3-4 ("given the jury's verdict in this case, I think that's probably enough.").

83

Defense counsel was sanctioned a second time a few days later, again for making a speaking objection.  Prosecutor Beth Silverman had been cross-examining Dr. Lorie Humphrey, who admitted that she had not turned over all of the data she had used who admitted that she had not turned over all of the data she had used in preparing her opinion regarding Sandi Nieves's mental state. After making her point, the following occurred.

> [Ms. Silverman] Q  You understand that this case that
> you're testifying in right now is a multiple murder
> case?
>
> A  I do.
>
> Q  Do you understand really the seriousness of the case –
>
> Mr. Waco:  Objection.  Lecturing by the district
> attorney.  It's argumentative.
>
> The Court:  I am going to ask the jury to go back into
> the jury room.

37 RT 5295:7-16.

After the jury left the courtroom, Judge Wiatt said defense counsel had made a speaking objection in the presence of the jury. Counsel apologized, explaining that "it's hard to think of the right words exactly at the appropriate time." Id. at 5296:21-22. Judge

84

Wiatt then sanctioned him in the amount of $1,050, again denying a further hearing. Id. at 5297:1-16. [30] [31]

While counsel was cross examining Dr. Brook, he attempted to show that Dr. Humphrey's numbers could be interpreted in several ways. He asked Dr. Brook a hypothetical. When Dr. Brook deflected the question with a nonresponsive answer, counsel objected. Judge Wiatt then sanctioned him in the jury's presence.

---

[30] A petition challenging the sanction was filed in the Court of Appeal. The court stayed imposition of the sanction and issued a Palma notice. Waco v. Superior Court, B142433. Judge Wiatt withdrew the sanction after Sandi Nieves was sentenced to death. 65 RT 10227:28- 10229:8.

[31] When the jury returned, Ms. Silverman asked another rhetorical question: "That is at this moment pending before this jury, that they have been sitting through and listening to for two months now?" Defense counsel objected on the ground that the question was argumentative. Judge Wiatt overruled the objection. 38 RT 5299:4-9.

40 RT 5615:4-15.  Judge Wiatt imposed sanctions of $1,100, payable within five days.  (See 19 RCT 4687- 94 (showing sanctions of $100); Id. at 4792-4800 (showing sanctions of $1,100).  He then cut off any further cross-examination of Dr. Brook on the subject.  Id. at 5615:23-5619:11.[32]

Dr. Diana Barrows performed the abortion on Sandi Nieves.  She testified for the prosecution.  Defense counsel was cross-examining her when the following occurred:

Q So the more you do, the more you get paid?

A Believe it or not, I'm not in it for the money.  I'm a pro-choice person, and I have been since I can remember.

Q But one of the motivations for you working at the clinic is to make money, to make a living?

A I work part-time.  I only work three days a week.  I'm semi-retired, I guess.

Q Well, I assume you're doing it to get paid, though, aren't you?

---

[32]  Counsel filed a petition in the Court of Appeal challenging the sanctions.  The Court of Appeal issued a stay and a Palma notice.  Waco v. Superior Court, B142477.  Judge Wiatt withdrew the sanction after Sandi Nieves was sentenced to death.  65 RT 10227:28-10229:8.

86

A  That's one of my motivations.  That's not the only motivation.

Q  I'm not saying anything is wrong with the motivation.

The Court:  I am going to ask the jury to go back into the jury room.

46 RT 6887:1-17.  The court continued:

The Court:  Mr. Waco, that is not a question.  That's a comment.  I warned you repeatedly not to make comments and editorialize. What is your explanation as to that gratuitous comment?

Mr. Waco:  I thought that the witness had made a statement with regards to the -- in the nature that she was feeling guilty about having made money out of this abortion procedure, and so I wanted to --

The Court:  Comfort the witness; is that what you're trying to do?

Mr. Waco:   Pardon?

The Court:  Comfort the witness; make her feel at ease; is that what you were trying to do?

Mr. Waco:  I wanted her to understand the nature of my question, and that my question had nothing to do with whatever her motivations were.  That's fine.

87

The Court:  I warned you not to do that.  You violated
a court order, and I am going to impose sanctions
pursuant to the code of civil procedure.

Id. at 6888:2-21. [33]

---

[33] In comparison, the prosecutors made similar comments
with no admonishment from the court, let alone sanctions.  A few
minutes after defense counsel was sanctioned for making his
comment regarding Dr. Barrows's motivation, Ms. Silverman asked
her: "you said one of your motivations is to obviously receive
payment; *nobody works for free*.  Do you have another motivation?"
46 RT 6900:27-6901:1.  There was no sanction against the
prosecutor for the italicized comment.

See also 48 RT 3520:9-10 (cross of Sandi Nieves by Ms.
Silverman: "Ma'am, I am not asking you about the lock on your
garage door."  No admonition, no sanction); 37 RT 5220:24-5221:7
(cross of Dr. Liorie Humphrey by Ms. Silverman: "Now, doctor, I
understand that as you're appointed in a criminal case, which is a
very serious case dealing with the death of four little girls and  the
attempted murder of a fifth child, that you would take –."  Defense
counsel's objections to the narrative overruled); 37 RT 5222:6-15

(cross of Dr. Humphrey by Ms. Silverman: "there are a number of questions I'd like to ask you about your testing of the defendant, your analysis of the neuropsychological testing and your conclusions regarding the defendant and how you reached those conclusions, but before I do that, let me ask you:" Defense counsel's objection to the narration overruled); 37 RT 5224:22-27 (cross of Dr. Humphrey by Ms. Silverman: "if you could just let me finish before you answer, so we don't repeat." Defense counsel's objection to argument with witness overruled.); 39 RT 5525:19-23 (cross examination of Dr. Humphrey by Ms. Silverman:

"Ma'am, you're being evasive. Just answer the question." Not only was there no admonition or sanction, but defense counsel was ordered to "sit down' when he objected.); 39 RT 5541:2-10

(redirect of Dr. Humphrey, objection by Mr. Barshop: "I am going to object. That's exactly opposite of what this witness just testified to." No admonition; no sanction despite this speaking objection).

Counsel filed a petition in the Court of Appeal challenging the sanctions. The Court of Appeal issued a stay and a <u>Palma</u> notice. <u>Waco v. perior Court</u>, B142821. Judge Wiatt withdrew the sanction after Sandi Nieves was sentenced to death. 65 RT 10227:28-10229:8

After a hearing the next morning, 33 Judge Wiatt imposed sanctions of $100. 48 RT 7252:26-7253:4. See 19 RCT 4812-4827.[34] Immediately prior to the resumption of testimony, counsel asked to have "the last question before the last answer read back." The Court said, "No." 46 RT 6890:23-24.

During cross examination of Dr. Robert Sadoff, the witness testified Sandi Nieves did not have to be in a dissociative state to put dowels in her windows. Defense counsel said, "I don't disagree with your concept here." 47 RT 7118:14-20. After the jury was sent out counsel was sanctioned.

---

[34] Counsel filed a petition in the Court of Appeal challenging the sanctions. The Court of Appeal issued a stay and a Palma notice. Waco v. Superior Court, B142821. Judge Wiatt withdrew the sanction after Sandi Nieves was sentenced to death. 65 RT 10227:28-10229:8.

After a hearing Judge Wiatt imposed sanctions of $100. 48 RT 7252:26-7253:4. See 19 RCT 4828-37.[35]

Later the same day during the cross-examination of Dr. Sadoff, the following occurred:

Q By Mr. Waco:  So would it be consistent with an altered state of consciousness with someone fainting and becoming oblivious to the world for 30 seconds to a 4 minute, or two minutes?

Ms. Silverman:    Objection.

Q By Mr. Waco:    Is that one of the forms that an altered state of consciousness can take?

Ms. Silverman: Objection. Asked and answered.

Mr. Barshop:    And assumes facts not in evidence. The Court:  Sustained.

Mr. Waco:    I respectfully object to the multiple objections. The Court:    I'll ask the jury to go back into the jury room.

---

[35] Counsel filed a petition in the Court of Appeal challenging the sanctions. The Court of Appeal issued a stay and a Palma notice. Waco v. Superior Court, B142821. Judge Wiatt withdrew the sanction after Sandi Nieves was sentenced to death. 65 RT 10227:28-10229:8

47 RT 7170:20-7171:6. [36] Counsel tried to explain that "I object only on the grounds because I don't know which objection the court is sustaining when the court says "I sustain the objection," when there are different people making different grounds.  I don't know how to change the question, or

---

[36]  Despite Judge Wiatt's permissive attitude toward the two prosecutors interposing seriatim objections ("it's entirely appropriate for the prosecutors to do that"), he did not have the same position when two defense counsel attempted to make a point.  See 61 RT 9610:11-13 ("I'm going to hear from either Mr. Fisher or Mr. Waco. I am not going to hear from both of you, back and forth."); See also 34 RT 4744:23-4745:10; 61 RT 9607:24-9610:15.  Compare, 37 RT 5261:15-24: "Your quarrel is with the concept that the prosecutors would at the same time raise an objection. They've done that countless times in this case. I have not told the attorneys that only one can talk at a time. I've made no limitation on them. They are both attorneys in this case. They're counsel of record. Either one of them can object and state whatever they want at any time."

figure out what the problem is." Id. at 7171:22-27. Judge Wiatt proceeded with sanctions in the amount of $100 after a hearing. Id. at 7171:28-7174:1; 48 RT 7252:26- 7253:4; 19 RCT 4886-4903.[37] When there was dual objection on different grounds, Judge Wiatt refused to tell counsel on what ground or grounds he had sustained the objection. See e.g., 52 RT 7878:7-14.[38]

During the prosecution's cross-examination of defense expert Dr. Gordon Plotkin, Mr. Barshop complained that he had not been provided Dr. Plotkin's CV. He then asked: "can I get a CV from anyone?" The witness offered to retrieve one from his car. Then defense counsel said: "I don't -- I believe it was sent downtown." Judge Wiatt then sent the jury out of the courtroom. He expressed an intention to impose sanctions

---

[37] Counsel filed a petition in the Court of Appeal challenging the sanctions. The Court of Appeal issued a stay and a Palma notice. Waco v. Superior Court, B142821. Judge Wiatt withdrew the sanction after Sandi Nieves was sentenced to death. 65 RT 10227:28-10229:8.

[38] Mr. Barshop: Objection. Calls for speculation. Ms. Silverman: And asked and answered.                    (continued...)

on defense counsel for making a speaking objection. Counsel responded that he was attempting to answer Mr. Barshop's question to "anyone" as to the location of the CV. The court then threatened contempt. 52 RT 7901:20-7904:11. (Later the court decided not to impose sanctions for this incident. 58 RT 9049:6-23.)

When defense counsel was cross examining Fernando Nieves during the penalty phase, he asked the witness if he had the original of a letter that Sandi Nieves had sent him in Germany. The witness answered that he had given it to the district attorney. Defense counsel then said, "we only have a xerox here." The court immediately sent the jury out and proceeded to give defense counsel oral notice that he

---

[38]   (...continued)

The Court:   Sustained.

Mr. Waco:   May I ask on what ground?

The Court:   Sustained. Just listen to the objections, and you will know the grounds."

would be held in contempt of court for making this comment. 64 RT 9461:17-9463:28. Judge Wiatt withdrew the citation after Sandi Nieves was sentenced to death. 65 RT 10227:28- 10229:8.

Midway during the guilt phase defendant sought a mistrial. 34 RT 4681:1-4683:11, 4684:15-4685:5.[39] This was followed by a series of subsequent mistrial motions. 35 RT 4771:8-4773:7 9 (denying written motion); 38 RT 5264:16-5266:8 (denying oral motion); 40 RT 5631:19- 5633:15(denying oral motion); 41 RT 5821:20-5827:19 (oral motion denied); 44 RT 4465:13-6466:24 (oral motion denied); 44 RT 6574:19-24 (no ruling); 49 RT 7430:12-7532:3 (oral motion denied).

During a discussion about foundation for evidence of mental impairment, defense counsel again sought a mistrial. He attempted to defend himself against charges he was purposely injecting error into the case and attempting to use inadmissible hearsay. After a joint attack from the two prosecutors and lectures from the judge, defense counsel finally said: "well, you know, it gets to the point, you know, it's -- it hurts too much to cry, and all you can do is sort of

---

[39] "[Mr. Waco:]: In the middle of the testimony early on the court banged its gavel when I was examining one of the witnesses, and                                          (continued...)

sit here and almost grin and bear it as best one can, and let the chips fall where they may." 34 RT 4724:27- 4725:2. Counsel was even chastised for accusing the court of being unfair: "You're warned about

---

[39](...continued)

throughout the trial the court's accusations and total demeanor indicate to me that the court seems to have a personal vendetta against myself, and maybe the entire defense team. And because of that, I reluctantly, respectfully ask for a mistrial, because I no longer feel that the court can look at these motions independently and give an independent evaluation. The whole tenor of the court's rulings and the way it denies the defense an opportunity to respond, whether it be in cross-examining witnesses or in motions being filed, and throughout the entirety of the case seems to be extremely one-sided, and my client is not getting a fair trial.

"I mean, that's my basic job. The court is obligated -- it's obligated to be fair and independent to assure Mrs. Nieves a fair trial and due process of law, and if the court looks within its own soul, it seems to me that your feelings towards me personally and the defense team has taken such a tenor, such a flavor, such an attitude that the court can no longer look at these things in a fair and independent way and make its rulings accordingly, instead of having a bias."

34 RT 4682:26-4683:6.

accusing the court of being unfair or backslapping or aligning itself with

the prosecution." 37 RT 5055:3-5. As the trial proceeded and the

disparagement and bias continued, counsel said he had become "very

anxious and quite upset, so my ability to articulate in a slow, succinct,

and more cohesive fashion has been affected by my agitation by the

court's seemingly -- seemingly, I emphasize the word "seemingly" --

agreeing with everything the district attorney has done." 42 RT

6059:22:27.

In fact, defense counsel said that he was directed at one point by his

supervisor "to go to UCLA, to get a checkup mentally and physically, and

see if I can continue with this case, because he was concerned I may not be

doing the job, or cannot do the job at this time, or any further." 42 RT

6056:1-6.

At 11:45 a.m. on July 7, 2000 when defense counsel asked for a

break because he had a headache and asked "to go to the office to

relieve it" since he did not "feel he [could] continue at this time," Judge

Wiatt not only refused to recess, but he belittled counsel. The judge

ordered counsel to continue. At noon, he ordered counsel back at 1:30

p.m. "with or without a headache." 45 RT 6735:16-6740:2.[40]

---

[40] Compare Judge Wiatt's solicitous treatment of Ms. Silverman. "Ms. Silverman:
To be quite honest, I'm exhausted at this point. I can't think straight. It's going on like
this for several days. . .Can the court give me maybe five minutes? Maybe I can sit here
quietly and cut out a substantial portion [of cross-examination]. ¶The Court: Yes you
can do that." 42 RT 6182:19-6183:15.

Despite the motions for mistrial and defendant's motions to disqualify Judge Wiatt pursuant to Penal Code § 170.1(a)(6), all motions were denied.  The judge continued presiding.  19 RCT 4663-4668, 4673-4680, 4774-4781, 4801-4809, 4838-4844; 20 RCT 5005-5060, 5075-5082, 5164-5168; 21 RCT 5280-5358, 5365-5372, 5457.

2.    **Disparagement and Threats to Defense Expert Witnesses**

a.    **Dr. Lorie Humphrey**

Lorie Humphrey, Ph.D., a defense psychologist, had a particularly difficult time with Judge Wiatt – so difficult that after he threatened her with prosecution for perjury, she never returned to testify, leaving the defense in need of a substitute neuropsychologist. [41]See 61 RT 9610:19-9624:19 ("[A]nd under the circumstances of her being called a liar and a perjurer, and the distress she was in over all of that, we didn't think we could bring her back and that she would be a good witness at that point.  So I, at least, started thinking in terms of trying to find an independent person to evaluate all this evidence" (61 RT 9618:22-9619:1).)

As Humphrey was cross-examined by one of the prosecutors, she was asked about a fourteen page report she had prepared and several tests she had given to Sandi Nieves.  At one point the court reporter complained that Dr. Humphrey was interrupting the questions

and the court reporter was having a problem recording both speakers.
53 RT 5319:1-3. The judge then dismissed the jurors. He threatened
Dr. Humphrey with sanctions.

> The Court:  Dr. Humphrey, the court reporter has just
> brought to my attention that you're interrupting the
> prosecutor in the questioning. I don't know what issues
> of divided attention or other psychological issues are at
> hand here, but you test people on this. Just from my
> perspective, it's not helpful when you're talking on top
> of somebody else, because these are excellent court
> reporters we have reporting this trial, but it's an
> insurmountable burden on them to try to write down two
> people simultaneously. It's very difficult, and that's why we
> have rules against it.
>
> If you do it again, I am going to impose sanctions against
> you for violating a lawful court order. You are ordered not
> to step over the words of counsel or the court, and if it
> means pausing and taking a breath before you answer,
> that's what you are going to have to do.

---

[41] See Part XIX infra.

The Witness:  That's a good idea.

The Court:  I warned you about this a number of

times, and it's gotten to the point, unfortunately –

Id. at 5319:13-5320:7.

Dr. Humphrey's testimony was then truncated so that Dr. Robert Brooks, a prosecution expert, could be taken out of order. [42] 38 RT 5364:5-20, 5369:2. Although Dr. Humphrey was in the courtroom with the notes while Dr. Brook testified, at the end of the day, after the jury was dismissed, she was nonetheless threatened with sanctions for failing to turn over the notes earlier. [43]

---

[42]  In the meantime, Dr. Humphrey went across Los Angles County to retrieve her notes, as ordered by Judge Wiatt. She got stuck in traffic coming back to court.  The judge refused to delay the proceedings for even a few minutes to allow Dr. Humphrey to assist defense counsel as the prosecution expert, Dr. Brook, was attacking Humphrey's earlier testimony. 38 RT 5381:13-23 ("I am not going to delay for her.").

[43]  Compare the treatment of prosecution witness Dr. Brook. When Dr. Brook stated that he had notes he had not given to the district attorney to show the defense:

Q With regards to the notes you took yesterday, you

say you have those with you.  You have not turned that

over -- did you turn it over to the district attorney?

A  No.                                    (continued...)

The Court:    All right.  I will tell you, counsel are

ordered here at 9:00 o'clock tomorrow, and however

long it takes, that's how long we'll be in session.  Now,

I want Dr. Humphrey to be here tomorrow regarding

the issue of sanctions for

non-compliance with discovery.  She is ordered to be

here tomorrow at 9:00 a.m.

Ms. Silverman:   Can we get those notes that she

went to get at her office?  I am assuming copies

were made.

The Court:   She was ordered to provide them to you at

1:30. Ms. Silverman:    No, she hasn't, and it's 5:00

o'clock.

Mr. Waco:   She's been sitting here waiting to turn it

over. She hasn't had an opportunity.

The Court:   Well, what is it about bringing it here and

giving it to the prosecutors at 1:30 that she didn't

understand?

Mr. Waco:   In all due respect, she was told to be back

here. We're not hiding anything.  She has the material.

The Court:   Well, that's not true.  You are hiding things

101

and have hid things in the past. Dr. Humphrey is here.

She is ordered to be here tomorrow at 9:00.

38 RT 5489:22-5490:20.

The next day proceedings were delayed until the afternoon because the defendant had not been brought to court by the bailiff. After the trial judge blamed the delay on defense counsel, he ordered Dr. Humphrey back at 2:30 p.m. when the defendant would be present. [44]

------

[43](...continued)

    Mr. Waco:    Your honor, I would respectfully ask for a recess to see them.

    The Court:    That request is denied.  It's untimely.

38 RT 3486:17-25.

[44]    See 39 RT 5491:1-5503:13.  "So the delay, once again, is attributable to Mr. Waco, and I will just have to order counsel to come back with the witnesses at 2:30."  Id. at 5501:23-25.  See also, id. at 5505:12-17 ("Mr. Waco: My client also gives me a notice that she requested to come here this morning at 9:55.  She's been telling the -- she was woken up at 7:00 o'clock to come here, and she told deputy McVey downtown, and I have here a computer readout.  The Court: Forget about that right now.").

"Dr. Humphrey, you're ordered back at 2:30. Call your babysitters and dog sitters and everybody else, and tell them we'll be here as late as it takes." 39 RT 5503:26-5504:1.

When the proceedings resumed, the prosecution was permitted to question Humphrey about a six page document she had received from a Dr. Satz, which Humphrey believed had new norms for scoring the color trails test that she had referred to in her trial testimony. The prosecution was also permitted, over objection, to cross-examine Humphrey as to a phone conversation she had had with Satz the previous day. Humphrey admitted that she learned from the conversation with Satz that the color trails norms she had used and testified about were not the newest norms. 39 RT 5507:1- 5511:7; Exh. 73. At that point Judge Wiatt became the inquisitor:

> Q  And were you told that the norms that are in
> the color trails manual are now outdated by Dr.
> Satz?
>
> A  No.
>
> Q  Isn't that what you testified to yesterday?

> A  Yes.  That's what I believed to be true at that
> time. The Court:  Well, what's changed to correct
> your belief? The Witness:    I've gotten more
> information.
>
> The Court:  So what you said yesterday was untrue,
> even though you thought it was true?
>
> The Witness:  Yeah.  It was the -- what to the best of
> my knowledge yesterday was true, and today I have
> more information.

Id. at 5511:8-21.  More questions were then asked by Ms. Silverman about Humphrey's telephone conversation with Dr. Satz.  Id. at 5511:22-5522:27. The prosecutor then asked an open-ended question: "Did Dr. Satz say anything else to you?"  After Dr. Humphrey answered that she did not think so, the following exchange occurred, ending with Judge Wiatt threatening her with prosecution for perjury.

> Q  Did Dr. Satz tell you that you shouldn't be
> mucking around in areas you are not qualified in?
> Was that his language?
>
> A  No.
>
> Q  That wasn't?
>
> The Court:    You're under oath, Dr.
> Humphrey. Q By Ms. Silverman:    Do you
> understand that?

> The Court:  If you're not sure, you can say that.  But if you specifically deny that and it's not true, you have a problem.

37 RT  5523:2-11.

The prosecutor continued asking questions about the norms used by Dr. Humphrey and whether she had attempted to mislead the court.  When defense counsel objected to the form of the questions and that most questions had been asked and answered previously, the trial judge overruled every objection.   The interrogation ended with another insult from the judge.

> Q By Ms. Silverman:   Were you wrong in using the norms that you used in this case in testifying before this jury?  Were you wrong?
>
> A  No, I do not believe I was.
>
> Q  You still are telling this court that you  were correct in using unpublished, experimental norms,  the ones contained in people's 73?
>
> Mr. Waco:  There is no evidence those are experimental norms, your honor.
>
> The Court:  I have overruled that objection a number of times. You don't have to make it again.

105

Q By Ms. Silverman:  Is that yes?  It's a simple

question. The Witness:    Repeat the question once

more.

The Court:  *Doctor, why don't you just listen to the question*

*the first time.*

The Witness:  There is a lot going on, and I lost track

of it. I'm sorry.

The Court:    Read it back.

        (Record read.)

The Witness:  The question misstates what I have

stated by referring to these as unpublished,

experimental norms.  I am not at all certain that these

are unpublished, experimental norms.

39 RT 5530:1-27 (emphasis added).  The judge did not relent during

the defense examination, where he also took over some of the

questioning.

The Court:  And sometimes you use the results and

sometimes you don't in forming your opinion; is

that what you're saying?

A  I use the results if they fit -- you look – when you

do a neuropsych examine, you get some scores sort of

in isolation.

The Court:  Why don't you just answer my question yes or no.

Id. at 5532:21-28.  See also, id. at 5546:10-5547:18, 5548:7-14.

106

When Dr. Brooks was called by the prosecution out of order
to rebut Dr. Humphrey, the court ordered Humphrey out of the
courtroom. Id. at 5558:13-26. After defense counsel objected,
Judge Wiatt stated, "if somebody lies in a courtroom, it would be
more appropriate that they not be in the courtroom when there's
impeachment evidence on that." Id. at 5559:22-26. After Dr. Brook
testified, the court stated that: "frankly, based on what Dr.
Humphrey has said, I mean, *she is just an out-and-out liar*, Mr. Waco."
Id. at 5572:3-5 (emphasis added).[45] [46]

---

[45] The lie, according to the court, was that "she characterized People's 73 as
the newest normative data when, in fact, it's in this '93 booklet." Id. at 5572:8-10.

[46] The record shows that among the numerous tests Dr. Humphrey
administered to Sandi Nieves, she used the wrong set of norms in scoring
the color trails results. Mistakenly, Humphrey thought the faxed norms,
prepared in 1993, were the most recent. Her testimony before the jury
covered a broad range of testing and results. The color trails was a small
part of it, but the prosecutors and court latched onto the color trails issue as
a means of undermining Dr. Humphrey's entire testimony.

The effect of Dr. Humphrey's use of older norms is debatable at best. In
fact, if she had relied on the correct norms, they would have shown Sandi Nieves to
be even more abnormal than Dr. Humphrey's results disclosed. 39 RT 5572:23-
5573:1. See also 40 RT 5609:4-27, 5611:18-25 (Dr. Brook testifies that norms in
the manual would have led to the same result).

The prosecution asked that she be precluded from providing further testimony. Judge Wiatt said he would not preclude her from resuming her testimony, but he then gave a direct threat to the defense and advice to the prosecution:

> Ms. Silverman:  But we don't want her to be recalled, your honor. This is a witness who clearly, I believe, has misrepresented and lied in a court of law, and should not be allowed to resume the stand knowing that.

> The Court:  Well, I am not going to preclude her from getting back on the stand. *If she wants to get back on the stand, you may want to have somebody from the Office of the Attorney General here.* You probably would have a conflict in prosecuting her. Maybe not. But it's clear to me that she's perjured herself.

Id. at 5517:6-17. [47] The threat itself violated Sandi Nieves' rights to a fair trial. See Webb v. Texas (1972) 409 U.S. 95 (trial judge threatened defense witness with prosecution for perjury). This requires reversal.

---

[47]  Judge Wiatt's visceral use of the term "perjury" was a direct threat. It was not any sort of unbiased analysis of criminal culpability or fair trial procedure. The crime of perjury requires a wilfully false material statement. See Pen. Code § 118; People v. Hedgecock (1990) 51 Cal. 3d 395, 405; People v. Pierce (1967) 66 Cal.2d 53, 61. It is highly doubtful Dr. Humphrey wilfully, as opposed to carelessly, misrepresented anything. Even so, the wrong norms in scoring a color trails test were not material to the outcome of this case or even Dr. Humphrey's opinions. See note 46 supra.

b.    **Dr. Philip Ney**

During the course of Dr. Phillip Ney's testimony, the court took a recess for the Fourth of July holiday.  Dr. Ney was from Victoria, Canada and had an active patient practice there.  40 RT 5739:3-4.  Judge Wiatt ordered him back at 10:00 a.m. on July 5, 2000.  Dr. Ney respectfully asked the court if he could return to court at 11:30 a.m. so that he could fly round trip in one day and continue treating his patients.  Judge Wiatt insisted he come to court at 10:00 a.m. and threatened him with an arrest warrant if he did not come back.  42 RT 6208:11-20 ("This court proceeding is going to take precedence over his personal life."); 6213:1-6214:6 ("If he doesn't come back and he's ordered back, I'll issue a warrant for his arrest.  And I'm sure the Canadian authorities will cooperate.").

During cross-examination of Dr. Ney, one of the prosecutors continually asked Dr. Ney what he had testified to during the prior week in the case.  Dr. Ney could not recall precisely without a transcript, Judge Wiatt implied in the presence of the jury that the prosecutors could show Ney was lying simply by use of the transcript after Ney testified. 42 RT 6093:6-6096:9; 6096:12-14 ("just ask a direct

question, and if it's inconsistent then you can impeach him with the transcript.") .[48]

### a.    Dr. Gordon Plotkin

When Dr. Gordon Plotkin, a defense expert, was testifying about a literature search he had conducted, Judge Wiatt gratuitously took over the examination in order to undermine Dr. Plotkin by making him appear to be shallow and incompetent.

The Court:   Wait, wait.  Please.  When you say you
found volume of articles, do you mean to say that
you found volumes of abstracts of articles?

The Witness:    That's correct.

The Court:    And you haven't read any of the articles themself;
is that correct?

_____

[48]   Judge Wiatt made it clear to the attorneys, outside the presence of the jury, that he believed Dr. Ney, like Dr. Humphrey, to be a "liar."  46 RT 7004:26-7006:4; 51 RT 7738:14-7739:28.  He also disparaged defense expert Dr. Kaser-Boyd, who ultimately did not testify, that "I don't have a lot of confidence in her declarations under oath."  36 RT 5012:18-22.

The Witness:  Right.  All from the same search. The Court:  Did you do this on the internet?

The Witness:   Yes.

The Court:  Didn't you see when you were online on the internet that you can simply log on and order the document by e-mail.

The Witness:   Well, I did this Saturday.

The Court:  Didn't you see that when you were online that all do you have do[sic] is log on and become a user and you can order the articles online?  Did you see that?

The Witness:  I don't think you can log on on a Saturday to become a user.  But it didn't phase me to do that.  I had enough data, I felt, to make that opinion.  I should say that I would like to read the article, that would be the ideal way of doing it, but it's not -- the previous expert testified that he based  his opinion on a pubmed search and not reading articles which explained it.

The Court:   Which expert are you referring to?

The Witness:  This was, I believe, [prosecution expert] Dr. Phillips talked about the PubMed search.

111

The Court:  But he is a board certified toxicologist,

correct? The Witness:    This is about serotonin

syndrome.

The Court:  All right.

The Witness:    He's not an expert in that.

52 RT 8008:13-8009:19.

When Dr. Plotkin, was cross-examined by the prosecution, he was asked why he had not interviewed the defendant.  Explaining that he was retained shortly before his testimony was presented, and further explaining the time constraints he worked under, Dr. Plotkin said it would be preferable to have interviewed the defendant beforehand.  53 RT 8104:6-27. The Court then gratuitously disparaged him by asking: "then why did you accept the appointment?"  Id. at 8104:28-8105:4.

After explaining that he generally enjoyed this type of work, Plotkin said that this was the most adversarial case he had seen. 8105:19-8106:12. He expressly noted that "I believe that the defense experts have been suggested as liars to begin with, and had I known that, I wouldn't have taken on the personal insults the way I have." Id. at 8105:22-25.

On cross-examination, Judge Wiatt consistently refused to allow Dr. Plotkin to explain his answers.  See e.g., 52 RT 7949:19-7950:7; 8092:6-17.

112

When Plotkin finally protested, with the jury out, Judge Wiatt threatened to have him taken off the Los Angeles County approved expert panel.

> The Court:  Now, Dr. Plotkin, I want a word with you. The Witness:  Sure.
>
> The Court:  Dr. Plotkin, you have not been denied an opportunity to explain your answers. What you don't perhaps understand is when you're being cross-examined by somebody, they ask you questions and you're expected to answer those questions. If you feel you need to explain it further, when redirect is done by Mr. Waco he can bring out the things that you felt were not explained. Every time there's been a limitation on your explanation, it's the court that has done it. *Now, if you have some problem with me, or if you have some problem being an expert on our panel, let me know, and I will contact the head of the panel and I will have you taken off.* But I don't want you arguing with the court in front of the jury, and when the jury comes in here I am going to tell them that. Bring in the jury.

53 RT 8119:8-28 (emphasis added).  The judge then told the jury "There has been no limitation on this witness in his ability to explain anything." 53 RT 8120:28-8121:1.

On the other hand, Judge Wiatt freely allowed prosecution experts to explain their answers and answer leading questions from the prosecution.

See e.g., 18 RT 1904:26-1905:3 (leading questions from prosecutors to prosecution experts permissible); 40 RT 5609:4-5610:5 ("let him finish, Mr. Waco"); 44 RT 6607:15-23 (leading questions from prosecutors to prosecution experts permissible); 54 RT 8279:11-8282:10 (lengthy explanation to "yes" and "no' questions); <u>id</u> at 8304:4-8305:21 (same); 45 RT 6711:18-6713:1 (over objection, court allows prosecution lengthy explanatory answer).

Later, as Dr. Plotkin was testifying, Judge Wiatt again denigrated him in front of the jury, doing the work of the prosecutors.

> [Mr. Waco] Q  And with regards to Ney calling it a "dissociative state" after a seizure, you call it — it's your terminology that it would be better termed a "delirium state." Is that correct?
>
> . . .
>
> A  I believe that he was confused during some parts of his testimony where he --
>
> Ms. Silverman:    Objection. Move to strike, nonresponsive. The Court:  Overruled.
> The Witness:  I would more be apt to describe that as a delirium state after a seizure. Where he, I believe,

misspoke and called it a dissociative state.

The Court:   When you say you believed he misspoke, you never talked to him, did you?

The Witness:   No. From reading his testimony.

The Court:   For all you know, he said exactly what he meant to say and he just doesn't know what he's talking about.

You don't know that, do you? The Witness:   That's correct. The Court: That's a possibility?  The Witness: Sure.

The Court:   *So why don't you confine your answers to that, and don't assume what is in Dr. Ney's mind if you're* (sic) *never spoken to the man.*

53  RT  8186:6-8187:10  (italics added).

3.    <u>Disparagement and Threats to Defense Lay Witnesses</u>

When lay witness Carl Hall testified at the penalty phase on behalf of the defendant, Judge Wiatt was equally demeaning – essentially taking advantage of Mr. Hall's lack of courtroom sophistication. Hall was explaining his "yes" and "no" answers. The judge would strike the explanations.  Then this occurred:

115

[Mr. Waco] Q  The -- did you also go to the funeral of the children?

A  I was able to attend the funeral.  And at that time I had witnessed some hostilities between --

Mr. Barshop:  I am going to object.  Ms. Silverman: Nonresponsive.

The Witness:  -- Mr. Folden.

The Court: All right.  I am going ask the jury to go back in the jury room.  Remember my admonitions.

62 RT 9659:19-28.  Outside the jury's presence Judge Wiatt threatened the witness with money sanctions and jail.

The Court:  Wait.  That calls for a yes or no answer, does it not?  Does it not?

The Witness:  It could.

The Court:  It does, doesn't it?  If you answer another question like you just did, I am warning you, if you answer a question other than yes or no when it calls for a yes or no answer and try to get before this jury improper evidence that I've already ruled upon, *I will hold you in contempt of court, put you in*

116

*jail for five days, fine you up to $1000 or impose monetary*

*sanctions of up to $1,500. Those are the options I have. Do you*

*understand that?*

The Witness:    I do.

Id. at 9660:12-27 (italics added).[49] Judge Wiatt then informed the jury that Hall had been admonished "not to get anything else before the jury that is not responsive to the question." Id. at 9664:17-20. Next Hall was chastised for answering a question while a question was pending. Judge Wiatt again showed his lack of patience and bias toward this defense witness:

---

[49] Previously Judge Wiatt held an Evidence Code § 402 hearing regarding the testimony of Carl and Cindy Hall. However, neither witness was present for the hearing. The court's ruling was less than clear and neither witness was informed by the court as to what was and was not the proper scope of their testimony. The only evidence pertaining to Hall that Judge Wiatt had previously ruled on related to defense Exhibit SS-7 concerning David Folden's repossession of a car from Sandi Nieves's home after the fire. Hall was not even present when this ruling was made. Hall's testimony, which was the subject of Judge Wiatt's disparagement before the jury, did not even begin to touch on the precluded subject matter. See 62 RT 9331:15-9638:24, 9631:1-9638:24.

Q By Mr. Waco:  What is there about Sandi's character that you believe benefits yourself?

Ms. Silverman:    Objection.    Irrelevant.

The Witness:  Sandi has been inspirational to me in raising my children.

By Mr. Waco:  You have to

wait.  Mr. Barshop: Move to

strike.

The Court:  Do you understand when there's an objection, you're not supposed to answer the question? Do you understand that?

The Witness:    Okay.

The Court:  Do you understand

that?  The Witness:  Okay.

The Court:  Then why did you

just make that response when

there was an objection raised?

Why did you just make that

response when there was

objection?  You don't know, do

you? The answer is stricken.

By Mr. Waco:  Are you nervous up

there? A Yes, I am, very much so.

Id. at 9666:12-9667:4.

118

Direct examination ended abruptly.  On cross-examination, Judge

Wiatt was not finished humiliating Hall and undercutting the mitigating

force of his testimony.

> By Mr. Barshop:  Do you think someone who kills
>
> their children is a warm, loving, caring parent?
>
> A  Not a person that might be in their right
>
> mind. Q Oh.  Who told you she wasn't in her
>
> right mind? A  Sandi would not do this if she
>
> had not been.

---

[50]  Judge Wiatt was clearly suspicious and biased against the defense

witnesses in general.  Sometimes this manifested itself in pettiness, such as

stating on the record that he needed to review the motel bill submitted for Mr.

and Mrs. Lucia, Sandi Nieves's stepparents, because it might include "x-rated

movies and room service and all kinds of things."  58 RT 9060:18- 9061:14;

9114:3-7.

When Dr. Gordon Plotkin was testifying, Judge Wiatt asked him if he

was referring to any notes.  Dr. Plotkin answered," No. Your honor."  52 RT

7863:13-15.  After the witness informed the Court that he was not referring to

notes, in the jury's presence, Judge Wiatt peered over at him as if to verify

that for himself.  Then, the subtle glance apparently being insufficient to satisfy

him, the Judge stood up, leaned over, and carefully scrutinized the witness area

to be sure that the witness was indeed not referring to any notes as he had

expressed to the Court. See Declaration of Howard Waco and Tina Katz, 22

RCT 5590.

Q  Who told you she wasn't in her right mind?

A  Sandi would not have done that had she been –

The Court:  Why don't you just answer the question. Who told that you?

The Witness:  Nobody told me.

The Court:  Then why didn't you just answer the question that way?

Id. at 9668:19-9669:7.

Judge Wiatt's conduct undercut Hall's testimony and prejudicially undermined Sandi Nieves's defense. "In this incident, as in others, the manner in which [he] addressed lay witnesses

reflects impatience, anger, and an intimidating lack of courtesy in explaining court procedure." Kloepfer v. Commission On Judicial Performance (1989) 49 Cal.3d 826, 844. See also, id. at 846, 857-858 (prejudicial misconduct for judge to tell witness, "You can be punished with a fine or jail. Keep your mouth shut.").[50]

4.    **Disparagement and Threats to Sandi Nieves**

Judge Wiatt was no less cruel and unfair when Sandi Nieves testified on her own behalf at the guilt phase. 35 RT 4783-4939. He threatened her, he disparaged her, and he branded her with an

"unmistakable mark of guilt." <u>See</u> <u>Holbrook v. Flynn</u> (1986) 475 U.S. 560, 571; <u>Estelle v. Williams</u> (1976) 425 U.S. 501.

After brief direct examination in which Nieves testified she remembered very little from the night of the fire, she was vigorously cross- examined by deputy district attorney, Beth Silverman. At the end of the cross-examination, Nieves said that "I sit here and wonder every day what I could have done different and what happened there, period. I have no idea." <u>Id.</u> at 4932:4-6. The prosecutor then asked if she had opened the sliding glass door in the morning after the fire to go into the backyard. Nieves answered that "I would have had to have." <u>Id.</u> at 4932:9. Next Nieves said she did not remember stepping over her children. <u>Id.</u> at 4932:19-20. At that point, the prosecutor asked Nieves to "turn around" and look at the photographs marked as Exhibit 3, showing the four dead girls on the floor. Nieves answered, "if it's of my children, I'm not." Judge Wiatt abruptly said in the jury's presence: "Put it in front of her then." Defense counsel objected. The objection was overruled. <u>Id.</u> at 4932:21-28.

When the photos blocked the jurors' view, Judge Wiatt ordered that they be put back. He then ordered Nieves to look at the photographs:

> [The Court:] Miss Nieves, you're ordered to turn around and look at the photographs.

> The Witness:   I am not looking at my children if they're dead.

121

> The Court:  I am ordering you to turn around and look at the photos.
>
> The Witness:   I am not looking at my kids.

Id. at 4933:4-10.  Judge Wiatt sent the jury out of the courtroom. Without any exhortation from the prosecution, or asking for a showing of relevance, or making inquiry whether the prejudicial effect might outweigh the probative effect under Evidence Code § 352, Judge Wiatt threatened Nieves with contempt of court.

> The Court:  I am ordering you look at the photographs, Miss Nieves.  You can put them front of her, if they'll fit on the table, and you're going to have to look at the photographs and be questioned on them. If you don't and you violate an order of the court, I will find in you contempt of court.  Let's bring out the jury.

Id. at 4933:20-27.  Defense counsel asked for "a couple minutes for the witness to compose herself?" Judge Wiatt responded with an emphatic, "no." Id. at 4933:28-4934:2.  Trial before the jury resumed.

The prosecutor then asked if Nieves was telling the jury she thought her children were asleep when she stepped over them. A defense objection was overruled. Nieves answered:

> I don't remember my kids at all on the floor. I don't remember them at all, and I am not going to look at my kids when they're deceased. I don't want to remember my kids like that. I want to remember my kids alive.

Id. at 4934:21:25. The prosecutor then asked if Nieves had looked at the "vomit, foam, and things" that were coming out of the children's mouths as she stepped over them. Nieves denied any recollection. Id. at 4934:26- 4935:4.

Defense counsel asked for a recess because "the witness is distraught." Without any prompting from the prosecution, Judge Wiatt overruled the request. He ordered defense counsel to "sit down." At that point, the prosecutor announced that she was finished. Id. at 4935:6-12.

Nieves had not looked at the photos, but the failure to do so did not impede the prosecutor's ability to make her point (that is, that Nieves had to step over the children to get out of the house),

and provided ammunition for an unfair attack on Nieves's character and honesty. Id. at 4935:28- 4936:19.[51]

After the jury was dismissed defense counsel made further objections to the use of the photos and Judge Wiatt's orders. The prosecutors did not have to argue their position because Judge Wiatt advocated for them. 35 RT 4935:28-4936:16. Judge Wiatt

---

[51] See Prosecution Guilt Phase Rebuttal Closing Argument (57 RT 8857:22-8858:3):

> We know the sliding gas door was closed and the
> kitchen window was closed during the fire, because
> there was no soot outside. Remember that
> testimony?
> The house was sealed up. We know from her
> testimony, as well as the physical evidence, that she
> opened the patio door and that she went out to the
> kiddie pool, as she said.
> And that when she did so, when she walked out and
> when she walked back in, she walked over the bodies
> of her children and claimed she didn't notice them.

overruled all objections and he briefly turned to scheduling matters. The bailiff then asked Judge Wiatt if he could take Nieves out of the courtroom because "she's going to throw up." The judge said, "all right," and adjourned the proceedings for the day. Id. at 4936:25-4939:15.

There was no reason that Sandi Nieves needed to be forced to look at photographs of her dead children. Looking at the photos would not have proved anything relevant to her guilt. The jury had already seen the photos when they were introduced and described by prosecution witness Bruce Alpern. 16 RT 1509:13-1510:3; Exh. 3. Sandi Nieves admitted that she had to open the glass doors to get out of the house. 35 RT 4811:21-25 (direct), 4932:7-12 (cross). Since the photos were admitted in evidence (26 RT 3568), they could have been published to the jury and used in the prosecution's closing argument to the jury, as they were, even though Nieves had not looked at them during her cross-examination. See 54 RT 8447:3-22 ("I would ask you to look at People's 3."); 57 RT 8858:1- 8859:24 (Nieves' hysteria "was all done to put on a dramatic show for you".).[52]

There was no need for Sandi Nieves to be ordered to look at the photos and for them to be forced in front of her as Judge Wiatt ordered. Forcing Sandi Nieves to look at the photos was nothing

_____

[52] Defense counsel's rebuttal argument is found at 55 RT 8620:4-8621:24; 56 RT 8686:7-28.

more than dramatic argument by the prosecution to the jury. Every point the prosecution made through cross-examination could have been made, and was made, in a manner that was less cruel and less prejudicial than the mechanism used by Judge Wiatt.[53]

It is inconceivable that any witness, even a criminal defendant– who must be treated as "innocent until proved guilty," Deck v. Missouri, (2005) 544 U.S. 622, 630 – would be humiliated and disparaged in the manner Sandi Nieves was treated by Judge Wiatt. She should have been treated the same as any other witness due to "the presumption of innocence that survives until a guilty verdict is returned." Portuondo v. Agard (2000) 529 U.S. 61, 76 (Stevens, J., concurring).[54]

---

[53] Judge Wiatt did not let the incident pass when it came time to settle the instructions. He argued that CALJIC 2.62 (telling the jury it could draw inferences from a defendant's failure to explain or deny evidence produced by the prosecution) was warranted by Nieves's refusal to look at the photos of the children. He read the instruction to the jury. 54 RT 8383:14-8384:14; 20 RCT 4932 (instruction); 46 RT 7010:27-7013:17 (instruction conference). The instruction was unwarranted inasmuch as Nieves admitted she "would have had to have" opened the sliding glass door. 35 RT 4932:9.

[54] There was never any evidence that she had any criminal record whatsoever.

In fact, the prosecutors had previously told Judge Wiatt that they did not want the fathers – Fernando Nieves and David Folden – to see the photos in order to identify the girls.  27 RT. 3566:2-5. It is inconceivable on this record that Judge Wiatt would have forced the fathers to look at the photographs to identify the girls if either the prosecution or the defense had asked either of them to do so and the fathers had shown any reluctance.  In his bias toward the defendant and her counsel, Judge Wiatt lost all perspective.

Judge Wiatt's treatment of Sandi Nieves when she testified was one element of the structurally unfair trial she received.  Standing alone and in combination with other acts of misconduct it also was prejudicial.

First, it took the jury away from consideration of guilt or innocence.

Instead it appealed to emotion and courtroom drama, with the judge figuratively pointing at Nieves's guilt and humiliation.  "The notion that judges may strip the defendant of a right that the Constitution deems essential to a fair trial, on the basis of a prior judicial assessment that the defendant is guilty as charged, does not sit well with the right to trial by jury. It is akin, one might say, to 'dispensing with jury trial because a defendant is obviously guilty.'" Giles v. California (2008) _____U.S __, 128 S.Ct. 2678, 2686 (quoting Crawford v. Washington (2004) 541 U.S. 36, 62).

The judge's treatment of the defendant turned the jurors' attention to a power struggle between Judge Wiatt and the defendant over whether she would look at the photos or defy an order to do so. It deflected the jury from its proper role: assessment of the evidence. <u>See</u> <u>People v. Williams</u> (1942) 55 Cal.App.2d 696, 703 ("Such remarks deflect the minds of jurors from the evidence actually before them and cause them to reach conclusions based upon feeling, bias, and prejudice, rather than upon the evidence which has been properly received and from which alone they should arrive at verdicts under the law.")

Second, the judge's order, the abrupt manner in which it was given, and the refusal to allow Sandi Nieves to compose herself, "conveyed to the jury disdain" for her and her testimony. Judges must seek to maintain a judicial process that is a dignified process. "The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." <u>Deck v. Missouri</u> (2005) 544 U.S. 622, 630. "Litigants, witnesses and attorneys alike are entitled to have a court function as a court of justice in fact as well as in theory. In exercising the firmness necessary to the dignity and efficient conduct of court proceedings, a judge's attitude should not reflect undue impatience or severity toward either counsel, litigant, or witnesses Justice should

128

not be moulded by the individual idiosyncrasies of those who administer it." People v. Black (1957) 150 Cal.App.2d 494, 499;[55] see People v. Sturm (2006) 37 Cal.4th 1218, 1240.

Third, the prosecution used Sandi Nieves's refusal to look at the photos and the defendant's objections to them to great advantage in closing argument. In fact, the prosecution argued that "[t]he defense doesn't want you to look at those photos." 57 RT 8937:22-23.

> The defense doesn't want you to look at those photos.
> They say -- you know what they say? That shows
> passion, prejudice to show you photos. Those photos
> are the best evidence of what she did. We didn't create
> the photos. The sheriff's department didn't create
> what's in those photos. She did. She's a murderer.

And in her rebuttal argument the prosecutor argued that Sandi Nieves's emotional reaction when ordered to look at the photos of her dead children was all an act, implying that her maternal horror was dishonest, that she was in fact not grievously distraught and jarred out her state of denial, and that she was in fact a manipulative killer. See 57 RT 8858:1- 8859:24.

---

[55] The quotation is from the Canons of Judicial Ethics adopted by the Conference of California Judges. Id. at 499.

Fourth, Judge Wiatt's conduct also marked Sandi Nieves with guilt by gratuitously forcing her to perform an unnecessary act before the jury and suffer humiliation before the jury in a manner that no witness should endure under our system of justice in the absence of a compelling reason. In this respect it was prejudicial to the administration of justice and a fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Sandi Nieves, like "every defendant" who is brought to court should have been given "the appearance, dignity, and self-respect of a free and innocent man." People v. Duran (1976) 16 Cal.3d 282, 290. See Giles, 128 S.Ct. at 2686; Deck v. Missouri (2005) 544 U.S. 622. [56] "[T]he criminal process presumes that the defendant is innocent until proved guilty." Deck at 630. In a reverse of this basic principle, Judge Wiatt's treatment branded Sandi Nieves with an "unmistakable mark of guilt." Holbrook v. Flynn (1986) 475 U.S. 560, 571. This alone requires reversal of the convictions.

---

[56] Deck concerned the shackling of a defendant at the penalty phase of a capital trial. The Court held that shackling violates due process in the absence of a compelling reason to do so. Because shackling sends a message to the jury that undercuts the presumption of innocence and violates human dignity, the shackling cases are fully applicable here.

5.      **The Trial Judge So Skewed the Proceedings Against the Defendant That She Could Not Obtain a Fair Trial of Either Guilt or Penalty**

An elementary rule of due process requires that trials be conducted evenhandedly. A court may not tip the scale of justice either toward the prosecution or the defense. Due process guaranteed by the Fourteenth Amendment and the Right to a Fair Trial Guaranteed by the Sixth Amendment require that justice "be a two-way street." Wardius v. Oregon (1973) 412 U.S. 470, 476. Mutuality is the touchstone of fairness. Here Judge Wiatt manifested his bias by treating the prosecution and defense entirely differently in the day to day conduct of Sandi Nieves's capital trial.

a.      **The Court Curtailed the Scope of Defense Questioning**

Judge Wiatt was hyper technical in curtailing defense questioning of prosecution witnesses, frequently sustaining objections to questions on cross-examination on the ground that they constituted argument. The following is a small sampling of examples in which Judge Wiatt ruled defense questions were impermissibly argumentative during the guilt phase of the trial: 19 RT 2035:18-22 ("So your testimony at the preliminary hearing under oath is incorrect?"); 19 RT 2143:20-23 ("How were the kids able to get out of the car if your truck was only two feet away if her van was face-in when your truck was parked next to it?"); 20 RT 2275:25-

131

2276:2 ("And isn't it also correct that from time to time she covered
her face with her hands and turned away from the outside world,
you or anybody else, as well as cry?"); 21 RT 2431:12-21 ("So if
Scott said that he broke up with your mother two weeks or a month
before that, would that be a true statement or an inaccurate
statement?"); 22 RT 2628:17-21 ("This was a rehearsed thing that
you had yesterday, wasn't it?); 22 RT 2688:27-2689:3 "So she was
concerned that she might die if she had -- went through with the
pregnancy?"); 22 RT 2690:12-16 ("That seemed -- did that seem
inconsistent with anybody trying to commit suicide?"); 23 RT
2877:8-11 ("We didn't see your letters.  What were your letters like?);
24 RT 2951:5-7 ("So your affairs were only on the weekend?"); 24
RT 2961:13-19 ("Didn't she even tell you that in the will?"  Hearsay
objection withdrawn, court sustains objection sua sponte as
argumentative).

Additional examples of questions which were objected to and
sustained include: 24 RT 2965:2-8 ("Are you saying you don't
remember whether Sandi told you she loved you and only wanted
your friendship and love and respect in May of 1997?"); 24 RT
2998:6-10 ("So she was left with less than $1,000–" No objection,
court interjects sua sponte "That's argument counsel."); 24 RT
3055:21-26 ("A. We weren't living together as a couple. Q. Just
loving friends?"); 24 RT 3099:17-20 ("A. That's correct. No verbal
communication unless she was yelling at me for some stupid

reason.  Q. Part of the stupid reasons were to make sure Maynard, David Maynard, stayed away from the kids?"); 26 RT 3449:3-7 (When I said "the gas can was almost half full," did you say "yes, maybe, or no"? The Court: it's already been read, Mr. Waco. Anything else would be a matter of argument to the jury."); 26 RT 3469:15-23 ("So he, in fact, did tell you that the last thing he remembers is his mother laying down on the floor next to him, between himself and the stove?"); 26 RT 3521:21-24 ("When you and your partner went this to the crime lab – The Court:  Mr. Waco, that's argumentative.  Mr. Waco:  I haven't finished the question."); 26 RT 3524:13-20 ("So he had not given you any opinions? [No objection.] The Court: That's argument, counsel."); 26 RT 3525:17-23 ("Isn't it a fact that the A&E taping was just a small portion, fraction, of the time that you participated with your partner in an investigation of this case?"); 30 RT 4030:22-27 ("Do you feel you're testifying here as honestly as you can on the subjects you're being asked?"); 30 RT 4090:10-13 ("And how would you describe her as a mother?"); 43 RT 6355:12-19 ("If you did not know how to make a proper diagnosis, then you may have been incorrect when you evaluated her as not being depressed or needing antidepressants, or even being remorseful?"); 45 RT 6748:13-18 ("Also would it be fair to say that we should also take your computer readout on face value, because it has limitations in the -- which you put into your own report?"); 45 RT 6801:18-26

133

("With regards to accuracies, you made a statement here about my client saying 'have a happy life while I'm dead.' Where did you find that? What letter did you find that in? I missed that.").

And there are more examples: 45 RT 6802:17-23("That particular note doesn't say "have a happy life while I'm dead"? Court sustains objection sua sponte as argumentative: "The letter is in evidence, and you can argue it."); 46 RT 6886:19-23 ("If there aren't any patients there, there isn't going to be any business to get paid; isn't that true?"); 46 RT 6903:19- 28 ("The bottom line is, isn't it true the doctors want the initials on there in order to protect themselves?  Isn't that what they want?"); 46 RT 6907:14- 18 ("So if a person is having problems, physically or mentally, and doesn't call, it wouldn't show up in your charts; right?"); 46 RT 6931:4-10 ("And with regards to the mother abusing her, you told the district attorney on direct examination that you have no personal recall at this time; is that right?"); 46 RT 6953:27-6954:3 ("And so if there was a lighter and you didn't take notice of it, then it doesn't mean the lighter was  or wasn't there on July the 1st; isn't that true?"); 46 RT 6954:4-8 ("If you took no note with regards to seeing the pills, it doesn't mean the pills weren't there, either, does it, sir?"); 46 RT 6965:6-13 ("Q. Did you ever ask her to sign off on any document that she would agree that this is the conversation that she had with you? A. No. You could have done so had you wished to; is that correct?"); 52 RT 7866:2-8 ("If a particular drug were not tested,

134

one would not know the amount that would be in the system; is

that correct?").

On the other hand, the reporter's transcript is replete with instances in

which the prosecutors were given substantial leeway in asking aggressive

argumentative questions of defense witnesses. The judge's leeway in favor

of aggressive, argumentative cross-examination is especially pervasive in

Deputy District Attorney Silverman's cross-examination of Sandi Nieves

and defense experts Dr. Lorie Humphrey, Dr. Phillip Ney, and Dr. Gordon

Plotkin. It was also evident in her cross examination of all defense lay

witnesses in the penalty phase. [57] See also Part XX 57 infra (prosecutor assumes

defendant committed "perjury" in questions; objections overruled).

---

[57]    See e.g., 61 RT 9566:1-9567:22 (Cross-examination of Henry
Thompson):

> [Mr. Barshop:]   Sir, didn't you just say that your daughter
> told you that Delores had kicked her out? Didn't you just
> testify to that a few moments ago?
>
> Mr. Waco:   Asked and answered, Your Honor.
>
> The Court:   Overruled.
>
> Mr. Waco: Also, argumentative.
>
> The Court:   Overruled.
>
> The Witness: Okay. Possibly I should rephrase that to where she
> maybe didn't physically kick her out. But she made it so
> untenable for her to live there, she left on her own. That

(continued...)

### b. The Court Continually Truncated Defense Questioning

Throughout the trial Judge Wiatt truncated defense counsel's examination of witnesses and argument.  He did so in a disparaging and often rude manner, exhibiting a bias and impatience with the defense that infected the trial proceedings.  For example, the judge told defense counsel 70 times in the presence of the jury to "move on," get onto "something else,"

---

[57](...continued)

possibility exists, if you want to play with words.
By Mr. Barshop:
Q  Sir, you chose the words; that you said that your daughter –
Mr. Waco:  The D.A. is argumentative –
The Court:  Overruled.
By Mr. Barshop:
. . .
Q  Is it now your testimony that you don't recall?  I'm just trying to get what you're trying to say.
Is it you don't recall?  Is it that your daughter was kicked out?
Mr. Waco:  Objection to the voice of the District Attorney shouting at the witness.
The Witness:  You have cast doubt in my mind, sir.  You twisted things around so much, I have trouble sorting them out.
The Court:   Any other questions of the witness?
By Mr. Barshop:
Q  Do you have the same trouble sorting out whether the defendant was a good, loving, and caring mother?
(continued...)

or get into "some other area." [58] He made similar comments to the prosecution five times. [59]

[57](...continued)

A    Absolutely not.

Mr. Waco:   Object to the form of the question. Sarcastic and argumentative.

The Court:    It's overruled.

61 RT 9566:1-9567:22.

[58]    See 16 RT 1582 (Bruce Alpern cross), 1586 (Bruce Alpern cross), 1638 (John Harm cross); 17 RT 1782 (James Ribe cross), 1791 (James Ribe cross); 18 RT 1951 (John Ament cross), 1961 (x2) (John Ament cross); 19 RT 2026 (John Ament cross), 2037 (John Ament cross); 21 RT 2451 (David Nieves cross), 2458 (David Nieves cross), 2529 (x2) (David Nieves cross), 2553 (David Nieves cross); 23 RT 2752 (David Nieves further recross), 2848 (Fernando Nieves cross), 2887 (Fernando Nieves cross); 24 RT 2964 (Fernando Nieves cross), 2979 (x2) (Fernando Nieves cross), 2983 (Fernando Nieves cross), 2984 (Fernando Nieves cross), 3097 (David Folden cross); 26 RT 3373 (Wesley Grose cross), 3374 (Wesley Grose cross), 3378 (Wesley Grose cross), 3433 (Robert Taylor cross), 3445 (Robert Taylor cross), 3466 (Robert Taylor cross), 3468 (Robert Taylor cross), 3508 (Robert Taylor cross); 29 RT 3832 (Del Winter direct); 38 RT 5461 (x2) (Robert Brook cross), 5475 (Robert Brook cross), 5482 (Robert Brook cross); 40 RT 5623-5624 (Robert Brook cross); 44 RT 6515 (John Dehaan cross), 6558 (John Dehaan cross); 45 RT 6694 (Alex Caldwell cross), 6730 (Alex Caldwell cross), 6760 (Alex Caldwell cross), 6761 (Alex Caldwell cross), 6774 (Alex Caldwell cross), 6775 (Alex Caldwell cross); 47 RT 7102 (x2) (Robert Sadoff cross), 7103 (x2) (Robert Sadoff cross), 7104 (Robert Sadoff cross), 7155 (Robert Sadoff cross), 7158 (Robert Sadoff cross), 7211 (Robert Sadoff recross); 48 RT 7394 (Gordon Plotkin direct); 52 RT 7827 (Gordon Plotkin direct), 7879 (x2) (Gordon Plotkin direct); 53 RT

(...continued)

The court's truncation of the defense testimony and cross- examination violated the defendant's right to a meaningful defense, the right to confrontation, the right to a fair trial, and the right to a reliable verdict in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Crane v. Kentucky (1986) 476 U.S. 683, 690; Delaware v. Van Arsdall (1986) 475 U.S. 673, 679; Davis v. Alaska(1974) 415 U.S. 308, 315-316; Chambers v. Mississippi (1973) 410 U.S. 284; Skipper v. South Carolina (1986) 476 U.S. 1, 4; Gardner v. Florida (1977) 430 U.S. 349, 362.

---

[58] (...continued)

8138 (Gordon Plotkin redirect), 8151 (Gordon Plotkin redirect), 8178 (Gordon Plotkin redirect), 8182 (x2) (Gordon Plotkin redirect), 8221 (Gordon Plotkin further redirect); 61 RT 9458 (x2) (Charlotte Nieves cross), 9489 (Shirley Driskell direct), 62 RT 9766 (Robert Suiter direct), 9819 (x2) (Robert Suiter redirect).

[59] See  43 RT 6400 (Philip Ney further recross); 53 RT 8089 (Gordon Plotkin cross), 8098 (Gordon Plotkin cross); 62 RT 9715 (Lenora Frey cross); 62 RT 9719 (Lenora Frey cross).

### c.   The Court Assisted the Prosecution in Presenting its Case by Improperly Engaging in Its Own Internet Research

Judge Wiatt assisted the prosecution in presenting its case by suggesting themes for closing argument, by sustaining objections on grounds not articulated by the prosecutors, by asking leading questions of witnesses, by guiding the prosecution in its cross-examination of defense witnesses, by stymying the defense presentation, and by giving "star" status to a prosecution expert. Rather than repeat ourselves later, we refer to instances where the court aided the prosecution as they are addressed in the course of other substantive arguments in this brief. Those instances are incorporated here.

During the presentation of evidence in the guilt phase, Judge Wiatt improperly conducted his own Internet research on defense expert witnesses and the subject matter of the witness's testimony.  First, Judge Wiatt conducted an Internet search in chambers into the background and organizational affiliations of defense expert Dr. Phillip Ney. Second, Judge Wiatt conducted his own Internet search using the PubMed search engine to disparage defense expert Dr. Gordon Plotkin.

Judge Wiatt's Internet research compromised the adversarial nature of the trial and aided the prosecution.

### i.    Internet Search on Defense Expert Dr. Phillip Ney

The defense called Dr. Phillip Ney, a psychiatrist with expertise in abortion and postpartum depression as well as

139

pharmacological effects on patients' neuropsychological state of mind. 40 RT 5676:22-5678:8. He also had expertise in diagnosing seizures and the neurological effects of seizures. 40 RT 5678:9-5679:12.

The judge held an Evidence Code § 402 hearing outside the presence of the jury during which he allowed the prosecution to question Ney about a meeting with Sandi Nieves. 40 RT 5801:10-5802:5. After the prosecution questioned Ney for some time, Judge Wiatt announced, "I have a few questions for Dr. Ney." 41 RT 5846:1-2.

The judge asked Ney a series of questions related to the International Institute of Pregnancy Loss and Child Abuse Research and Recovery (IIPLCARR) of which Dr. Ney had testified he was president. 41 RT 5846:3-18. Judge Wiatt asked for the names of the other officers, overruling a defense relevance objection. 41 RT 5846:19-23. The judge then asked whether Dr. Ney ran a ministry called "Centurians." 41 RT 5847:26-28. Judge Wiatt questioned Dr. Ney about the purpose of the Centurians. 41 RT 5848:8-12. The judge asked Ney about his personal view on abortion and whether he had lectured at "pro-life" organizations.
41 RT 5848:13-25.

After the hearing, Judge Wiatt stated, "I'm going to have marked as People's 78 three documents that I found in researching Dr. Philip Ney on the Internet early this morning. I'll give a copy

140

to each counsel." 41 RT 5873:13-18.

The documents marked as People's 78 included three items. The first was a document with the heading "Human Life International's 17th World Conference on Love, Life and the Family, 1998 Houston," which included what appeared to be a description of a talk entitled "The Post- Abortion Syndrome" given by Drs. Phillip and Marie Ney.  Exh. 78 at 1. The second was an article entitled "World conference glows with special events," by Jim Vittitow and Marianna Alpha, CV. Id. at 2.  The article stated that Dr. Phillip Ney founded the International Institute of Pregnancy Loss and Child Abuse Research and Recovery (IIPLCARR) and a ministry called "Centurions."  Id. The third item was a speech entitled "Word Power: the Use of Language to Dehumanize and Rehumanize," by Margaret H. (Peggy) Hartshorn, Ph.D., in which the author thanks Dr. Phillip Ney as the founder of IIPLCARR for the opportunity to speak. Id. at 3.

This information was obtained by the judge, not the parties.

### ii. PubMed Internet Research Regarding Dr. Gordon Plotkin

The defense called Dr. Gordon Plotkin, a psychiatrist and a Ph.D. in Biochemistry.  41 RT 7376:1-7378:7.  He testified during cross- examination he conducted research to prepare for his testimony using the PubMed search engine that searches the

National Library of Medicine. 52 RT 7926:7-28. He explained he had only retrieved abstracts of the articles he relied on because it was a Saturday, he had accepted appointment to the case on very short notice, and he was unfamiliar with a way to retrieve the full article via the Internet. 52 RT 7929:2-12. Normally to get the entire article he would go to UCLA's Bio-Med Library. 52 RT 7929:12-14.

Directly following this testimony, the court excused the jury for lunch. 52 RT 7929:16-17.

Cross-examination of Dr. Plotkin continued in the afternoon. 52 RT 7934:26. He testified that he did not agree with prosecution expert Dr. Scott Phillips' testimony that phentermine does not induce serotonin. 52 RT 8004:9-26. Plotkin said that he found a volume of literature using the PubMed search engine that supports the finding that Phentermine raises serotonin levels and acts as a monoamine oxidase inhibitor. Id. He indicated he found a report involving tests on rats that identified the particular monoamine oxidase inhibitor. 52 RT 8007:12-17. The prosecution attacked Plotkin for relying on an abstract of an article as opposed to the entire article. 52 RT 8007:18-8008:5. Then Judge Wiatt interrupted and the following exchange took place:

The Court:   Wait, wait. Please.

When you say you found a volume of articles, do you mean to say that you found volumes of abstracts of articles?

The Witness:    That's correct.

The Court:    And you haven't read any of the articles
themself; is that correct?

The Witness:   Right.  All from the same
search. The Court:   Did you do this on the
internet?

The Witness:    Yes.

The Court:   Didn't you see when you were online on
the internet that you can simply log on and order the
document by e-mail?

The Witness:    Well, I did this Saturday.

The Court:   Didn't you see that when you were online
that all you have do is log on and become a user and
you can order the articles online?  Did you see that?

The Witness:   I don't think you can log on on a
Saturday to become a user.  But it didn't phase me to
do that.  I had enough data, I felt, to make that opinion.
I should say that I would like to read the article, that
would be the ideal way of doing it, but it's not -- the
previous expert testified that he based his opinion on a
PubMed search and not reading articles which explained
it.

52  RT  8008:13-8009:11.

As Dr. Plotkin looked through his materials to find the abstract of the article at issue, Judge Wiatt pulled out a copy that he announced to the jury he had "downloaded on the Internet during the lunch hour." 52 RT 8011:1- 5.

### iii. Judge Wiatt's Internet Research was Improper and Showed His Bias in Favor of the Prosecution

Judge Wiatt improperly used the Internet to conduct his own investigation into facts not in evidence before the court. His independent Internet research violated the California Code of Judicial Ethics that prohibits the trial judge from "independently investigat[ing] facts in a case." Advisory Com. Com., Cal. Code of Jud. Ethics, Canon 3B(7). A trial judge "must consider only the evidence presented, unless otherwise authorized by law." Id. See also People v. Jackson (1990) 218 Cal.App.3d 1493, 1505 (impermissible for judge to visit property involved in a hearing without the presence of the parties and counsel); People v. Handcock (1983) 145 Cal.App.3d Supp. 25, 32 (judge's independent investigation of accident and calling of own witness was prejudicial error); People v. Andrews (1970) 14 Cal.App.3d 40, 44, 92 (judge's reference to prosecution witness's lie detector test not yet in evidence was prejudicial error).

144

Judge Wiatt took on the role of prosecutor when he
conducted independent research into facts at issue but not yet in
evidence before the court and the jury.

First, the judge searched and discovered background
information about defense expert Dr. Ney that the prosecution had
not brought to the court's attention. He used this information to
cross examine Dr. Ney on areas meant to discredit Dr. Ney or
show bias. 41 RT 5846:3-5848:13-25. His inclination to call the
documents a People's exhibit, as opposed to a court exhibit,
demonstrated his alignment with the prosecution. Exh. 78.

Second, after hearing testimony from defense expert Dr.
Plotkin about his research using the search engine PubMed, Judge
Wiatt performed his own PubMed search during the lunch hour. 52
RT 8011:4-5. He then used his search results to disparage Dr.
Plotkin in front of the jury. 52 RT 8008:13-8009:11.

The defendant raised the impropriety of the judge's
independent research in her motion for a new trial. 22 RCT 5535-
5588 (motion denied in its entirety, 65 RT 10348). With respect to
the judge's research during Dr. Plotkin's testimony, the motion
pointed out that "Certainly the District Attorney had every
opportunity to conduct the same research as the court, and there is
no justification for the court to conduct its own independent
research, and then to provide the fruits of that research to the

145

District Attorney to aid in the prosecution of the case." 22 RCT 5577-5578.

By conducting his own Internet research, Judge Wiatt compromised the adversarial process. His actions were no different from the judge who improperly visited the scene of an incident without the presence of parties. Jackson, 218 Cal.App.3d at 1505. "Unilateral investigation by a trial court, although consistent with the role of an advocate, appears contrary to the primary responsibilities of a neutral judicial officer, and once started, invites abuse." Handcock, 145 Cal.App.3d Supp. at 32. See also Du Pont de Nemours v. Collins (1977) 432 U.S. 46, 56 (Court of Appeals erred because it employed a university professor to assist the court in understanding the record and to prepare reports and memoranda for the court "which had not been examined and tested by the traditional methods of the adversary process").

The areas that Judge Wiatt independently investigated were for the benefit of the prosecution. He conducted his own credibility determination of defense expert witnesses, and then provided his research as ammunition to the prosecution. He inserted himself into the role of prosecutor, and therefore showed his bias against Sandi Nieves. In the case of Dr. Plotkin's testimony, Judge Wiatt improperly aligned himself with the prosecution in front of the jury. People v. Robinson (1960) 179 Cal.App.2d 624, 633-637. The Supreme Court has held that "[f]air trials are too important a part of

146

our free society to let prosecuting judges be trial judges of the charges they prefer." In re Murchison (1955) 349 U.S. 133, 137. As a result of Judge Wiatt's improper unilateral Internet research, Sandi Nieves was denied a "fair trial in a fair tribunal" which is "a basic requirement of due process." Id. at 136.

Further, while the judge's biased behavior obviates the need for a prejudice inquiry, in this instance, given that the defense expert testimony went to the very heart of the defense, the judge's improper assault on the credibility of that testimony can not be considered harmless beyond a reasonable doubt. Chapman v. California, supra, 386 U.S. at 24.

d.    **The Court Refused to Accommodate the Scheduling of Defense Witnesses, but Freely Accommodated and Allowed Prosecution Experts to Testify During the Defense Case**

Judge Wiatt was biased and unfair in his treatment of the scheduling of prosecution and defense witnesses. He broke up the defense case by allowing prosecution witnesses to testify out of order. He was disparaging and unaccommodating with respect to the scheduling of defense witnesses.

Del Winter was the defense arson expert. Defense counsel asked to schedule him out of order because he was going to leave for Minnesota for three months. 20 RT 2199:17-2202:5. Judge Wiatt responded, "look, you're the one that wants to call him as a

147

witness. You have to make arrangements to have him available as a
witness. It's not the court's obligation. . . . Look, his vacation
schedule is not of great concern to me, nor should it be to you."
Id. at 2201:6-9, 26-27. Winter did not testify until the prosecution
case was complete. 28 RT 3659:1 (People rest); 28 RT 3756:9-18
(Winter); 29 RT 3808:8-10.

Later, after the court ordered a two week continuance in the
middle of the trial to allow the prosecution to analyze the defense
experts' reports, the defense was caught off guard in scheduling one
of its prime neurology experts, Dr. Michael Gold. The prosecution
and the court insisted on examining Dr. Gold first in an Evidence
Code § 402 hearing outside the presence of the jury. See Part VIII
infra. When that hearing ended, one of defendant's attorneys asked
for an accommodation for Dr. Gold due to the fact that he was
scheduled to go on a short vacation in Europe the following week,
when he was likely to be needed as a witness. The court denied the
accommodation with the comment: "the convenience of witnesses
is not good cause to continue. The request to continue is denied."
31 RT 4230:12- 4233:4. Id. at 4233:28-4234:8 ("he will have to
cancel his vacation. I am ordering that he be here."); id. at 31 RT
4285:5-4291:16 (court refuses to order conditional examination); id.

148

at 4331:27-4333:2 (defense raises issue of scheduling Dr. Gold again); id. at 4334:16-4335:13 (defense counsel asks to have Dr. Gold testify briefly out of order, court responds: "I am going [to] run the courtroom not you."); 31 RT 4443:1-4444:24 (renewed request for conditional examination of Dr. Gold denied); id. at 4446:1-9 (court insists that Dr. Gold appear); 38 RT 5272:13-5273:3 (court will not accept defense counsel's representation that Dr. Gold's trip was prepaid).

On Tuesday, June 27, 2000, Dr. Phillip Ney was questioned outside the presence of the jury in advance of his trial testimony pursuant to Evidence Code § 402. During this proceeding, the judge announced that Dr. Ney would have to be back in court on Thursday, June 29, 2000, because the court took an unscheduled recess on Wednesday, June 28, 2000. Defense counsel and Dr. Ney protested several times, explaining that the doctor had to attend to patients that day. They requested that he be permitted to return the next court day of the following week. 41 RT 5929- 5933:20. See id. at 5929:26-28 ("he can be here Thursday, because I can order him to be here. And if I order him to be here, he will be here."); id. at 5996:18-5997:17 ("I am ordering Dr. Ney to be in this courtroom this

Thursday at 10 a.m.").[60] Dr. Ney came back on Thursday, but the prosecution did not finish cross-examining him prosecution did not finish cross-examining him. Defense counsel again raised the issue of scheduling regarding Dr. Ney's patients (6142:17- 6145:28), but at the end of the day the judge announced that they would reconvene on July 5 (42 RT 6186:6-13, 6205:14-6206:13).

The judge gave the defense the choice of foregoing re-direct or bringing Dr. Ney back on the fifth despite Dr. Ney's scheduling problems. Id. at 6207:8-6209:20. Dr. Ney asked to speak. He asked if he could come at 11:30 a.m. in order to be able to fly in from Victoria the same day, saying he had "very, very ill patients." Id. at 6211:8-12. Judge Wiatt threatened him with an arrest warrant and threatened the defense with an adverse instruction in the event that Dr. Ney failed to return on time. Id. at 6212:6- 6213:10. Dr. Ney was ordered to return at 10:00 a.m. on July 5. Id. at 6214:6. When the

---

[60] The reporter's transcript for volume 41 shows Tuesday as June 27, 2000, and shows that the court adjourned until Thursday, June 28, 2000. 41 RT 6000:3-5. Wednesday was June 28, 2000, and Thursday was June 29, 2000. Volume 42 shows a date of June 27, 2000. It actually covers Thursday, June 29, 2000. The date printed on the transcript is erroneous. There was no court session on Wednesday, June 28, 2000. See 19 RCT 4669-70, 4685-86.

prosecution failed to finish with its recross-examination on the fifth, Dr. Ney was told to come back the next day. He protested: "your honor, I have a patient that almost died." Judge Wiatt's response was to say: "whatever that means." 43 RT 6425:26-6426:1. The record shows a brief recess and then the defense rested, allowing Dr. Ney to return to Victoria and his patients, without the testimony it had anticipated. 43 RT 6427:2-28.[61]

---

[61] Even when defense counsel was sick for a day with the stomach flu, Judge Wiatt had no sympathy: "Well, my view is unless it's a life threatening illness, an attorney representing somebody in a capital murder case should be present for the trial." 36 RT 4941:4-7. See id. at 4941:8-14.

> [The Court:] "I am ordering Mr. Waco to be here at 1:30.
>
> [Supervising Deputy Public Defender] Mr. Lessem: Well, your honor, I am going to -- as Mr. Waco's supervisor, I would tell the court if he can be here, he can be here. You can't order a man who is ill if he can't be here. He will make an endeavor.

Id. at 4945:28-4926:5. Later the judge ordered Mr. Waco back the next day. The judge said that would appoint a medical expert to have him examined if he did not return. Id. at 4954:24-28.

(Judge Wiatt called in sick and did not appear in court on Tuesday, June 6, 2000. 31 RT 4841:7.)

151

There was one exception when the judge took a defense witness out of order. The judge allowed the defense to call immediately after she testified for the prosecution one of the owners of the burned home Sandi Nieves rented, Clare Csernay, because her husband would be unavailable for two weeks due to vacation and a serious medical problem. Since Mrs. Csernay had, in any event, already testified as a prosecution witness at that point, this was not much of an accommodation to the defense. 20 RT 2306:1-3; 20 RT 2338:5-2341:9.

The Attorney General may argue that these scheduling conflicts were within the court's discretion. However, the treatment of the prosecution witnesses was much different, demonstrating that this was not discretion. It was an expression of bias.

Over a defense objection, the court allowed the prosecution to call David Nieves, defendant's son, out of order, breaking up the defense cross examination of Althea Volk. Id. at 2380:4-2383:9.

Over defense objection, the judge allowed the prosecution to call Dr. Robert Brook, a prosecution psychologist, as a rebuttal witness, in middle of the defense case. The prosecution's reason for calling Dr. Brook in the middle of the defense case – he had a prepaid vacation planned. 37 RT 5108:14-5111:7. See 38 RT 5364:5-20, 5369:12 (prosecution calls Dr. Brook out of order).

Similarly, over a defense objection, the judge allowed Dr. Robert Chang, a physician who treated Sandi Nieves following the fire, to testify out of order because "he's not being compensated." 43 RT 6310:18.  See 43 RT  6309:8-6311:19, 631319-6314:24, 6315:15.  Dr. Chang broke up Dr. Ney's testimony, added to Dr. Ney's time in the courthouse, and forced him to come back for an additional day so that the prosecution could continue its recross-examination.  Id. at 6425:24-6426:20.  Scheduling of prosecution and defense witnesses was not a "two way street" as required by the Fourth Amendment.  See Wardius v. Oregon (1973) 412 U.S. 470, 476.

e.    **The Court Aggressively Enforced Discovery Obligations Against the Defendant, But Relaxed and Ignored Disclosure Obligations of Prosecution Witnesses**

i.    **Disparities in Producing Discovery**

Judge Wiatt was aggressive in requiring the defense to meet its reciprocal discovery obligations under Penal Code §§ 1054.3 and 1054.7. The judge cited defense counsel for contempt for failing to meet discovery deadlines. 31 RT 4163:8-10.  The judge also gave a jury instruction, CALJIC 2.28, in both the guilt and penalty phases telling the jury the defendant had failed to meet her discovery obligations and that "the weight and significance of any concealment

and delayed disclosure are matters for your consideration. " In Parts XIII and XXIV of this argument we challenge the court's substantive rulings and show that the court's conduct was prejudicial under California law and the United States Constitution. We incorporate that argument here by reference.

But the judge's failure to make the same discovery obligations a "two-way street" was also something more. It was part of the overall unfair trial given to Sandi Nieves.

For example, the judge denied a defense motion for mistrial or to strike the testimony of Dr. Ribe, from the coroner's office, even though materials were not disclosed in advance of his testimony in discovery.[62]

When defense counsel challenged the failure of the prosecution to produce the results of gas chromatograph readout results that witness Phil Teramoto used as a basis for his testimony, the judge responded, "So what?" 28 RT 3656:14-3658:22.

---

[62] Following testimony of the coroner, Dr. Ribe, the defense moved for a mistrial or, in the alternative, to strike Dr. Ribe's testimony on the ground that the prosecution had not disclosed a tape recording of Dr. Ribe's statements or another doctor's report that Dr. Ribe relied on. 19 RT 1991:22-1993:20, 1995:26-1996:4. Judge Wiatt denied both motions. 19 RT 1995:26-1996:4.

When defense counsel asked to see the notes that Dr. Robert
Brook prepared the day before his testimony, Judge Wiatt denied the
request as "untimely." 38 RT 5436:17-25.

The judge denied the defense the opportunity to review, the
prosecution's arson expert, Dr. Dehaan's notes. 44 RT 6444:24-6445:17,
6452:20-6453:20.

Again, the defendant was given disparate treatment.

## ii. <u>Disparities in Requiring Transcriptions of Notes</u>

The prosecutors claimed they could not read the file notes of Drs.
Lorie Humphrey, Phillip Ney, Gordon Plotkin, and Nancy Kaser-
Boyd. 29 RT 3911:28-3912:2, 3937:17-3939:23, 3939:28-3941:15; 48
RT 7362:28-7367:12; 49 RT 7442:7-7444:11. Judge Wiatt ordered
them to prepare new, typewritten versions of their notes for the
prosecution or to read their notes to a court reporter for
transcription. 29 RT 3937:17-3939:23, 3959:12- 3961:16; 31 RT
4142:1-4, 4144:28-4145:4. See also 48 RT 7371:7-11; 49 RT 7442:7-
7444:11; 7811:23-7812:6  (defense witness, Dr. Gordon Plotkin). [63]

---

[63] Defense counsel objected to the prosecutors' request that the experts
transcribe their notes because the discovery statutes do not require experts to
prepare new versions of notes they have generated in connection with the
case. 29 RT 3915:28-3916:17. The defense nonetheless offered to have its
experts assist with any words or phrases the prosecutors could not read. <u>Id.</u>

155

As he granted a two week continuance at 63 the request of the prosecution, he told the jurors the defense experts' notes were "indecipherable to a great degree. . . ." 30 RT 4112:23-4113:10. Id. at 4112:28-4113:5.

The judge even gave the jury an instruction at the end of the guilt phase of the trial, telling the jurors that the defense had failed to produce "[r]eadable notes," among other things. 30 RT 4113:28-4114:16. In Part XIII of this argument we challenge the court's substantive rulings requiring the defense to transcribe the experts' raw notes. We will show that the court's conduct and instructions were prejudicial under California and federal law. We incorporate that argument here by reference. But the judge's ruling was something more: it was completely one-sided.

When the defense later requested transcriptions of a prosecution expert's notes (35 RT 4849:1-4850:7, 36 RT 4947:23-27, 4952:7-13), Judge Wiatt denied the request because "[t]here is not a need to have a transcription of notes" (Id. at 4953:8-10). 44 RT 6444; see 39 RT 5587:21- 25 (court again refuses to order transcription of Dr. Brook's notes). See also 44 RT 6444:7-6452:26 (court refuses to order transcription of prosecution expert Dr. John Dehaan's notes).

f.    **The Court Provided the Prosecution with Funding for Its Experts, While the Defense was Limited to Penal Code 987.9 Restrictions**

All the defense experts were funded in accordance with procedures required by Penal Code § 987.9. Although the trial was held in the North Valley District of the Los Angeles County Superior Court located in San Fernando, defense attorneys were required to go downtown to the Central District in Los Angeles and make their case for expert funding. For example, defendant attempted to use a psychologist with expertise in trauma and the Mormon religion to assist the defense. This psychologist was located in Northern California. The psychologist was initially appointed by Judge Larry Fidler at the rate of $150 per hour not to exceed $5,250.00. Supplemental CT II (confidential) 55, 93. When counsel returned to Judge Fidler asking for an additional $22,100, the judge held a hearing and stated on the record that he found the supplemental request "exhorbitant" and "outrageous." The judge said that he would probably never appoint an out of county expert again. Id. at 120-121. Judge Fidler extensively questioned defense counsel and required that the defense provide specific information exactly as to the scope of work and the justification. Id. at 118-137 (Oct. 18, 1998 RT (987.9 hearing))

The defense was required to make applications and submit information through the county's formal Penal Code § 987.9 process. The defense had the burden of actually demonstrating the need for particular experts and the need for particular funds. People v. Guerra (2006) 37 Cal.4th 1067, 1085; People v. Beardslee (1991) 53 Cal.3d 68, 100; Corenevsky v. Superior Court (1984) 36 Cal.3d 307.

As far as the record on appeal shows, [64] Judge Wiatt, the trial judge, appointed most prosecution experts without any hearings at all. [65] The submissions by the prosecution were minimal at best. Some experts were appointed at high hourly rates up to $500 per hour. And some were appointed at court expense from

---

[64] See Supp. III RCT 337.

[65] Appellant sought a settled statement from the Superior Court to clarify the process by which the prosecution obtained the appointment of their experts, but the Superior Court denied the motion in post trial record correction proceedings. June 7, 2007 RT. On June 25, 2008, the California Supreme Court denied appellant's Motion for an Order requiring additional Superior Court proceedings pertaining to the funding of prosecution experts.

Pennsylvania, Colorado, and Toronto without even submitting curriculum vitae for the court's review. It appears from the record the trial judge was automatically approving the prosecution's requests for appointment and funding of its experts, while the defense had to go through the more stringent Penal Code § 987.9 procedures. [66] See 10 RCT 2337 (appointment of Dr. Barry Hirsch at $100 per hour; half page application without showing qualifications); 11 RCT 2533-2335 (appointment of Dr. Roger Bertoli at $250 per hour; half page application without showing qualifications); 11 RCT 2557-2559 (appointment of Dr. Edwin Amos at $350 per hour; half page

--------

[66] The record as certified by the trial court contains one transcript of an ex parte in camera conference about the appointment and compensation of prosecution expert Robert Sadoff, M.D. May 22, 2000 RT 2926-2932 (approving hourly rate of $500.00 per hour). It also contains one transcript of an ex parte in camera conference in which the trial judge substantially increased the hourly rate for prosecution expert Robert Brook, M.D. June 23, 2000 RT 5498:3-5499:13.

application without showing qualifications); 11 RCT 2562 (appointment

of Serological Research Institute, Richmond, California at $180 per

hour; no application or other showing of necessity or qualifications); 11

RCT 2563-2564 (appointment of John DeHaan, Ph.D. at $200 per

hour; half page application without showing qualifications); 11 RCT

2585-2586 (appointment of Catherine Koverola, Ph.D. at $150 per

hour; no application or other showing of necessity or qualifications); 18

RCT 4471-4473 (appointment of Dr. Robert Sadoff, Jenkintown,

Pennsylvania at $500 per hour); 18 RCT 4527-4528(appointment of Dr.

Alex Caldwell at $450 per hour; half page

---

[66] The record as certified by the trial court contains one transcript of an ex parte in camera conference about the appointment and compensation of prosecution expert Robert Sadoff, M.D. May 22, 2000 RT 2926-2932 (approving hourly rate of $500.00 per hour). It also contains one transcript of an ex parte in camera conference in which the trial judge substantially increased the hourly rate for prosecution expert Robert Brook, M.D. June 23, 2000 RT 5498:3-5499:13.

The record does not contain any other transcripts or written records of any hearings, conferences or communications regarding the appointment and/or compensation of Dr. Sadoff, Dr. Brook or any of the nine other prosecution experts appointed by the court, including the six other prosecution experts who testified at trial.

application without showing qualifications); 18 RCT 4548-4550

(appointment of Dr. Helen Mayberg, Toronto, Canada, at $300 per

hour; half page application without showing qualifications)[67]; 18 RCT

4598-4600 (amended appointment of Dr. Barry Hirsch at $200 per

hour; half page application without showing qualifications);[68] 19

---

[67] During cross examination of Dr. Mayberg, defense counsel attempted to make the point that she could be paid as much as $10,000.00. Without objection from the prosecution, Judge Wiatt sarcastically responded:

> [Mr. Waco] Q And that's up to $10,000 in this case?
> The Court:   Mr. Waco, it's not necessary, especially --
> I am the one that signs the order. I am the one that's going to sign the bill.
> Mr. Waco:  I would like the record to reflect what the price tag is on this witness.
> The Court:  Well, how about the price tag on all your witnesses? Are we going to get into that?

32 RT 4363:16-23.

[68]   The half page declaration in support of Dr. Hirsch's second appointment is dated the day after Judge Wiatt signed the order of appointment.  Compare 18 RCT 4598, with 18 RCT 4600. Further, the declaration in support of the appointment said that "The amount of work expected to be performed by Dr. Hirsch will be massive as he will not only testify, but will act as liaison between all experts and the prosecution.  He is also responsible for the distribution of all discovery to the experts."  Id. at 4600.

Compare the treatment of defense counsel when they attempted to obtain additional funding for their psychologist.  Oct. 18, 1998 RT (987.9 hearing) 118-137("exhorbitant" and "outrageous").

RT 4784-4786 (appointment of Dr. Scott Phillips, Denver, Colorado at $300 per hour; half page application without showing qualifications); 21 RCT 5384-5385 (amended appointment of Dr. Edwin Amos at $350 per hour; half page application without showing qualifications); 21 RCT 5387-5389 (amended appointment of Dr. Robert Brook at $200 per hour).  In fact, during an ex parte hearing midway through the trial that was sealed and not available to the defense, Judge Wiatt sua sponte raised the "previously imposed limits on [all] the experts for the prosecution in this case." 39 RT 5498:11-19 (previously sealed) ("I think it's fairly clear that due to the history in this case, that more time would be needed, other than that that was previously authorized.").

For all that is shown by this record, the judge was working hand and hand with the prosecutors appointing whatever experts they requested pursuant to Evidence Code §§ 730, 731 – all at court expense. See 38 RT 5439:13-17 (prosecution expert Robert Brook testifies that he is being paid by the court); 47 RT 7103:25-27 (trial judge states that "All experts in this case are being paid by the

162

court"); 56 RT 8791:12-8792:3 (prosecutor states that prosecution expert Scott Phillips was "paid by the court").[69]

At trial, the defense objected to this imbalance. 39 RT 5578:11-5579:11. Noting that the District Attorney already had a fund for payment of experts, defense counsel objected that the court was giving the prosecution "carte blanche" to appoint experts and have them paid for by the court because "then the court becomes an agent" of the prosecution. Id. at 5579:6-7. For example, at one point, Ms. Silverman characterized Dr. Robert Brook in the course of a question on direct examination "as a professional appointed for the court to present both sides." 38 RT 5423:18-21.[70] The judge dismissed counsel's objections as "the stupidest thing I've ever heard in a courtroom." 39 RT 5578:22-23; see also

---

[69] For reasons that are not apparent on the record, Judge Wiatt requested to see the Pen. Code § 987.9 file, which was supposed to be confidential. People v. Anderson (1987) 43 Cal.3d 1104, 1131-1133. See 2 Supplemental II RCT (Confidential) 503 ("Judge O'Neill: I got a call from Kim, Judge J. Wiatt's clerk of San Fernando, Dept. J. He wants 987.9 file on Sandi Nieves by tomorrow. I also got a call from John Brock. The issue is on Dr. Ney. He wants a hearing if you would allow the file to be sent to San Fernando.").

[70] "Q And would that be something that in your profession, as a professional appointed for the court to present both sides and not skew data one way or the other, that you would address in such a report?" 38 RT 5423:18-21.

5579:8-9 ("Mr. Waco, that's absurd. I'm not going to consider that at all. That's ridiculous.").

When the case was over and the jury had returned its death verdict a juror asked Judge Wiatt: "Do the defense and prosecution get the same amount of money–." The judge answered, "Yes." 65 RT 10224:28- 10225:2.

But the actual disparity of treatment in funding in favor of prosecution experts was not the 'two-way street," required by the United States Constitution. Aiding the prosecution, without requiring any showing comparable to Penal Code § 987.9 procedures, violated Sandi Nieves's Sixth Amendment right to a fair trial, her right to due process guaranteed by the Fourteenth Amendment to the United States Constitution, and the equal protection of the law, guaranteed by the Fourteenth Amendment. Wardius v. Oregon (1973) 412 U.S. 470, 476. "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." Griffin v. Illinois (1956) 351 U.S. 12, 19.

Similarly, there can be no equal justice when the trial judge aids the prosecution in funding its experts without requiring the same showing demanded of the defendant. Discrimination in the administration of justice is constitutionally impermissible. This is "a country dedicated to affording equal justice to all and special privileges to none in the administration of its criminal law." Griffin, 351 U.S. at 19.

164

6.    **The Trial Judge's ex Parte Communication with the Prosecution**

On June 20, 2000, during the on-going guilt phase, defense counsel was absent due to illness. 36 RT 4958:7. The Minute Order for June 20, 2000, states that the court held "a chambers conference with the People on the issue of discovery." 18 RCT 4646. The transcript of the conference was ordered sealed and prepared under separate cover. 36 RT 5016:6-7.

The sealed transcript reveals that the court met with the two district attorneys and two of the prosecution experts, Dr. Hirsch and Dr. Brook, in chambers without the defense, about a number of issues including discovery, witness order, the highly-contested topic of a PET [Positron Emission Tomography] scan, and the character and integrity of one of the defense experts, Dr. Kaser-Boyd. 36 RT 5017-5026. A subsequent previously sealed transcript shows a follow-up meeting on June 23, 2000. 39 RT 5497-5500.

The trial court's ex parte communications with the prosecution were improper. Among other things, deputy district attorney Silverman told Judge Wiatt that the defense expert, Dr. Kaser-Boyd "attempted apparently to be untruthful to a court in this county." 36 RT 5020:26-28. Further, the court gave the district

165

attorney legal advice. Id. At 5022:17-25 ("You may want to look at the case of People versus Tillis, 18 Cal.4th 284. I don't know if you are aware of that.").[71]

### a. The Trial Court Exploited Defense Counsel's Absence Due to Illness to Conduct an Ex Parte Chambers Conference with the Prosecution and Its Experts

On the day of defense counsel's absence due to illness, the trial court granted the prosecution's request for a "chambers conference regarding the discovery." 36 RT 5017:21-23. The prosecution brought three items to the attention of the court. First, the prosecution sought guidance on how it should proceed with information in its possession relevant for impeachment of defense expert Dr. Nancy Kaser-Boyd. 36 RT 5018:15-5019:20.

Second, the prosecution requested that it be allowed to call witnesses out of order, in the middle of the defense case. 36 RT 5023:15-19. Third, the prosecution asked about sealing its motion for a gag order regarding the PET scan administered to Sandi Nieves, an issue of significant contention between the parties in the case. 36 RT 5024:18-5025:7.

---

[71] In People v. Tillis (1998) 18 Cal. 4th 284, the California Supreme Court held that the prosecution had not violated discovery rules by failing to disclose evidence concerning an arrest and other unlawful conduct of

the expert witness used for impeachment purposes.

5023:15-19. Third, the prosecution asked about sealing its motion for a gag order regarding the PET scan administered to Sandi Nieves, an issue of significant contention between the parties in the case. 36 RT 5024:18-5025:7.

The first item on the prosecution's agenda for the ex parte meeting was the discovery issue. Ms. Silverman announced to Judge Wiatt she had received information from another district attorney that Dr. Kaser-Boyd had testified untruthfully in a previous case. 36 RT 5018:15-5020:28. Ms. Silverman alleged that Dr. Kaser-Boyd had testified that she received approval from a nationally renowned MMPI expert, Dr. James Butcher, to alter the instructions on the MMPI before administering it to the defendant in the prior case. 36 RT 5018:22-5019:1. Dr. Hirsch, who was also the opposing expert in the prior case, explained to Judge Wiatt that he had personally discussed the situation with Dr. Butcher. 36 RT 5020:13-15. Dr. Butcher supplied Hirsch with a copy of an email from Dr. Kaser-Boyd in which she purportedly sought approval for what she had done after she already had given her testimony. 36 RT 5020:7-18.

The prosecution stated that the material the defense turned over in discovery in Sandi Nieves's case indicated that Dr. Kaser-Boyd altered the instructions on the MMPI in the same manner. 36 RT 5020:19-24. Ms. Silverman said, "I have concerns about disclosing the information to

167